## United States Court of International Trade
## Before the Honorable M. Miller Baker, Judge

| | |
|---|---|
| Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Jiangsu Zhongji Lamination Materials Stock Co., Ltd., Jiangsu Zhongji Lamination Materials Co., Ltd., Jiangsu Huafeng Aluminum Industry Co., Ltd.,<br><br>        Plaintiffs,<br><br>        v.<br><br>United States,<br><br>        Defendant,<br><br>Aluminum Association Trade Enforcement Working Group and its Individual Members, et al.,<br><br>        Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  **Ct. No. 21-00138**<br>)  **Nonconfidential Version**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Memorandum of Points and Authorities in Support of Rule 56.2 Motion for Judgment Upon the Agency Record of Plaintiffs Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Jiangsu Zhongji Lamination Materials Co., Ltd., Jiangsu Zhongji Lamination Materials Stock Co., Ltd. And Jiangsu Huafeng Aluminum Industry Co., Ltd.**

Jeffrey S. Grimson
Sarah M. Wyss
Bryan P. Cenko
Wenhui "Flora" Ji
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

September 9, 2021

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................... i

TABLE OF AUTHORITIES ............................................................ iii

GLOSSARY OF TERMS ................................................................ vii

ADMINISTRATIVE DETERMINATION UNDER REVIEW ............ 1

ISSUES PRESENTED ........................................................................ 2

I.    Whether Commerce's selection of its surrogate values to value
Zhongji's aluminum ash, rolling oil, rolling oil additive and
international freight was supported by substantial evidence and
otherwise in accordance with law. .......................................................... 2

II.   Whether Commerce's denial of Zhongji's double remedies
adjustment was supported by substantial evidence and otherwise in
accordance with law. .............................................................................. 3

III.  Whether Commerce's decision not to modify its liquidation
instructions to capture Zhongji's re-invoiced sales was unsupported by
substantial evidence or otherwise not in accordance with law ............. 3

STATEMENT OF FACTS ................................................................... 4

SUMMARY OF ARGUMENT ............................................................ 13

STANDARD OF REVIEW ................................................................. 16

ARGUMENT ...................................................................................... 17

I.    Commerce's Selection of its SVs to Value Zhongji's Aluminum
Ash, Rolling Oil, Rolling Oil Additive and International Freight Was
Unsupported By Substantial Evidence and Otherwise Not in
Accordance with Law .............................................................................. 18

    A.    Commerce Unlawfully Selected an Overly Broad Code that
    Contains No Data Specific to the Aluminum Ash Used by Zhongji . 21

    B.    Commerce Unlawfully Ignored Record Evidence and Failed to
    Provide a Reasoned Explanation When Selecting its SV to Value
    Rolling Oil and Rolling Oil Additive ................................................. 27

    C.     International Freight ................................................ 31

II.    Commerce's Decision to Not Grant Zhongji a Double Remedies Adjustment was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law ................................................ 40

    A.    Zhongji Received Countervailable Subsidies Relating to its Purchases of Several Inputs ................................................ 44

    B.    The Record Shows that Average Import Prices Declined During the Period of Review ................................................ 47

    C.    Commerce Can Reasonably Estimate the Extent to Which Zhongji's Dumping Margin Has Increased ................................................ 63

III.   Commerce's Refusal to Capture Zhongji's Re-Invoiced Sales in its Liquidation Instructions Was Unsupported by Substantial Evidence and Otherwise not in Accordance with Law ................................................ 66

**CONCLUSION** ................................................ 74

# TABLE OF AUTHORITIES

## Cases

*Association of Am. School Paper Suppliers v. United States*, 34 CIT 919, 716 F. Supp. 2d 1329 (2010) ............................................................... 19

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ............................................................................................. 65

*C.J. Tower & Sons v. United States*, 21 C.C.P.A. 417, 71 F.2d 438 (1934) ............................................................................................................. 70

*Changzhou Trina Solar Energy Co. v. United States*, __ CIT __, 492 F. Supp. 3d 1322 (2021) ................................................................. 39

*Changzhou Trina Solar Energy Co. v. United States*, No. 18-00176, 2021 Ct. Intl. Trade LEXIS 99 (Aug. 10, 2021) ...................................... 38, 39

*Chaparral Steel Co. v. United States*, 901 F.2d 1097 (Fed. Cir. 1990) .. 70

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) ......................... 16

*CP Kelco U.S. Inc. v. United States*, 949 F.3d 1348 (Fed. Cir. 2020) ..... 65

*Dorbest Ltd. v. United States*, 30 CIT 1671, 462 F. Supp. 2d 1262 (2006) ..................................................................................................... passim

*Goldlink Indus. Co. v. United States*, 30 CIT 616, 431 F. Supp. 2d 1323 (2006) ............................................................................................. 19

*Huayin Foreign Trade Corp. v. United States*, 322 F.3d 1369 (Fed. Cir. 2003) ............................................................................................... 16

*Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, __, CIT __, 28 F. Supp. 3d 1317 (2014) ........................................................ 22, 23

*Jiangsu Zhongji Lamination Materials Co. v. United States*, __ CIT __, 96 F. Supp. 3d 1134 (2019) ............................................................ 35, 36

*Linyi City Kangfa Foodstuff Drinkable Co. v. United States*, No. 15-00184, 2016 Ct. Intl. Trade LEXIS 89 (Sept. 21, 2016) ...................... 29

*Longkou Haimeng Mach. Co. v. United States,* 33 CIT 603, 617 F. Supp. 2d 1363 (2009) .................................................................................. 20

*Melamine Chems., Inc. v. United States*, 732 F.2d 924 (Fed. Cir. 1984) ........................................................................................................ 71, 73

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............................................................................... 17

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ... 17, 31, 58, 66

*NMB Singapore Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) . 17

*NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995) .... 70, 72, 73

*Polyethylene Retail Carrier Bag Comm. v. United States*, 29 CIT 1418 (2005) .................................................................................... 22

Seah *Steel Vina Corp. v. United States*, 950 F.3d 833 (Fed. Cir. 2020) . 18

*Shinyei Corp. of Am. v. United States*, 355 F.3d 1297 (Fed. Cir. 2004) . 71

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ............ 17

*SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020) ................................................................................................. 18

*Swiff-Train Co. v. United States*, 793 F.3d 1355 (Fed. Cir. 2015) ......... 16

*Thai Plastic Bags Indus. Co., Ltd. v. United States*, __ CIT __, 949 F. Supp. 2d 1298 (2013) ............................................................ 55

*Transactive Corp.* ............................................................................... 62

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996) .......... 55

*U.S. Steel Corp. v. United States*, __ CIT __, 953 F. Supp. 2d 1332 (2013) ................................................................................................. 17

*U.S. Steel Group v. United States*, 25 CIT 1293, 177 F. Supp. 2d 1325 (2001) .................................................................................... 70

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ........................ 17

*Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353 (Fed. Cir. 2019) ......................................................................... 19, 33

*Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011) ......................................................................... 19, 40

## Statutes

19 U.S.C. § 1516a ............................................................................... 16

19 U.S.C. § 1677b ......................................................................... 18, 19

19 U.S.C. § 1677f .......................................................................... passim

19 U.S.C. § 1677m ............................................................................. 62

## Other Authorities

*Certain Aluminum Foil From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review*; 2017–2019, 86 Fed. Reg. 17,358 (Dep't of Commerce Apr. 2, 2021)..........1, 13

*Certain Aluminum Foil From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; 2017-2019*, 86 Fed. Reg. 11,499 (Dep't of Commerce Feb. 25, 2021) ....................................................... 1, 10, 73

*Certain Aluminum Foil From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Partial Rescission; 2017-2019*, 85 Fed. Reg. 37,829 (Dep't of Commerce June 24, 2020)....4

*Certain Aluminum Foil From the People's Republic of China: Preliminary Results of the Countervailing Duty Administrative Review and Rescission of Review, in Part; 2017-2018*, 85 Fed. Reg. 38,861 (Dep't of Commerce June 29, 2020) ....................................................46

*Certain Corrosion Inhibitors From the People's Republic of China: Final* ....................................................................................................53

*Certain Fabricated Structural Steel From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5,376 (Dep't of Commerce Jan. 30, 2020) ............42

*Certain Glass Containers From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141 (Dep't Commerce May 22, 2020) ........................................................37

*Certain Quartz Surface Products From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 84 Fed. Reg. 23,767 (Dep't of Commerce May 23, 2019)..........................42

*Initiation of AD and CVD Administrative Reviews*, 84 Fed. Reg. 27,587 (Dep't of Commerce June 13, 2019) ......................................................4

*Universal Camera*..............................................................................58, 66

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 Fed. Reg. 54,106 (Dep't of Commerce Oct. 9, 2019)........................................................................55

## Regulations

19 CFR § 351.102.......................................................................37

# GLOSSARY OF TERMS

Aluminum Dross/Ash……………………………………………Aluminum Ash

Aluminum Association Trade Enforcement
Working Group…………………………………………..Aluminum Association

Anhui Maximum Aluminum Industries Company……………...Maximum

Global Trade Atlas…………………………………………………GTA

Harmonized Tariff Schedule……………………………………….HTS

Issues and Decision Memorandum……………………………..I&D Mem.

Jiangsu Huafeng Aluminum Industry Co., Ltd……………………Huafeng

Jiangsu Zhongji Lamination Materials Co., (HK) Ltd.,
Jiangsu Zhongji Lamination Materials Co., Ltd.,
Jiangsu Zhongji Lamination Materials Stock Co., Ltd.
and Jiangsu Huafeng Aluminum Industry Co., Ltd……………..Zhongji

London Metal Exchange…………………………………………..LME

Preliminary………………………………………………………Prelim.

Questionnaire Response…………………………………………...QR

Xiamen Xiashun Aluminum Foil Co., Ltd……………..Xiamen Xiashun

Pursuant to Rule 56.2(c) of the Rules of the U.S. Court of International Trade, Plaintiffs Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Jiangsu Zhongji Lamination Materials Co., Ltd., Jiangsu Zhongji Lamination Materials Stock Co., Ltd. and Jiangsu Huafeng Aluminum Industry Co., Ltd. (collectively "Zhongji"), hereby move for judgment upon the agency record.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

Zhongji challenges certain aspects of the Final Results of the first administrative review of the antidumping duty order ("AD Order") on certain aluminum foil from the People's Republic of China conducted by the U.S. Department of Commerce ("Commerce"). *See Certain Aluminum Foil From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; 2017-2019*, 86 Fed. Reg. 11,499 (Dep't of Commerce Feb. 25, 2021) ("Final Results"), Appx03639-03641, and accompanying Issues and Dec. Mem. ("Final I&D Mem."), Appx02476-02494, as amended in *Certain Aluminum Foil From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review*; 2017–2019, 86 Fed. Reg. 17,358, 17,359 (Dep't of Commerce Apr. 2, 2021)

("Amended Final Results"), Appx04450-04452.  The review in question

covers entries of certain aluminum foil ("aluminum foil") during the

November 2, 2017 through March 31, 2019 period of review.

## ISSUES PRESENTED

I.   Whether Commerce's selection of its surrogate values to value
     Zhongji's aluminum ash, rolling oil, rolling oil additive and
     international freight was supported by substantial evidence and
     otherwise in accordance with law.[1]

Commerce's selection of its surrogate values ("SVs") for Zhongji's

aluminum ash, rolling oil, rolling oil additive and international freight

was unsupported by substantial evidence and otherwise not in

accordance with law because its selected SVs for these inputs did not

represent the best available information on the record where: 1)

Commerce selected an overly broad Harmonized Tariff Schedule

("HTS") code that was not specific to the aluminum ash used by Zhongji;

2) Commerce failed to provide a reasoned explanation for selecting data

to value Zhongji's rolling oil and rolling oil additive that were

inconsistent with record evidence submitted by Zhongji; and 3)

Commerce failed to provide a reasoned explanation for valuing Zhongji's

---

[1] Zhongji is combining Counts I through IV from its Complaint as one
issue in this brief.  *See* Compl. at 7-8 (Apr. 2, 2021), ECF No. 8.

international freight using Maersk data that represent mere price quotes as opposed to the Descartes, or, in the alternative, Xeneta datasets submitted by Zhongji.

II.   Whether Commerce's denial of Zhongji's double remedies adjustment was supported by substantial evidence and otherwise in accordance with law.

Commerce' determination to not grant Zhongji a double remedies adjustment was unsupported by substantial evidence and otherwise not in accordance with law because Zhongji established that 1) there is a link between the countervailable subsidies that Zhongji received through lower priced inputs and its cost of manufacturing ("COM") and 2) there is a link between Zhongji's COM and its selling price of aluminum foil.

III.  Whether Commerce's decision not to modify its liquidation instructions to capture Zhongji's re-invoiced sales was unsupported by substantial evidence or otherwise not in accordance with law

Commerce's decision not to modify its liquidation instructions to include the phrase "*resold or* imported" to capture Zhongji's sales where its merchandise was subsequently re-invoiced prior to importation into the United States was unsupported by substantial evidence and otherwise not in accordance with law because Commerce's customs

instructions, once issued, will lead to the inaccurate liquidation of certain entries of Zhongji's customers at a punitive dumping rate.

## STATEMENT OF FACTS

On June 13, 2019, Commerce initiated the first administrative review of aluminum foil from the People's Republic of China ("China") covering the period of review of November 2, 2017 through March 31, 2019. *See Initiation of AD and CVD Administrative Reviews*, 84 Fed. Reg. 27,587, 27,589 (Dep't of Commerce June 13, 2019), Appx25964, Appx27589. On August 14, 2019, Commerce selected two mandatory respondents: (1) Zhongji and (2) Xiamen Xiashun Aluminum Foil Co., Ltd. ("Xiamen Xiashun"). *See Certain Aluminum Foil From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Partial Rescission; 2017-2019*, 85 Fed. Reg. 37,829 (Dep't of Commerce June 24, 2020) ("Prelim. Results"), Appx02464-02466, and accompanying Issues and Dec. Mem. at 3 ("Prelim. I&D Mem."), Appx01002. Between September 12, 2019 and March 13, 2020, Zhongji timely submitted answers to Commerce's initial and supplemental questionnaires. *See* Prelim. I&D Mem. at 3 n.12, Appx01002. Between

November 2019 and May 2020, Zhongji submitted surrogate value and rebuttal surrogate value information for consideration by Commerce. *See generally id.* at 4, Appx01003. Zhongji submitted evidence that the aluminum dross/ash ("aluminum ash") produced as a by-product in its aluminum foil production process is most accurately classified under HTS 7602.00.19. *See generally* Final I&D Mem. at Cmt. 1, Appx02482-02483. Further, Zhongji provided significant evidence that the rolling oil and rolling oil additive it uses in its production of aluminum foil are most accurately classified under HTS 2710.12.21. *See generally id.* Finally, Zhongji submitted information from the Descartes and Xeneta databases to value international freight. *See* Prelim. I&D Mem. at 27, Appx01026; Final I&D Mem. at Cmt. 1, Appx02483.

On February 18, 2020, Zhongji responded to Commerce's double remedies questionnaire. *See* Final I&D Mem. at Cmt. 4 n.67, Appx02490. Zhongji set forth that its material inputs, i.e., foil stock, aluminum strip and aluminum ingot, are subsidized according to Commerce's countervailing duty ("CVD") determination, and that those subsidies lower Zhongji's COM. *See generally id.* at Cmt. 4, Appx02489-02490. Zhongji then explained that the price of all of its aluminum

materials – inputs purchased and foil sold – is directly related to the London Metal Exchange ("LME") ingot price. *Id.* In other words, the aluminum price is undoubtedly affected by the alleged subsides on the metal input cost. Zhongji then demonstrated that its aluminum foil prices declined during the period of review, thereby establishing a subsidy-to-cost link. *See generally id.*

On April 2, 2020, Zhongji submitted pre-preliminary comments requesting that Commerce modify its liquidation instructions to ensure that imports of subject merchandise exported by Zhongji are assessed at the proper dumping margins when calculated on a customer-specific basis where those customers re-sold the goods to another customer prior to importation. *See generally* Final I&D Mem. at Cmt. 3, Appx02488-02489. Zhongji explained that some of its customers re-invoiced sales prior to importation into the United States and, therefore, the importer of record may differ from the customer listed in Zhongji's sales database, from which Commerce constructs the importer-specific assessment rate instructions. *See id.* Zhongji noted that Customs and Border Protection ("CBP") may possibly liquidate such importations at the China-wide rate. *See id.* To avoid the inappropriate application of

the China-wide rate, Zhongji requested that Commerce insert the words *"resold or* imported" before the list of U.S. customers provided to CBP in its liquidation instructions. *See id.*

On June 24, 2020, Commerce published the Preliminary Results, calculating a dumping margin of zero percent for Zhongji. *See Prelim. Results*, 85 Fed. Reg. at 37,830, Appx02465. In the Preliminary Results, Commerce selected Bulgaria as its surrogate country for purposes of calculating normal value and made various surrogate value selections pursuant to that decision, including aluminum ash, rolling oil and rolling oil additive and international freight. *See* Prelim. I&D Mem. at 13, 27, Appx01012, Appx1026; *see also* Mem. from Michael J. Heaney and Chelsey Simonovich to the File re: SVs for the Preliminary Determination at 4,8 (June 18, 2020) (Public Document) ("SV Mem."), Appx01241, Appx01245. In addition, although stating that it was relying on the Descartes data to value international freight in its preliminary decision memorandum, Commerce instead selected an inferior surrogate value source, Maersk, to value Zhongji's international freight. *Compare* Prelim. I&D Mem. at 27, Appx1026 *with* SV Mem. at 8, Appx01245 (setting forth that Commerce valued international freight

using Maersk data and marine insurance using P.A.F. data).

Commerce noted that Zhongji and Xiamen Xiashun submitted

responses to its double remedies questionnaires but made no

determination on this issue. *See* Prelim. I&D Mem. at 3, Appx01002.

On August 3, 2020, Zhongji submitted a case brief for Commerce's

consideration. *See* Final I&D Mem. at 2 n.3, Appx02481. Zhongji

argued that Commerce failed to use the best available information

when selecting its SVs for aluminum ash, rolling oil, rolling oil additive

and international freight. *See id.* at Cmt. 1, Appx02483. Further,

Zhongji maintained that Commerce should adopt Zhongji's pre-

preliminary comments and modify the liquidation instructions to

account for entries that are resold by Zhongji's U.S. customers prior to

importation. *See id.* at Cmt. 3, Appx02488. Finally, Zhongji argued

that Commerce failed to consider Zhongji's double remedies

questionnaire response and, therefore, Commerce was obligated to

provide interested parties with an opportunity to brief this issue in

advance of the Final Results. *See id.* at Cmt. 4, Appx02489-02490. On

August 17, 2020, Zhongji submitted a rebuttal brief in response to

certain arguments made by the Aluminum Association Trade

Enforcement Working Group ("Aluminum Association"). *See id.* at 2

n.4, Appx02481.

Following this initial phase of briefing, Commerce released a post-

preliminary decision memorandum concerning the issue of double

remedies. *See* Mem. from Dana S. Mermelstein to James Maeder re:

Decision Memorandum for the Post-Preliminary Results of the

Antidumping Duty Administrative Review of Certain Aluminum Foil

from the People's Republic of China; 2017-2019 at 2 (Sept. 2, 2020)

(Public Document), Appx02467-02470. Commerce determined that the

record failed to substantiate both a subsidies-to-cost link and a cost-to-

price link for Zhongji. *See id.* Commerce then provided that interested

parties may submit additional case and rebuttal briefs limited to the

issue of double remedies. *See id.*, Appx02469.

On September 2, 2020, Zhongji submitted an additional case brief

on the issue of double remedies, arguing that it met all three statutory

criteria for Commerce to make a double remedies adjustment. *See* Final

I&D Mem. at 2 n.6, Appx02481, *see also id.* Cmt. 4, Appx02489-02490.

Zhongji also contended that Commerce failed to support its preliminary

determination with the type of detail typical of its consideration of this

issue in other cases and, to the extent that it provided new explanations in the Final Results, Zhongji would be denied an opportunity to meaningfully comment on those new conclusions.

On February 25, 2021 Commerce published the Final Results, calculating an dumping margin of 23.62 percent for Zhongji. *See Final Results*, 86 Fed. Reg. at 11,500, Appx03640. Concerning Commerce's selection of SVs in the Final Results, Commerce continued to measure Zhongji's aluminum ash by-product using an overly broad four-digit HTS code – HTS 2620. *See* Final I&D Mem. at Cmt. 1, Appx02485-02486. Commerce failed to address Zhongji's argument that HTS 2620 did not represent the best available information because HTS 2620 covers waste that contains other metals besides aluminum. *See id.* Commerce summarily dismissed the data under HTS 7602.00.19, which it acknowledged is specific to aluminum waste, concluding that at the four digit-level HTS 7602 broadly covers scrap, cuttings, and other by-products that are not specific to aluminum ash. *See id.*, Appx02486.

Regarding Commerce's selection of SVs for Zhongji's rolling oil and rolling oil additive, Commerce continued to reject the specific eight-digit code submitted by Zhongji. *See id.* at Cmt. 1, Appx02487. Instead

10

of addressing the evidence submitted by Zhongji that HTS 2710.12.21 represents the best available information to value Zhongji's rolling oil and rolling oil additive, including its submission of a specification sheet noting the particular properties of inputs purchased by Zhongji, Commerce merely concluded that "Zhongji's description of these inputs available on the record is not sufficiently detailed to support selection of the eight-digit HTS categories for these inputs in this case." *Id.*

Commerce also confirmed that it intended to rely on the Maersk data, which include estimated rather than actual shipping charges, as its SV for international freight. *See id.* Commerce provided no explanation for its rejection of the Descartes data submitted by Zhongji despite initially appearing to indicate that it had relied on this data to value international freight in the Preliminary Results. *See id.*; *see also* Prelim. I&D Mem. at 27, Appx01026. Commerce also rejected the Xeneta data submitted by Zhongji, finding that the Xeneta data are not a public source when Zhongji merely treated the publicly available subscription-based data as proprietary to protect the intellectual property rights of Xeneta. *See* Final I&D Mem. at Cmt. 1, Appx02487. Further, instead of engaging with the record, Commerce relied upon

arguments presented by the Aluminum Association for its finding that the Xeneta data can reflect shipping data from China. *See id.*

In the Final Results, without seeking further clarification form Zhongji, Commerce found that the evidence submitted by Zhongji in its double remedies questionnaire response was insufficient to establish a subsidy-to-cost link or a cost-to-price link. *Id.* at Cmt. 4, Appx02490. Accordingly, Commerce did not make a double remedies adjustment to Zhongji's purchases of primary aluminum, aluminum plate and electricity. *See id.* at Cmt. 4, Appx02490-02492.

After failing to address this issue in the Preliminary Results, *see* Prelim I&D Mem., Appx01000-01027, Commerce rejected Zhongji's request to modify its liquidation instructions. See Final I&D Mem. at Cmt. 3, Appx02489. Commerce determined that Zhongji's request to include the language "*resold or* imported" in its liquidation instructions is unnecessary where its practice is to issue liquidation instructions based on the entered value calculated for a respondent in its margin program rather than by U.S. customer. *See id.*

On March 29, 2021, Commerce released the Amended Final Results, but Zhongji's dumping margin remained the same. *See*

*Amended Final Results*, 86 Fed. Reg. at 17,359, Appx04450-04452

(amended results were released on March 29 and published in the

federal register on April 2).

## SUMMARY OF ARGUMENT

Commerce's selection of its SVs for Zhongji's aluminum ash,

rolling oil, rolling oil additive and international freight was

unsupported by substantial evidence and otherwise not in accordance

with law because they do not represent the best available information

on the record.  Concerning aluminum ash, Commerce unlawfully

selected Global Trade Atlas ("GTA") data for an overly broad HTS code,

HTS 2620, which was unrepresentative of Zhongji's aluminum ash

because it contained no data specific to aluminum and instead

represented slag, ash and residues for other metals.  By contrast, the

HTS GTA data from Bulgaria covering HTS 7602.00.19 submitted by

Zhongji were specific to its aluminum ash.  When selecting its SVs for

Zhongji's rolling oil and rolling oil additive, Commerce, without

explanation, unlawfully ignored a specification sheet provided by

Zhongji which demonstrated the best available information to value

these inputs fell under HTS 2710.12.21.  Finally, Commerce failed to

provide a reasonable explanation for rejecting the Descartes data submitted by Zhongji, in favor of Maersk data, to value Zhongji's international freight. In the alternative, the Xeneta data are superior to the Maersk data which represent mere price quotes rather than actual freight charges.

Commerce' determination not to grant Zhongji a double remedies adjustment was unsupported by substantial evidence and otherwise not in accordance with law because Zhongji established that 1) there was a subsidies-to-cost link between the alleged countervailable subsidies that Zhongji received through lower priced inputs and its COM and 2) there cost-to-price link between Zhongji's COM and its selling price of aluminum foil. Zhongji noted that Commerce had preliminarily found in the companion CVD review of aluminum foil from China that the primary aluminum, aluminum plate and electricity used by Zhongji in its production of subject merchandise were subject to countervailable subsidies. Zhongji demonstrated a subsidies-to-cost link in which the costs of its costs of primary aluminum/aluminum plate made up a significant portion of its COM and Commerce had previously found in another investigation in China that purchases of electricity impacted

the COM. Zhongji then established a cost-to-price link in which the decline in the domestic purchase prices of primary aluminum, aluminum plate, electricity directly correlated with a lower selling price of subject merchandise. Third, Zhongji showed that Commerce could reasonably estimate the extent to which Zhongji's dumping margin increased as the result of its receipt of subsidies related to its purchases of primary aluminum, aluminum plate and electricity.

Commerce's decision not to modify its liquidation instructions to include the phrase "resold or imported" to capture Zhongji's sales where its merchandise was subsequently re-invoiced prior to being imported into the United States was unsupported by substantial evidence and otherwise not in accordance with law. Commerce ignored Zhongji's argument regarding the risk of the inappropriate application of the China-wide rate to importers not appearing in Commerce's assessment rate instructions where Zhongji's customers re-invoiced merchandise prior to importation. Commerce's customs instructions, once issued, will lead to the inaccurate liquidation of certain entries of Zhongji's customers engaged in this re-selling sales pattern at a punitive dumping rate, which is contrary to Commerce's obligation to enforce the

antidumping law as remedial measure and avoid over-collection of punitive duties.

## STANDARD OF REVIEW

"The Court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Huayin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (internal citation omitted). Substantial evidence requires "more than a mere scintilla," see*, e.g., Swiff-Train Co. v. United States*, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (internal citation omitted), and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Huayin*, 322 F.3d at 1374 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Moreover, substantial evidence supporting an agency determination must be based on the whole record, and the Court shall take into account not only the information that supports the agency's decision but also whatever in the record "fairly detracts from its

weight." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-78 (1951)). Disregarding record information with no explanation defies this requirement. Although Commerce does not have to provide perfect explanations, "the path of Commerce's decision must be reasonably discernable." *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

Further, "{t}o be in accordance with law, a decision must not be arbitrary and capricious . . . and must be supported by substantial evidence and reasoned explanations." *U.S. Steel Corp. v. United States*, __ CIT __, __, 953 F. Supp. 2d 1332, 1336 (2013) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-43 (1983)). "{I}t is well-established that 'an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.'" *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

**ARGUMENT**

I. Commerce's Selection of its SVs to Value Zhongji's Aluminum Ash, Rolling Oil, Rolling Oil Additive and International Freight Was Unsupported By Substantial Evidence and Otherwise Not in Accordance with Law

In selecting SVs, Commerce must value factors of production using the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate." 19 U.S.C. § 1677b(c)(1); *see also* Seah *Steel Vina Corp. v. United States*, 950 F.3d 833, 842 (Fed. Cir. 2020) (quoting *Dorbest Ltd. v. United States*, 30 CIT 1671, 1675, 462 F. Supp. 2d 1262, 1268 (2006) ("The term 'best available' is one of comparison."). Commerce's "scrutiny of surrogate values is important because they are proxies -- they are not actual costs but estimates based on the best available information." *Dorbest*, 30 CIT at 1677, 462 F. Supp. 2d at 1269-70 (offered, like all Court of International Trade cases herein, as analogous and persuasive authority). As a result, a "surrogate value must be as representative of the situation in the {non-market economy} country as is feasible." *SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351, 1356 (Fed. Cir. 2020) (quoting *Seah Steel*, 950 F.3d at 845). Commerce's selection of the best available information, therefore, "establishes the antidumping margins as accurately as possible." *Zhejiang DunAn*

18

*Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011)

(internal quotations omitted). "Commerce's analysis when selecting the

'best available information' on the record inherently involves a

comparison of the competing data sources to identify what available

information is 'best' to value factors of production." *Weishan Hongda*

*Aquatic Food Co. v. United States*, 917 F.3d 1353, 1367 (Fed. Cir. 2019)

(citing 19 U.S.C. § 1677b(c)(1)); *see also Association of Am. School Paper*

*Suppliers v. United States*, 34 CIT 919, 924, 716 F. Supp. 2d 1329, 1334

(2010) (Commerce must "examin{e} and compar{e} the advantages and

disadvantages of using certain data as opposed to other data" (citation

omitted)).

In reviewing Commerce's selection of its SVs, the "court's duty is

not to evaluate whether the information Commerce used was the best

available, but rather whether a reasonable mind could conclude that

Commerce chose the best available information." *Zhejiang*, 652 F.3d at

1341 (quoting *Goldlink Indus. Co. v. United States*, 30 CIT 616, 619,

431 F. Supp. 2d 1323, 1327 (2006)). Affirming Commerce's

determination of the best available information as reasonable, however,

"requires a *reasoned explanation from Commerce that is supported by*

the administrative record."  *Dorbest*, 30 CIT at 1677; 462 F. Supp. 2d at 1269-70 (emphasis added); *see also Longkou Haimeng Mach. Co. v. United States,* 33 CIT 603, 609, 617 F. Supp. 2d 1363, 1369 (2009) ("For the Court to conclude that a reasonable mind would support Commerce's selection of surrogate data as the best available information, Commerce must justify its selection with a reasoned explanation.")  If Commerce selects an SV source that is unsupported by the record, i.e., "a data set that is demonstrably unrepresentative or distortional, a reasonable mind may rightly question how such a selection could be the 'best.'"  *Dorbest*, 30 CIT at 1677, 462 F. Supp. at 1269.  In short, to be supported by substantial evidence Commerce's selection of its SV sources must be representative of a respondent's inputs as reflected by the record.

Here, Commerce's selection of its SVs to value Zhongji's aluminum ash, rolling oil, rolling oil additive and international freight was unsupported by substantial evidence and otherwise not in accordance with law because they do not represent the best available information on the record to value Zhongji's inputs.

A. Commerce Unlawfully Selected an Overly Broad Code that Contains No Data Specific to the Aluminum Ash Used by Zhongji

In the Final Results, Commerce relied on Bulgarian data from the Global Trade Atlas ("GTA") for HTS 2620 to value Zhongji's aluminum ash by-product. *See* Mem. from Michael J. Heaney & Chelsey Simonovich to the File re: Zhongji Analysis Mem. for the Final Results at Attach. I (Public Version) (Feb. 19, 2021) ("Final Analysis Mem."), Appx02505; *see also* SV Mem. at Attach. I, Appx01248. By contrast, Zhongji submitted data on the record under HTS 7602.00.19 to value its aluminum ash. *See* Letter on Behalf of Zhongji to Dep't of Commerce at Exs. SV-1 to SV-2 (Nov. 1, 2019) (Public Document) ("Zhongji SV Cmts."), Appx28867-28875, Appx28983. Commerce's determination to value Zhongji's aluminum ash by-product under HTS 2620, instead of the more specific HTS 7602.00.19, was unsupported by substantial evidence and otherwise not in accordance with law because these data do not represent the best available information on the record to value Zhongji's aluminum ash for the reasons set forth below.

Commerce regularly rejects overly broad datasets when selecting its SV source. *See Polyethylene Retail Carrier Bag Comm. v. United*

*States*, 29 CIT 1418, 1444 (2005) (noting that "in previous cases, Commerce recognized that import statistics based on a basket tariff category are inappropriate if a more representative alternate surrogate is available"). For instance, in *Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, __, CIT __, 28 F. Supp. 3d 1317 (2014), the Court upheld Commerce's decision to value Trina Solar's aluminum frames in its antidumping duty investigation using an eleven digit HTS-code instead of a six-digit HTS code, HTS 7616.99, in part, because "7616.99 is a catch-all category that covers many diverse aluminum products . . . whose value is not reasonably comparable to that of respondent's aluminum solar panel frames" *Id.* at __, 28 F. Supp. 3d at 1338.

Commerce's reliance on HTS 2620 was unrepresentative of the aluminum ash generated and reintroduced to the melt by Zhongji. Commerce wrongly stated that HTS 2620 "best matched the respondents' description of the input" because it covered "Aluminum Ash & Aluminum Dross." SV Mem. at 4, Appx01241. This is not, however, the description for that HTS heading in the European Union tariff schedule, which instead sets forth that HTS 2620 covers: "Slag, ash and residues (other than from the manufacture of iron or steel),

containing metals, arsenic or their compounds." Zhongji SV Cmts. at Ex. SV-3, Appx28992-28994. On its face, HTS 2620 covers a broad variety of metals beyond aluminum as Commerce incorrectly represented in its initial SV memorandum. *See id.* For instance, HTS 2620 includes: "Slag, ash and residues" "Containing mainly zinc:," "Containing mainly lead:," "Containing mainly copper," "Containing arsenic, mercury, thallium or their mixtures, of a kind used for the extraction of arsenic or those metals or for the manufacture of their chemical compounds" and "other." *Id.* Unlike in *Jiangsu Jiasheng*, where the Court held that Commerce correctly rejected a basket category because it broadly covered merchandise that was not reflective of the input used by the respondent, here, Commerce selected a broad four-digit HTS code that was not specific to the aluminum ash generated by Zhonji. HTS 2620 cannot represent the best available information to value Zhongji's aluminum ash given that these data are unrepresentative of Zhongji's input where the overly-expansive four-digit HTS code includes waste containing a majority of metal other than aluminum.

Not only does HTS 2620 include overly expansive data, i.e., metals

other than aluminum, these data are further flawed because they do not even include any information specifically related to aluminum. Under HTS 2620, only HTS 2620.40.00 references aluminum – covering: "Slag, ash and residues (other than from the manufacture of iron or steel), containing metals, arsenic or their compounds: Containing mainly aluminium." *Id.* A review of the available data for HTS 2620, however, shows that there were no imports of HTS 2620.40.00 into Bulgaria during the period of review. *See* Letter on Behalf of Zhongji to Dep't of Commerce re: Surrogate Value Rebuttal Cmts. at Ex. SVR-5 (Nov. 12, 2019) (Public Version) (Zhongji Rebuttal Cmts), Appx12819-12821; *see also* Final I&D Mem. at Cmt. 1, Appx02486 (setting forth that "HTS 2620.40 contains no data from Bulgaria for the POR"). Commerce, nonetheless, concluded that "metallurgical content is not the sole factor in determining the value of a by-product." Final I&D Mem. at Cmt. 1, Appx02486. This statement stands in stark contrast to Commerce's actual calculation of its SV for aluminum ash where it "isolate{ed} the percentage of ash that consisted of aluminum input" and then "cap{ed} the valuation of the aluminum that Zhongji recovers in the dross/ash aluminum recovery process." *Id.* Commerce cannot in one instance

claim that metallurgical content does not matter but then later rely on that very content of aluminum to cap the amount of aluminum output realized by Zhongji. By failing to contain any data specific to aluminum, the specific input generated by Zhongji in its production process, Commerce's selection of its SV represents an "unrepresented or distortional" calculation that no reasonable mind could conclude constitutes the best available information on the record. *Dorbest*, 30 CIT at 1677, 462 F. Supp. at 1269-70.

By contrast, Zhongji submitted GTA data from Bulgaria covering HTS 7602.00.19 that is specific to the aluminum waste produced by Zhongji. *See* Zhongji SV Cmts. at Ex. SV-1 to SV-2, SV-3, Appx Appx28867-28875, Appx28983, Appx29116-29118 (setting forth that HTS 7602.00.19 covers "Aluminum waste and scrap: - Waste: other (including factory rejects")). Commerce nonsensically determined that HTS 7602.00.19 is not the most specific category to value Zhongji's aluminum ash because "the broader HTS category 7602 under which it falls describes scrap, cuttings, and other such by-products, not ash." Final I&D Mem. at Cmt. 1, Appx02486. This is a blatant misstatement of the HTS schedule as 7602.00.90 includes scrap. *See id.* Further,

HTS code 7602.00.11 includes other types of aluminum waste such as "shavings, chips, milling, sawdust and filings." *Id.* By selecting more detailed eight-digit HTS code– here, 7602.00.19 – Zhongji narrowed its proposed SV to exclude the type of materials that Commerce determined were not representative of its input. Instead, 7602.00.19 is narrowly defined to include the type of aluminum ash generated by Zhongji.

Once Commerce properly compares the advantages and disadvantages of the Bulgaria GTA data under HTS 7602.00.19 to the data under HTS 2620, the only reasonable conclusion supported by the administrative record is that the former data are most representative of Zhongji's aluminum ash. HTS 7602.00.19 is specific to the type of *aluminum* waste generated in Zhongji's production process whereas HTS 2620 lacks *any* data for aluminum. Commerce's selection of HTS 2620 to value Zhongji's aluminum ash, therefore, was unsupported by substantial evidence and otherwise not in accordance with law because these data do not represent the best available information to value Zhongji's aluminum ash.

B. Commerce Unlawfully Ignored Record Evidence and Failed to Provide a Reasoned Explanation When Selecting its SV to Value Rolling Oil and Rolling Oil Additive

In the Final Results, Commerce valued Zhongji's rolling oil using Bulgarian GTA data under HTS 3404.99 and rolling oil additive under 3811.90. *See* Final Analysis Mem. at Attach I (Public Version), Appx02505. Zhongji submitted Bulgarian GTA data under HTS 2710.12.21 to value its rolling oil and rolling oil additive. *See* Zhongji SV Cmts. at Ex. SV-1 to SV-2 (Public Version), Appx Appx28867-Appx28875, Appx28882-28884. Commerce's determinations to value Zhongji's rolling oil under HTS 3404.99 and Zhongji's rolling oil additive under HTS 3811.90 were unsupported by substantial evidence and otherwise not in accordance with law because HTS 2710.12.21 represents the best available information to Zhongji's rolling oil and rolling oil additive for the reasons set forth below.

In valuing Zhongji's rolling oil and rolling oil additive, Commerce ignored record evidence and selected data from an HTS code that does not include the input consumed by Zhongji. Commerce chose to value Zhongji's rolling oil and rolling oil additive under Chapter 34, which covers "SOAP, ORGANIC SURFACE-ACTIVE AGENTS, WASHING

PREPARATIONS, LUBRICATING PREPARATIONS, ARTIFICIAL
WAXES, PREPARED WAXES, POLISHING OR SCOURING
PREPARATIONS, CANDLES AND SIMILAR ARTICLES,
MODELLING PASTES, 'DENTAL WAXES' AND DENTAL
PREPARATIONS WITH A BASIS OF PLASTER" and Chapter 38,
which covers "MISCELLANEOUS CHEMICAL PRODUCTS." *See*
Zhongji SV Cmts. at Ex. SV-3, Appx29053-Appx29064; Zhongji Rebuttal
Cmts. at Ex. SVR-1 (Public Version), Appx12791-12794.

By contrast, Chapter 27 covers "MINERAL FUELS, MINERAL
OILS AND PRODUCTS OF THEIR DISTILLATION; BITUMINOUS
SUBSTANCES; MINERAL WAXES." Zhongji SV Cmts. at Ex. SV-3,
Appx28995-29004. The specific HTS code submitted by Zhongji, HTS
2710.12.21, covers:

> Petroleum oils and oils obtained from bituminous minerals
> (other than crude) and preparations not elsewhere specified
> or included, containing by weight 70 % or more of petroleum
> oils or of oils obtained from bituminous minerals, these oils
> being the basic constituents of the preparations, other than
> those containing biodiesel and other than waste oils: Light
> oils and preparations: For other purposes: Special spirits:
> White spirit.

Zhongji SV Cmts. at Ex. SV-3, Appx28999-29000. Additionally, the
notes accompanying the European Union's tariff schedule provides

additional context for the HTS code that Zhongji submitted as the most representative of its input. Specifically, the notes clarify that:

2. For the purposes of heading 2710:

(a) 'special spirits' (subheadings 2710 12 21 and 2710 12 25) mean light oils as defined in subheading note 4 to this chapter, not containing any anti-knock preparations, and with a difference of not more than 60 °C between the temperatures at which 5 % and 90 % by volume (including losses) distil;

(b) 'white spirit' (subheading 2710 12 21) means special spirits as defined in paragraph (a) above with a flash-point higher than 21 °C by the EN ISO 13736 method

*Id.*, Appx28995-28996.

HTS 2710.12.21 is more specific to Zhongji's rolling oil and rolling oil additive because Zhongji sources rolling oil and rolling oil additive that is made from petroleum and has a flash point that meets the specification in the European Union tariff schedule notes covering white spirits. While "the law does not require Commerce to build the record on the plaintiffs' behalf," *Linyi City Kangfa Foodstuff Drinkable Co. v. United States*, No. 15-00184, 2016 Ct. Intl. Trade LEXIS 89, at *11 (Sept. 21, 2016), here Zhongji built a sufficient record by providing a specification sheet for its rolling oil and rolling oil additive in its Surrogate Value Rebuttal Comments. *See* Zhongji Rebuttal Cmts. at

Ex. SVR-2 (Business Proprietary Document), Appx12804-12814.  That

exhibit shows that [

]. *Id.*  The best available information to value Zhongji's rolling

oil and rolling oil additive, thus, is HTS 2710.12.21 because it covers

[                                              ] like Zhongji's inputs.

Commerce's classification of Zhongji's Chapter 34 or Chapter 38 cannot

be used in valuing Zhongji's rolling oil and rolling oil additive which fall

squarely within Chapter 27 and HTS 2710.12.21 specifically.

Commerce failed to address this record evidence in any fashion

and instead merely found "unpersuasive Zhongji's argument that the

eight-digit HTS classifications that it has offered to value refining oils

and additives . . . are more specific to Zhongji's inputs used in its

production process than the four- or six-digit HTS classifications that

Commerce selected in the Preliminary Results."  Final I&D Mem. at

Cmt. 1, Appx02487; *see also* SV Mem. at 3, Appx01241 (valuing

Zhongji's rolling oil under HTS 3403.99).  In failing to consider the

specification sheet submitted by Zhongji, Commerce failed to take into

account information that "fairly detracts from {the} weight" of its

conclusion. *Nippon*, 458 F.3d at 1351. Further, this Court cannot affirm Commerce's determination of the best available information as reasonable where it has failed to provide a "reasoned explanation." *Dorbest*, 30 CIT at 1677; 462 F. Supp. 2d at 1269. At a minimum, this Court must remand Commerce's selection of its SVs for rolling oil and rolling additive such that it can examine the specification sheet submitted by Zhongji and provide a reasoned explanation for why this specification sheet does not establish that Zhongji's inputs fall squarely under HTS 2710.12.21.

In sum, Commerce's selection of SVs for Zhongji's rolling oil and rolling oil additive were unsupported by substantial evidence and otherwise not in accordance with law because these data are inconsistent with the record and do not represent the best available information to value Zhongji's inputs.

C. International Freight

Commerce's selection of its international freight SV has been fraught with errors throughout this entire proceeding. In the Preliminary Results, Commerce stated that it "valued international freight using price rates from Descartes.com." Prelim. I&D Mem. at 27,

Appx01026 (citing Zhongji SV Cmts. at SV-7, Appx29356-29364). In the Surrogate Value Memorandum, however, Commerce stated that "we relied on an average of monthly rate data from Maersk and P.A.F." SV Mem. at Attach. I, Appx01245, Appx01248 (showing that Commerce did in fact rely on the Maersk data in calculating normal value). In the Final Results, Commerce clarified that it valued Zhongji's international freight using Maersk data. *See* Final I&D Mem. at Cmt. 1, Appx02487; Final Analysis Mem. at Attach I (Public Version), Appx02506. Commerce's selection of the Maersk data to value Zhongji's international freight was unsupported by substantial evidence and otherwise not in accordance with law because these data do not represent the best available information on the record.

   i. Commerce Failed to Provide a Reasonable Explanation for Rejecting the Descartes Data Which Represent the Best Available Information to Value Zhongji's International Freight

Commerce's selection of the Maersk data was unsupported by substantial evidence and otherwise not in accordance with law because it failed to provide any explanation for rejecting the Descartes data submitted by Zhongji, which represent the best available information to value Zhongji's international freight as compared to the Maersk data.

*See* Zhongji SV Cmts. at SV-7, Appx29356-29364 (submitting data from Descartes.com to value Zhongji's international freight).

As noted, above, in the Preliminary Results, Commerce incorrectly stated that it had selected the Descartes data as its SV for international freight. *See* Prelim. I&D Mem. at 27, Appx01026 (citing Zhongji SV Cmts. at SV-7, Appx29356-29364). Despite Zhongji noting this discrepancy in its case brief and advocating for Commerce to select the Descartes data as its SV to value international freight, *see* Letter on Behalf of Zhongji to Dep't of Commerce re: Case Brief at 18-19 (Aug. 3, 2020) (Public Version) ("Zhongji Case Br."), Appx25797-25798, Commerce proceeded to disregard these arguments without explanation and instead selected the Maersk data. *See* Final I&D Mem. at Cmt. 1, Appx02487 (discussing only the Maersk data as the best available information on the record as compared to Xeneta data that was also submitted by Zhongji). At a minimum, Commerce's determination to rely on the Maersk data was unsupported by substantial evidence because it failed to "compar{e} . . . the competing data sources to identify what available information is 'best' to value factors of production." *Weishan*, 917 F.3d at 1367. Similarly, Commerce did not

provide a "reasoned explanation" for selecting the Maersk data over the
Xeneta data. *Dorbest*, 30 CIT at 1677; 462 F. Supp. 2d at 1269.

Further, even if Commerce had conducted such an analysis, its
determination would nonetheless be unsupported by substantial
evidence and not in accordance with law because the Descartes data
present the best available information on the record to value Zhongji's
international freight. The Maersk data were irredeemably flawed
because the rates are only estimates rather than real costs, did not
necessarily identify, or include all relevant charges and were
consistently [ ████████ ] than data showing actual consummated
transactions presented in the Xeneta database. *See* Zhongji Rebuttal
Cmts. at SVR-8 (Business Proprietary Document), Appx12827-12846.
In a complete abrogation of its duty to consider all SV data on the
record, Commerce made no mention of these numerous and
fundamental flaws in the Maersk data. *See* Final I&D Mem. at Cmt. 1,
Appx02487. Commerce's refusal to acknowledge the shortcomings of
the Maersk data is even more egregious considering that the Court
upheld Commerce's selection of Descartes data to value Zhongji's
international freight in the underlying investigation concerning

aluminum foil from China. *See Jiangsu Zhongji Lamination Materials Co. v. United States*, __ CIT __, __, 96 F. Supp. 3d 1134, 1353 (2019). Commerce's determination cannot be supported by substantial evidence when it has supplied no reasonable explanation from deviating from its SV selection in the initial investigation.

For these reasons, Commerce's selection of the Maersk data to value Zhongji's international freight was unsupported by substantial evidence and otherwise not in accordance with law because it failed to provide a reasonable explanation for its determination. Further, even if Commerce had provided such an explanation, its selection of the Maersk data would not be supported by substantial evidence or otherwise in accordance with law because the Descartes data represent the best available information on the record to value Zhongji's international freight.

      ii.  Commerce Wrongly Determined that the Maersk Data Were the Best Available Information on the Record Compared to the Xeneta Data Submitted by Zhongji

In the alternative, Commerce's selection of the Maersk data to value Zhongji's international freight was unsupported by substantial evidence and otherwise not in accordance with law because the Xeneta

data are the best available information on the record. *See* Zhongji

Rebuttal SV Cmts. at SVR-8 (Public Version), Appx12827-12846

(submitting Xeneta data on the record).

In the Final Results, for the first-time time, Commerce considered

the Xeneta data as a potential source to value Zhongji's international

freight. *See* Final I&D Mem. at Cmt. 1, Appx02487. Commerce found

"Maersk to be a superior SV source as compared to Xeneta" because of

its "public availability" and the alleged fact that "the Xeneta data can

reflect shipping data from China which is an impermissible source for

valuing SVs." *Id.* (citing Letter on Behalf of Aluminum Association to

Dep't of Commerce re: Pet'rs' Rebuttal Br. at 32-37 (Public Version)

(Aug. 17, 2020), Appx25863-25868). Concerning the public availability

of the Xeneta data, Zhongji acknowledges that the Court previously

held in the appeal of the underlying AD investigation of aluminum foil

from China that the Xeneta data were not publicly available. *See*

*Jiangsu Zhongji*, __ CIT at __, 396 F. Supp. 3d at 1354. Commerce's

analysis of the Xeneta data, however, has evolved since the Court

decided that case. In a recent countervailing duty investigation,

Commerce found that data obtained from pay for subscription services

was public in nature because "any party {could} access the information if they pay for the service." *Certain Glass Containers From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141 (Dep't Commerce May 22, 2020) and accompanying Issues and Dec. Mem. at Cmt. 9, pp. 44. Commerce held that "{w}ith regard to whether Xeneta data is proprietary, we disagree. Xeneta data is a pay for service subscription service, meaning any party can access the information if they pay for the service. In this respect Xeneta is not proprietary but public in nature." *Id.* (citing to 19 CFR § 351.102(b)(21)(iii) as the definition of "publicly available"). Although this investigation was a CVD proceeding, Commerce interpreted the definition of "publicly available" under 19 CFR § 351.102(b)(21)(iii), which is applicable to the dumping context. *See* 19 CFR § 351.102(b)(21)(iii) ("'Factual information' means: Publicly available information submitted to value factors under § 351.408(c) or to measure the adequacy of remuneration under § 351.511(a)(2)."). The Court has also recently upheld Commerce's determination upon remand to rely on Xeneta data to calculate its SV for international freight instead of Maersk data. *Changzhou Trina Solar Energy Co. v. United States*, No.

18-00176, 2021 Ct. Intl. Trade LEXIS 99, at *9 (Aug. 10, 2021) ("*Trina II*"). This Court is not bound by its prior holding in *Jiangsu Zhongji*, and, therefore, should find the more recent interpretations of the definition of publicly available information by Commerce to be persuasive. Further, Commerce provided no support for its assertion that the Xeneta data reflect shipping data from China and instead merely referred to the Aluminum Association's rebuttal brief. *See* Final I&D Mem. at Cmt. 1, Appx02487. Again, this Court cannot affirm Commerce's best available information determination where it fails to provide a reasoned explanation for its finding. *Dorbest*, 30 CIT at 1677, 462 F. Supp. 2d at 1269-70. In sum, the two flaws identified by Commerce concerning the Xeneta data do not weigh in favor of rejecting these data in favor of the Maersk data.

By contrast, the Maersk data are fundamentally flawed because these data constitute mere quotes that have not been finalized or actually agreed upon between parties. *See* Letter on Behalf of Petitioners to Commerce re: Petitioners' Preliminary Surrogate Value Comments at SV-6 (Nov. 1, 2019) (Public Document), Appx28387, Appx28415-28738 ("Rate information is an indication only and Maersk

rates are subject to our terms and conditions."). Such estimates do not necessarily identify, or include all relevant charges, and do not reflect consummated transactions. *Id.* By comparison, the Xeneta data consist of "several hundred thousand rates per month." Zhongji Rebuttal SV Cmts. at Ex. SVR-8 (Public Version), Appx12828. Commerce failed to explain how data that consists of mere price quotes could more accurately reflect international freight costs, when the agency had data consisting of actual values paid for international freight on the record. Indeed, the Court has recently remanded Commerce's reliance on Maersk data where Commerce failed to explain why it found it reasonable "to choose price quotes over broad data sets." *Changzhou Trina Solar Energy Co. v. United States*, __ CIT __, __, 492 F. Supp. 3d 1322, 1330 (2021) ("*Trina I*"); *see also Trina II*, No. 18-00176, 2021 Ct. Intl. Trade LEXIS 99, at *9 (Aug. 10, 2021) (sustaining Commerce's remand redetermination to rely solely on Xeneta data over Maersk data). This Court should find the reasoning in *Trina I and II* to be persuasive because the facts in that care are directly analogous to this action. Like in *Trina I and Trina II*, here, Commerce relied on mere price quotes, the Maersk data, without providing an explanation for

why *actual costs* do not represent the best available information to value Zhongji's international freight.  By relying on mere quotations, which do not represent the best available information the record to value Zhongji's international freight, Commerce failed to "establish{} {Zhongji's} antidumping margin{} as accurately as possible." *Zhejiang*, 652 F.3d at 1341.

In sum, Commerce's determination to rely on Maersk data as its SV for Zhongji's international freight was unsupported by substantial evidence and otherwise not in accordance with law because the Xeneta dataset represent the best available information on the record.  No reasonable reading of the record can support the flaws that Commerce identified in the Xeneta database where by comparison the Maersk data are significantly distorted by representing mere price quotes.

II.    Commerce's Decision to Not Grant Zhongji a Double Remedies Adjustment was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law

The U.S. antidumping law unambiguously requires Commerce to avoid the imposition of a double remedy when it imposes, at the same time, countervailing duties and antidumping duties based on Commerce's non-market economy ("NME") AD calculation methodology.

*See* 19 U.S.C. § 1677f-1(f).  In the Final Results, Commerce failed to follow this statutory mandate by denying Zhongji a double remedies adjustment where Zhongji established through record evidence that there was both a subsidies-to-cost link and a cost-to-price link concerning its purchase of primary aluminum, aluminum plate, and electricity production inputs.

Under 19 U.S.C. § 1677f-1(f), Commerce shall "reduce the antidumping duty by the amount of the increase in the weighted average dumping margin" resulting from a countervailable subsidy program that "has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period." 19 U.S.C. § 1677f-1(f)(1).

In analyzing whether a respondent qualifies for a double remedies adjustment, Commerce has established the following three-criteria test:

1.  whether a countervailable subsidy (other than an export subsidy) has been provided with respect to a class or kind of merchandise;
2.  whether such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period; and

3. whether Commerce can reasonably estimate the extent to which that countervailable subsidy, in combination with the use of NV determined pursuant to section 773(c) of the Act, has increased the weighted-average dumping margin for the class or kind of merchandise.

*See, e.g.*, *Certain Fabricated Structural Steel From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5,376 (Dep't of Commerce Jan. 30, 2020), and accompanying Issues and Dec. Mem. at 10-11. Relevant to the second criteria listed above, Commerce examines where the respondent can demonstrate:

1. a subsidies-to-cost link, i.e., a subsidy effect on the cost of manufacturing (COM) of the merchandise under consideration; and
2. a cost-to-price link, i.e., respondent's prices were dependent on changes in the COM.

*Certain Quartz Surface Products From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 84 Fed. Reg. 23,767 (Dep't of Commerce May 23, 2019), and accompanying Issues and Dec. Mem. at 12 ("Quartz I&D Mem.").

In the Final Results, Commerce denied Zhongji's double remedies adjustment for primary aluminum, aluminum plate, and electricity

production inputs because it found that Zhongji established neither a "subsidy-to-cost link" nor a "cost-to-price link." Final I&D Mem. at Cmt. 4, Appx02490. Commerce found that the evidence presented by Zhongji was insufficient to show that the subsidy programs purportedly received by Zhongji decreased the cost of its inputs during the period of review but failed to offer any analysis in support of its conclusion that Zhongji failed to demonstrate both a subsidies-to-cost link and cost-to-price link. *See* Final I&D Mem. at Cmt. 4, Appx02490-02492. Further, Commerce offered no analysis on the first and third criteria under 19 U.S.C. § 1677f-1(f)(1). Applying the test under 19 U.S.C. § 1677f-1(f)(1) to the full record here, Zhongji has met all three criteria. In sum, in its double remedies questionnaire response, Zhongji established that it consumed inputs that Commerce has determined to have been subsidized on the basis of less-than-adequate-remuneration ("LTAR") pricing: ingot (FOP name = ALINGOT), strip (FOP name = ALUSTRIP), stock (FOP name = FLSTOCK) and electricity (FOP name =ELECTRICITY. *See Final Results*, accompanying Analysis Mem. at Attach. I (Public Version), Appx02505-02508. Further, Zhongji showed that these lower input prices directly [ ███ ] its COM of subject

merchandise, which in turn [ ████ ] its selling price of aluminum foil. *See* Letter on Behalf of Zhongji to Dep't of Commerce re: Double Remedies Questionnaire Response at DR-6, DR-7 (Feb. 18, 2020) (Business Proprietary Document) ("Double Remedies QR"), Appx16029-16030.

### A. Zhongji Received Countervailable Subsidies Relating to its Purchases of Several Inputs

Zhongji met the first element of the statutory test, whether "a countervailable subsidy (other than an export subsidy . . . ) has been provided with respect to a class or kind of merchandise." 19 U.S.C. § 1677f-1(f)(1)(A). Zhongji reported that certain inputs it used in the production of subject merchandise were simultaneously subject to countervailable subsidies in the form of primary aluminum, aluminum plate and/or sheet and strip and electricity provided for LTAR. *See* Double Remedies QR at DR-6 (Public Version), Appx16029. Zhongji reproduces its reporting chart below:

| Name of subsidy program under investigation | Does the program impact your cost of manufacturing, as reflected in your books and records (Y/N)? If Y, complete the remaining columns. | Identify the specific cost category or account impacted | Cite to your accounting records and attach documentation. |
|---|---|---|---|
| Provision of Primary Aluminum for LTAR | Y | Raw material cost | Cost of manufacturing ledger and manufacturing overhead ledger |
| Provision of Electricity for LTAR | Y | Energy cost | Cost of manufacturing ledger and manufacturing overhead ledger |
| Provision of Aluminum Plate and/or Sheet and Strip for LTAR | Y | Raw material cost | Cost of manufacturing ledger and manufacturing overhead ledger |

Id.

There is no doubt that Commerce determined that each of the programs identified by Zhongji is countervailable. *See Certain Aluminum Foil From the People's Republic of China: Preliminary*

*Results of the Countervailing Duty Administrative Review and*

*Rescission of Review, in Part; 2017-2018*, 85 Fed. Reg. 38,861 (Dep't of

Commerce June 29, 2020), and accompanying Dec. Mem. at 39-43

("CVD Dec. Mem.").  In addition, Zhongji submitted its CVD

questionnaire response from the concurrent CVD administrative review

and Commerce found that Zhongji received benefits from each of these

programs.  *See* Double Remedies QR at Ex. DR-3 (Business Proprietary

Document), Appx16039-16048.  The record, therefore, demonstrates

that Zhongji has satisfied the first element under 19 U.S.C. § 1677f-

1(f)(1)(A) that "a countervailable subsidy (other than an export subsidy)

has been provided with respect to a class or kind of merchandise."  In

the Final Results, Commerce failed to provide any specific analysis of

this element, but given the clear factual record, the only reasonable

reading of the evidence is that a countervailable subsidy was provided

to Zhongji with respect to primary aluminum, aluminum plate and/or

sheet and strip and electricity.[2]

---

[2] If Commerce's stated position is that Zhongji did not benefit from countervailable subsidies related to these inputs then Commerce should revoke the affirmative CVD findings it has made with respect to those inputs.

B. The Record Shows that Average Import Prices Declined
   During the Period of Review

As listed above, the second statutory element to qualify for double remedies adjustment is whether "such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period." 19 U.S.C. § 1677f-1(f)(1)(B). To establish this element, Commerce looks for a subsidies-to-cost link (i.e., subsidy effect on the COM of the subject merchandise) and a cost-to-price link (i.e., a showing that respondent's selling prices were affected by the lower COM). *See* Final I&D Mem. at Cmt. 4, Appx02490-02492. In the Final Results, as discussed below, Commerce unreasonably determined that Zhongji "failed to establish either a 'subsidy-to-cost link' or a 'cost-to-price link'." *Id.*, Appx02490.

  i. Input Pricing Had a Direct Impact on Zhongji's COM

Contrary to Commerce's finding that "Zhongji has not demonstrated that the programs discussed in its double remedies response have led to a decrease in COM," Final I&D Mem. at Cmt. 4, Appx02491, Zhongji precisely demonstrated how the pricing of each direct input was incorporated directly into Zhongji's COM ledgers, and further showed that Zhongji's input prices and its COM both trended

down during the period of review.  *See* Double Remedies QR at DR-2,

Ex. DR-4.1 (Business Proprietary Document), Appx16025, Appx16049-

16050.

Fundamentally, Commerce failed to recognize how Zhongji's

subsidized input prices led to lower costs in its particular production

process.  Importantly, the majority of Zhongji's COM of the subject

merchandise is derived from foil stock; the record demonstrates that the

cost of foil stock is [ ███ ] percent of the cost of materials to manufacture

finished goods and [ ███ ] percent of the total cost of production for the

subject merchandise.  *See id.* at DR-2, Appx16025.  Zhongji explained to

Commerce multiple times on the record that the price of foil stock is

lowered by subsidies on other aluminum materials (i.e., primary

aluminum, and aluminum plate and/or sheet and strip).  *See id.* at DR-6

(Public Version), Appx16029.  Specifically, two of Zhongji's affiliated foil

stocks suppliers, Jiangsu Huafeng Aluminum Industry Co., Ltd.

("Huafeng") and Anhui Maximum Aluminum Industries Company

("Maximum"), both produce foil stock, which is subject to the subsidy on

primary aluminum and aluminum strip.  Further, both Huafeng's and

Maximum's aluminum inputs account for the majority of their

48

production costs.  At Huafeng, aluminum strip was [ ███ ] percent[3] of the COM in the [ ██████████ ] and aluminum ingot and scrap were [ ████ ] percent[4] of the COM in the [ █████  ██████ ].  *See id.* at Ex. DR-5.1, Appx16055-16057.  At Maximum, aluminum strip costs, less the scrap generated, was [ █████ ] percent[5] of the COM in the [ ██████████ ] and [ █████ ] percent[6] of the COM at the [ ███ ██████████ ].  *See id.* at Ex. DR-6, Appx16063-16066.  Aluminum ingot and aluminum scrap, less aluminum ash, accounted for [ █████ ] percent[7] of the COM at the casting workshop.  *See id.*  In sum, Zhongji purportedly benefited from the subsidy programs on primary aluminum and aluminum strip and sheets because the cost these metal inputs



[3] [ ████████████████████████████████████ ].  *See id.* at Ex. DR-5.1, Appx16055-16057.
[4] [ ████████████████████████████████████ ].  *See id.*
[5] [ ████████████████████████████████████ ].  *See id.* at Ex. DR-6, Appx16063-16066.
[6] [ ████████████████████████████████████ ].  *See id.*
[7] [ ████████████████████████████████ ].  *See id.*

49

make up over [ ▮ ] of the cost of foil stock and foil stock makes up [ ▮ ]
percent of the total cost of production for the subject merchandise.

Given that the aluminum ingot, strip and stock constitute such a
significant proportion of the COM of subject merchandise, any decrease
in pricing of aluminum inputs would quite naturally cause a decrease in
the COM. To demonstrate how costs on electricity affects its COM,
Zhongji submitted subledgers demonstrating how its electricity expense
ties back to its overall COM. Specifically, electricity expenses are
captured in the [ ▮ ] of Jiangsu Zhongji and Huafeng.
*See id.* at Exs. DR-4.2, DR-5.2, Appx16051-16054, Appx16058-16062.
Maximum accounts for electricity expenses in its [ ▮ ] account. *See
id.* at Ex. DR-6, Appx16063-16066.

Despite the above-described evidence, Commerce found in the
Final Results that "Zhongji has not demonstrated that the programs
discussed in its double remedies response have led to a decrease in
COM." Final I&D Mem. at Cmt. 4, Appx02491. Commerce erroneously
determined that:

Zhongji's demonstration of its system for tracking {} primary aluminum, aluminum plate, and electricity in its accounting records merely establishes how Zhongji tracks its usage of these three consumption inputs. This accounting information, however, fails to establish a link between the subsidies received by Zhongji, the COM of the subject merchandise, and the price of the merchandise.

*Id.*, Appx02491-02492. To the contrary, the record establishes that Zhongji's purchases of aluminum ingot, aluminum sheet (including aluminum strip and foil stock) and electricity are lower because of the LTAR subsidies that Commerce has countervailed. Notably, however, because of the nature of the aluminum and electricity subsidies, Zhongji does not receive a lump sum payment identified as a subsidy because these "subsides" are not recognized as such in China and, accordingly, are not reflected in Zhongji's financial statements. Instead, these "subsidies" are designated as such by Commerce pursuant to its CVD methodology because the suppliers are state owned or operated. *See* CVD Dec. Mem. at 40. Zhongji cannot, therefore, point to a specific line item in its accounting records that reflects subsidies provided on its aluminum and electricity inputs. Commerce does not require such a linkage before imposing countervailing duties. Instead, according to Commerce's own CVD methodology, the subsidy is subsumed in the

prices of the LTAR inputs. A subsidies-to-cost linkage is established automatically when the respondent purchases a LTAR input and confirms how that input is part of its COM. In fact, no further evidence of receipt of subsidy, beyond purchasing the input, could ever be shown when Commerce's financial contribution determination is based on U.S. CVD law and not based on a subsidy designation in China. Commerce requires a linkage from Zhongji that it does not require of itself before imposing countervailing duties.

In fact, Commerce has previously found information that is identical to what Zhongji provided on the record here to be sufficient to qualify for a double remedies adjustment. For instance, in its investigation of quartz surface products from China investigation, Commerce found a subsidies-to-cost link based on the following:

> With respect to the subsidies-to-cost link, in its double remedies questionnaire response, Yixin Stone reported that it consumed electricity, quartz, and polyester resin in the production of subject merchandise. Yixin Stone provided information indicating that the subsidy programs affected its COM. Specifically, Yixin Stone stated that it identifies and monitors the cost fluctuations of these raw materials. Thus, Commerce concluded that Yixin Stone established a subsidies-to-cost link because subsidies for the provision of electricity, quartz, and polyester resin for LTAR impact their costs for producing subject merchandise.

Quartz I&D Mem. at 12 (citations omitted); *see also Certain Corrosion Inhibitors From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 7,532 (Dep't of Commerce Jan. 29, 2021), accompanying Mem. on Final Double Remedy Calc. at 2 (Commerce found subsidies-to-cost link established because respondents "provided information indicating that the subsidy programs affected their COM" and stated that they identify and monitor the cost fluctuations of these raw materials.). Here, Zhongji has demonstrated the same *and more*. First, Zhongji reported that it consumes the identified inputs and the LTAR items flow directly into its COM. *See* Double Remedies QR at DR-6 (Public Version), Appx16029. Second, Zhongji reported that the subsidy programs affected its COM. *See id.* at DR-2, Appx16025. Third, Zhongji stated that it monitors and identifies cost fluctuations of these raw materials. Moreover, Zhongji has reinforced the subsidies-to-cost link by showing that its aluminum inputs constitute a significant portion of the subject merchandise COM through its cost ledgers. *See id.* at Ex. DR-4.1 (Business Proprietary Document), Appx16049-16050 (showing that the cost of foil stock is [ ] percent of the cost of materials used to

manufacture finished goods and [ ▮ ] percent of the total cost of

producing the subject merchandise). Thus, any change in price of these

inputs would be directly reflected in the COM of subject merchandise.

Commerce tried to distinguish the quartz surface investigation

with the instant review by stating in conclusory fashion that in the

quartz surface case, the respondent established:

> 1) a subsidies-to-cost link by demonstrating that subsidies
> received for LTAR impacted the cost for producing subject
> merchandise; and
> 2) a cost-to-price link by demonstrating that it directly
> adjusted the sales price of subject merchandise when the
> raw material costs changed substantially.

Final I&D Mem. at Cmt. 4, Appx02491. Without distinguishing

Zhongji's facts from the quartz surface case, Commerce simply

concluded that "Zhongji has failed to establish that the prices for the

inputs in question established a monthly decline, or in COM, and thus

failed to establish a subsidies-to-cost link," *id.*, when in fact, Zhongji did

demonstrate a decline in both inputs and COM as detailed above. The

substantial evidence standard requires that "the path of Commerce's

decision must be reasonably discernable." *NMB Singapore*, 557 F.3d at

1319. Here, Commerce provided no reasoning to allow parties to

discern the path of its decision to treat this case differently from the

quartz surface case. Further, Commerce's decision here is arbitrary because it treated similar situation differently "without adequate explanation and factual support on the record." *Thai Plastic Bags Indus. Co., Ltd. v. United States*, __ CIT __, __, 949 F. Supp. 2d 1298, 1302 (2013); *see also Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996).

Commerce, instead, relied on its finding in the wooden cabinets and vanities case, but that case is factually distinguishable. *See* Final I&D Mem. at Cmt. 4, Appx02491. There, the mandatory respondent "only provided charts with the monthly prices of electricity and plywood" and failed to provide documents "such as company accounting records, to demonstrate a connection between subsidies received and COM." *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 Fed. Reg. 54,106 (Dep't of Commerce Oct. 9, 2019), and accompanying Dec. Mem. at 48 ("Vanities Dec. Mem."). Here, unlike the respondent in the wooden cabinets and vanities investigation, Zhongji provided company accounting records,

i.e., cost of production ledgers and overhead ledgers, demonstrating that its cost to procure LTAR inputs flows directly to the relevant COM subledgers in its accounting system. *See, e.g.*, Double Remedies QR at Exs. DR-4.1-DR-6 (Business Proprietary Document), Appx16049-16066.

Commerce also erroneously found that "Zhongji has offered no convincing explanation of how quoted LME prices for primary aluminum ingot establish a monthly decline in the prices of aluminum jumbo rolls which comprise Zhongji's aluminum inputs and a distinctly different production input than primary aluminum ingot." Commerce wrongly summarized Zhongji's inputs as "jumbo rolls" when in fact Zhongji consumed ingot (FOP name = ALINGOT), strip (FOP name = ALUSTRIP), stock (FOP name = FLSTOCK), and electricity (FOP name =ELECTRICITY, all of which relate to inputs for which Commerce has applied LTAR subsidy findings. *See Final Results*, accompanying Analysis Mem. at Attach. I (Public Version), Appx02505-02508. Moreover, through its COM ledgers and description of the subject merchandise's production process, Zhongji has demonstrated the significant effect of the costs of aluminum ingot, sheet and foil stock on

the COM of the subject merchandise. *See* Double Remedies QR at DR-2

(Public Version), Appx16025.

In sum, Zhongji demonstrated a strong subsidies-to-cost link in

which the cost of its LTAR inputs made up such a significant portion of

its COM that it is inconceivable that subsides on these inputs would not

lower its COM. *See* Double Remedies QR at DR-2, DR-7, Appx16025,

Appx16030. If Commerce found Zhongji's information deficient, it

should have informed Zhongji and given Zhongji the opportunity to

remedy any deficiency, but it did not. *See* 19 U.S.C. § 1677m(d).

Commerce's determination that Zhongji did not establish a subsidies-to-

cost link is, therefore, unsupported by substantial evidence and

otherwise not in accordance with law.

> ii. Zhongji's Lower COM Resulted in Lower Selling Prices
> of Subject Merchandise

In the Final Results, Commerce stated that a " 'cost-to-price link'

occurs where a change in the COM results in a change to the prices

charged to the customer," and "{h}ere, Zhongji has not demonstrated

that the programs discussed in its double remedies response have led to

a decrease in COM or that any such decrease (if it had occurred) would

have resulted in a change in prices charged to the customer." Final

I&D Mem. at Cmt. 4, Appx02491.  Commerce, however, offered no analysis aside from a conclusory statement that "Zhongji failed to establish a 'cost-to-price link,' as set forth in Section 777A(f) of the Act." *Id.*  Commerce completely failed to examine the connection between changes in COM and changes in exporting price of the subject merchandise (i.e., cost-to-price link), as detailed below.

In sum, in its double remedies questionnaire response, Zhongji directly responded to Commerce's requests for information regarding internal processes for price setting, i.e., how prices are set, how price changes are realized and how the COM is incorporated directly into pricing.  *See* Double Remedies QR at DR-1-DR-4 (Public Version), Appx16024-16027.  Commerce, however, failed to discuss this relevant information on the record relating to a cost-to-price linkage.  Final I&D Mem. at Cmt. 4, Appx02491-02492.  Commerce must take into account not only the information that supports the agency's decision but also whatever in the "record fairly detracts from its weight."  *Nippon*, 458 F.3d at 1351 (quoting *Universal Camera Corp.*, 340 U.S. at 477-78).  Here, if Commerce actually engaged with the record, including the facts that detract from its determination, the only reasonable reading of the

record concerning Zhongji's price-setting structure is that Zhongji has established a "cost-to-price" link as set forth below.

First, Zhongji provided that "{w}hen setting and changing the prices of exports to the United States, the primary factor that Zhongji HK considers is the overall cost of manufacturing, including the costs of the main inputs such as foil stock, aluminum strip, aluminum ingot, and the cost of electricity, labor, overheads etc." Double Remedies QR at DR-2 (Public Version), Appx16025. Aluminum pricing generally consists of two components: (1) a conversion premium, negotiated and agreed by the parties and (2) the price of the metal component that is based on the LME ingot price. *See id.* at DR-1-DR-2, Appx16024-16025. The pricing methodology, i.e., conversion premium plus aluminum ingot price, is widely used in the aluminum processing industry; thus, aluminum strip and foil stock are also priced in the same manner when Zhongji's purchases them as inputs. Under this pricing structure, the price fluctuation in ingot is automatically translated to the prices of aluminum strip, foil stock and foil. The changes in the export prices of subject merchandise are, therefore, largely driven by fluctuations of the aluminum input cost during the relevant time period. *See id.* at DR-2,

Appx16025.

Second, in terms of the price-setting process, Zhongji reported that the head of the sales department "monitors the LME ingot price and checks with the purchase manager and financial manager regarding the cost of the domestic purchase prices of foil stock, aluminum strip, aluminum ingot, electricity and other elements of the cost of manufacturing periodically to consider the prices quoted to the customers." *Id.* at DR-3, Appx16026. Through this mechanism, Zhongji's COM flows directly into its pricing for subject merchandise because the head of sales department adjusts Zhongji's quoted price to its customers based on fluctuations in the cost of aluminum inputs and electricity. *See id.* at Ex. DR-1, Appx16035-16036 (showing that exports of subject merchandise [███████████████████████████████████████████ ██████████ ] during the period of review in tandem with [ ██████ ] in input purchases).

Commerce cites to the investigation of Wooden Cabinets and Vanities, *see* Final I&D Mem. at Cmt. 4, Appx02491, but in that case, Commerce also did not conduct any analysis on the cost-to-price link. Commerce only provided a conclusion that the respondent "failed to

identify a cost-to-price linkage, as no price fluctuations were shown to result from a change in cost during the relevant period." Vanities Dec. Mem. at 48-49. Here, if Commerce is looking for the correlation between price fluctuation and change in costs to establish the cost-to-price link, Zhongji has shown this correlation. Zhongji has shown both (1) how the COM is directly incorporated into its pricing (in the metal cost component for example) and (2) that those changes were realized in the pricing of subject merchandise during the period of review. *See* Double Remedies QR at DR-1-DR-4 (discussing pricing adjustments) (Public Version), Appx16024-16027.

In the quartz surface products from China investigation, Commerce found a cost-to-price link on the basis that:

> Yixin Stone stated that it adjust{s} the sales price of the subject quartz surface products when the raw material costs change substantially. In addition, Yixin Stone reported that its accounting department reports significant cost changes to management and that management, in turn, considers the price changes and then instructs the sales department to conduct market research and price negotiations with the U.S. customers.

Quartz I&D Mem. at 12 (citations omitted). Here, Zhongji similarly sets prices based on consultations between the head of the purchase

department, the financial manager and the head of the sales department. *See* Double Remedies QR at DR-3 (Business Proprietary Document), Appx16026. Zhongji monitors raw material costs and the COM more broadly to renegotiate pricing with its customers where necessary. *See id.* In fact, the specific pricing mechanism in the aluminum industry *dictates* that pricing is adjusted on a monthly basis. *See id.* at DR-10, Appx16033. Although Zhongji has provided identical information that Commerce found to be sufficient to establish a cost-to-price link in the quartz surface products case, Commerce arbitrarily treated Zhongji differently here. *See Transactive Corp.*, 91 F.3d at 237 ("{A}n agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently.").

Again, if Commerce questioned Zhongji's response or found information that it submitted deficient, it should have informed Zhongji and given Zhongji the opportunity to remedy any deficiency, but it failed to do so. *See* 19 U.S.C. § 1677m(d). For the foregoing reasons, the record demonstrates that Zhongji has proven a subsidies-to-cost link and a cost-to-price link, and Commerce's finding that Zhongji failed to

adduce sufficient evidence establishing these linkages was unsupported by substantial evidence and otherwise not in accordance with the law.

### C. Commerce Can Reasonably Estimate the Extent to Which Zhongji's Dumping Margin Has Increased

The third element of Commerce's double remedies statutory test is whether Commerce "can reasonably estimate the extent to which the countervailable subsidy . . . , in combination with the use of {normal value} determined pursuant to {section 773(c) of the Act}, has increased the weighted-average dumping margin for the class or kind of merchandise." 19 U.S.C. § 1677f-1(f)(1)(C). Based on its past practice and the record here, Commerce can reasonably estimate the amount by which Zhongji's dumping margin has increased by the subsidy programs identified.

The quartz surface products from China investigation again provided Commerce with a well-reasoned example, where Commerce "applied a documented ratio of cost-price changes for the relevant manufacturing sector as a whole, which is based on data provided by Bloomberg, as the estimate of the extent of subsidy pass-through." Quartz I&D Mem. at 12. Where the examined company is also the mandatory respondent in the concurrent CVD proceeding, Commerce

relied on the "calculated subsidy rates for electricity, quartz, and

polyester resin for LTAR, multiplied by the pass-through rate obtained

from Bloomberg, in order to obtain the amount of subsidy passed

through and deducted from the calculated AD margin." *Id.* at 13. Here,

Commerce could have used this same methodology to calculate any

adjustment for Zhongji but failed to do so in the Final Results. Zhongji

provided the following chart in its double remedies questionnaire

response indicating the percentage of its COM accounted for by each

raw material at issue here:

| Production Stage | Input cost percentage | Conversion cost percentage |
|---|---|---|
| Aluminum foil | Cost of foil stock, [ ▉ ]% | Conversion cost from foil stock to aluminum foil, [ ▉ ]% |
| Foil stock | Cost of aluminum strip, [ ▉ ]% | Conversion cost from aluminum strip to foil stock, [ ▉ ]% |
| Aluminum strip | Cost of aluminum ingot, [ ▉ ]% | Conversion cost from aluminum ingot to aluminum strip, [ ▉ ]% |

Double Remedies QR at DR-2 (Business Proprietary Document),

Appx16025. The input cost percentage column indicates the aluminum

component of the cost of production at each stage and is an accurate

pass-through factor for Commerce's calculation with respect to Zhongji's

aluminum products. Electricity costs are included in the conversion cost percentage. *See id.* at DR-8, Appx16031. Using this record information in conjunction with its past practice, Commerce could have accurately calculated the reduction in Zhongji's dumping margin.

Overall, Commerce failed to explain why it acted inconsistently from its earlier decision with similar facts. *See* Quartz I&D Mem. at 10-13. The Court will only uphold Commerce's determination where Commerce "reasonably tie{s} the determination under review to the governing statutory standard and to the record evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding." *CP Kelco U.S. Inc. v. United States*, 949 F.3d 1348, 1356 (Fed. Cir. 2020) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). In the Final Results, Commerce barely discusses the reasoning behind its findings, or any of the significant evidence submitted by Zhongji in its double remedies questionnaire response, or the special considerations raised by the nature of the aluminum industry. As a result, Commerce failed to meet its burden to examine the record fully and explain its decisions. *See*

*Nippon*, 458 F.3d at 1351 (quoting *Universal Camera Corp.*, 340 U.S. at 477-78).

In sum, Commerce's denial of Zhongji's double remedies adjustment was unsupported by substantial evidence and otherwise not in accordance with the law because Zhongji has demonstrated all statutory elements under 19 U.S.C. § 1677f-1(f)(1)(B) to receive such adjustment. This Court, therefore, must remand this issue back to Commerce with instructions to apply the double remedies adjustment and recalculate Zhongji's antidumping margin based on such an adjustment.

III.    Commerce's Refusal to Capture Zhongji's Re-Invoiced Sales in its Liquidation Instructions Was Unsupported by Substantial Evidence and Otherwise not in Accordance with Law

Commerce has an overarching obligation to enforce the AD law by imposing duties as a remedial measure, and its liquidation instructions are meant for CBP to accurately assess relevant entries to avoid overcollection of punitive duties.  In the Final Results, Commerce refused to modify its default language in Zhongji's liquidation instruction to capture certain re-invoiced sales, which will lead to the

erroneous liquidation of certain Zhongji shipments at the China-wide rate.

In the Final Results, Commerce determined that it does not intend to modify its standard liquidation instruction language for Zhongji to insert "resold" before "imported by or sold to" in paragraph 1 once it issues liquidation instructions for Zhongji. *See* Final I&D Mem. at Cmt. 3, Appx02488-02489. This determination runs contrary to the factual record. Specifically, Zhongji established that some of its customers re-invoice sales of subject merchandise prior to importation. *See* Letter on Behalf of Zhongji to Dep't of Commerce re: Pre-Preliminary Results Comments on Liquidation Instructions Reseller Issue (Apr. 2, 2020) (Public Version), Appx 24809-24816. As a result of this sales arrangement, in certain instances, a different importer of record would appear on the entry documents than Zhongji's initial customer. Zhongji clarified that the record confirms these sales arrangements. *See id.* For example, in the case of certain sales to [ █████████████████████ ], the importer of record was another entity, because [ ████████████████ ] reinvoiced Zhongji's foil prior to importation. *See* Zhongji Case Br. at 3 (Business Proprietary

Document), Appx25782; *see also* Letter on Behalf of Zhongji to Dep't of Commerce re: Section A Questionnaire Response at Ex. A-6 (Sept. 12, 2019) (Business Proprietary Document), Appx09099-09107 (showing that Zhongji's sale to [ ██████████████████████████████

████████████████████ ] and the importer of record was not

[ ███████████████ ] but, rather, [ █████████ ] customer, [ ████

█████████ ]). The same occurs with some other customers, such as [

█████████ ]. *See* Zhongji Case Br. at 3 (Business Proprietary

Document), Appx25782. Commerce's standard language, therefore,

would only cover entries that are "imported by or sold to" firms, as

indicated on the commercial invoice or CBP documentation, which will

result in Zhongji's entries that are re-sold prior to importation being

subject to the China-wide rate of 105 percent, instead of Zhongji's rate

of 23.62 percent, as modified for each of Zhongji's specific customers.

Commerce rejected Zhongji's request to modify its standard

liquidation sales, finding unpersuasive:

> Zhongji's contention that liquidation by entered value would
> result in an "erroneous" assessment of the Zhongji entries at
> issue, as we have based our calculation of entered value
> (which serves as the importer-specific basis over which we
> will liquidate Zhongji's entries) on the data that Zhongji
> provided in its U.S. sales listing.

Final I&D Mem. at Cmt.3, Appx02489. Commerce misunderstood or actively dodged Zhongji's argument. Zhongji was not claiming that Commerce's margin calculation is incorrectly calculated based on the values by which Zhongji sold to each customer but rather that when Commerce issues its liquidation instructions, the Zhongji's sales subject to the re-sale arrangement described above would not be assessed duties commensurate with Zhongji's review-specific rate (i.e. at 105 percent instead of the customer-specific percentage). *See id.* Specifically, where Zhongji made a U.S. sale to a customer with knowledge that the goods are destined for the United States, but where Zhongji's direct customer then reinvoiced the product prior to importation, the importer of record would be different from Zhongji's initial customer as identified in its sales database. *See* Letter on Behalf of Zhongji to Dep't of Commerce re: Section C Questionnaire Response at Ex. C-1 (Sept. 30, 2019) (Business Proprietary Document), Appx09862-09870 (showing that Zhongji reported its customers in the fields CUSCODU and CUSNAMU where Zhongji made sales with knowledge that the goods were destined for the United States). Commerce uses those customer names as proxies for the importer of

record.  For sales made where the re-seller importer does not appear in Zhongji's customer database, Commerce's default instruction language would cause these sales, which were analyzed for purposes of importer-specific assessment rates, to effectively drop out of the administrative review and liquidate at the China-Wide rate when they were rightfully eligible for Zhongji's calculated rate.   Commerce's default liquidation language, thus, will result in an inaccurate, punitive assessment of duties and frustrate the purpose of the review.

As the Court of Appeals for the Federal Circuit ("Federal Circuit") has repeated time and again, AD laws are "remedial *not punitive.*" *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (citing *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103-1104 (Fed. Cir. 1990)) (emphasis added).  The function of AD law is to "reduc{e} or eliminat{e} discrepancies in pricing between the U.S. and foreign markets." *U.S. Steel Group v. United States*, 25 CIT 1293,1298, 177 F. Supp. 2d 1325, 1330 (2001); *see also C.J. Tower & Sons v. United States*, 21 C.C.P.A. 417, 427, 71 F.2d 438 (1934) (stating that the statute's object is "to impose *not a penalty*, but an amount of duty *sufficient* to equalize competitive conditions between the exporter and

70

American industries affected") (emphasis added). Also, "{t}he purpose of the {AD} law, as its name implies, is to discourage the practice of selling in the United States at {Less-Than-Fair-Value ("LTFV")} by the imposition of *appropriately* increased duties." *Melamine Chems., Inc. v. United States*, 732 F.2d 924, 933 (Fed. Cir. 1984) (emphasis added). Consistent with these obligations, Commerce was obliged to tailor its liquidation instructions to Zhongji's selling patterns in order to ensure that the duties imposed are "appropriately increased" to equalize market conditions and not be punitive in nature. "{I}f Commerce{'s} instructions are inaccurate or incorrect, Customs will liquidate the entries according to the improper instructions and the determination will not be the basis for the assessment of duties." *Shinyei Corp. of Am. v. United States*, 355 F.3d 1297, 1306 (Fed. Cir. 2004). Commerce's failure to correct its default language was unsupported by substantial evidence and otherwise not in accordance with law.

Commerce's default language in its liquidations instructions frustrates the underlying purpose of the AD statutory scheme by subjecting Zhongji's "re-invoiced sales" to excessive duties at the China-Wide rate, which turns a statutorily remedial measure (i.e., the

assessment of antidumping duties) into a punitive one.  In *NTN Bearing*, the Federal Circuit remanded Commerce's decision to correct a clerical error in the respondent's submission: a transcribing error that resulted in inclusion of four Canadian sales in the U.S. sales database. *See* 74 F.3d at 1208-09.  The court ordered the remand because such modification would neither "have required beginning anew nor have delayed making the final determination," but without correcting this error would "result{} in the imposition of many millions of dollars in duties not justified under the statute." *Id.* at 1208.  Similarly, here, Zhongji proposed a simple fix to Commerce's liquidation instructions, that would not have required Commerce to begin this proceeding anew nor causing any delays in the administrative review given that Commerce has not yet issued liquidation instructions for Zhongji. Zhongji's proposed modification will align Commerce's assessment instructions with how Zhongji reported its U.S. sales, and how Commerce normally would calculate customer-specific dumping margins if Zhongji's customer and the importer of record were the same entity.  Most importantly, adding the phrase "resold" to the liquidation instructions is consistent with Commerce's statutory obligation to

impose an "appropriate" amount of remedial duties and avoid overcollection of many millions dollars of punitive duties. *See id.* at 1208 (noting that the purpose of antidumping laws is "remedial not punitive"); *see also Melamine Chems.*, 732 F.2d at 933 ("The purpose of the antidumping law, . . . is to discourage the practice of selling in the United States at LTFV by the imposition of *appropriately* increased duties.") (emphasis added). By refusing to modify its default liquidation instructions, Commerce will effectively subject Zhongji's re-invoiced transactions to a punitive duty rate (i.e. China-wide rate at 105 percent) instead of the a remedial one (i.e., Zhongji's overall rate at 23.62 percent as tailored to Zhongji's specific customers). *Final Results*, 86 Fed. Reg. at 11,500, Appx03640. Commerce's decision, therefore, was unsupported by substantial evidence and otherwise not in accordance with the law given that its customs instructions, once issued, will lead to the inaccurate liquidation of certain entries of Zhongji's customers at a punitive rate, which is contrary to Commerce's obligation to enforce the antidumping law as remedial measure and avoid over-collection of punitive duties.

In sum, this Court must remand this issue back to Commerce with instructions to modify its liquidation instructions once they are issued, to include the phrase "*resold or* imported" in paragraph 1 before the list of importers, to capture Zhongji's sales where its merchandise was subsequently re-invoiced prior to being sold into the United States.

## CONCLUSION

For the foregoing reasons, Zhongji requests that the Court grant its Motion for Judgment on the Agency Record because the Final Results were unsupported by substantial record evidence or unlawful. To remedy these errors, Zhongji requests that the Court remand the Final Results to Commerce for a determination in accordance with the points of law discussed above.

Respectfully submitted,

Dated: September 9, 2021     /s/ Jeffrey S. Grimson
                             Jeffrey S. Grimson
                             Sarah M. Wyss
                             Bryan P. Cenko
                             Wenhui "Flora" Ji
                             *Counsel to Zhongji*

**CERTIFICATE OF COMPLIANCE**

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 13,985 words.

Dated: <u>September 9, 2021</u>

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW,
Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Zhongji*