**NONCONFIDENTIAL
VERSION**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before:  The Honorable M. Miller Baker, Judge**

| | |
|---|---|
| **JIANGSU ZHONGJI LAMINATION MATERIALS CO.,** *et al.*, | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) ) |
| **UNITED STATES,** | ) **Court No. 21-00138** ) |
| **Defendant,** | ) ) |
| **Aluminum Association Trade Enforcement Working Group and its Individual Members, et al.,** | ) ) ) ) |
| **Defendant-Intervenors.** | ) ) |

**Defendant-Intervenors' Response in Opposition to
<u>Plaintiffs' Motion for Judgment on the Agency Record</u>**

> **JOHN M. HERRMANN
> PAUL C. ROSENTHAL
> JOSHUA R. MOREY
> GRACE W. KIM
> KELLEY DRYE & WARREN LLP
> 3050 K Street, N.W., Suite 400
> Washington, DC  20007
> (202) 342-8400**
>
> **Counsel to Defendant-Intervenors**

**January 14, 2022**

NONCONFIDENTIAL
VERSION

# **Table of Contents**

**Page**

DEFENDANT-INTERVENORS' RESPONSE IN
OPPOSITION TO PLAINTIFFS' MOTION FOR
JUDGEMENT ON THE AGENCY RECORD ......................................... 1

ADMINISTRATIVE DETERMINATION UNDER REVIEW ................. 2

ISSUES PRESENTED AND SUMMARY OF THE
ARGUMENT .................................................................................... 3

STANDARD OF REVIEW ................................................................. 7

STATEMENT OF FACTS .................................................................. 9

I.    The Department Relied on the Best Available
      Information to Value Zhongji's Factors of Production ................. 10

      A.    Best Available Information Standard ................................. 10

      B.    The Department Reasonably Relied on
            Information for Merchandise Classifiable Under a
            Tariff Classification That Provides for Aluminum
            Ash to Value Zhongji's Aluminum Ash By-
            Product ........................................................................ 12

      C.    The Department's Selections of Surrogate
            Information to Value Zhongji's Rolling Oil and
            Rolling Oil Additive Inputs Are Reasonable ..................... 17

            1.    Rolling Oil ................................................... 18

            2.    Rolling Oil Additive ....................................... 20

      D.    The Department's Selection of Maersk Data As
            the Best Available Information to Value Ocean
            Freight Is Reasonable .................................................... 21

NONCONFIDENTIAL
VERSION

# Table of Contents
## (continued)

**Page**

II.   The Department Reasonably Rejected Zhongji's Request for a Double Remedies Adjustment .................................. 24

     A.   The Department Correctly Determined There Is No Cost-To-Price Link ................................................ 25

     B.   The Department Correctly Determined There Was No Subsidy-to-Cost Link ............................... 31

III.  The Department Reasonably Declined to Modify Its Standard Liquidation Instructions ............................... 32

IV.  Conclusion ......................................................... 32

NONCONFIDENTIAL
VERSION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Carbon Activated Tianjin Co. v. United States*,
  Ct. No. 20-00007, Slip Op. 21-149,
  2021 Ct. Intl. Trade LEXIS 151 (Oct. 22, 2021) ................................. 11

*Jacobi Carbons AB v. United States*,
  313 F. Supp. 3d 1344 (Ct. Int'l Trade 2018) ........................... 12, 14-15

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*,
  28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ........................................ 15

*Matsushita Elec. Indus. Co. v. United States*,
  750 F.2d 927 (Fed. Cir. 1984) ........................................................... 8, 9

*Mitsubishi Heavy Indus., Ltd. v. United States*,
  275 F.3d 1056 (Fed. Cir. 2001) ............................................................. 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*,
  463 U.S. 29 (1983) ........................................................................... 9, 22

*Qingdao Sea-line Trading Co. v. United States*,
  766 F.3d 1378 (Fed. Cir. 2014) .......................................................... 11

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
  44 F.3d 978 (Fed. Cir. 1994) ................................................................ 7

*United States Steel Group v. United States*,
  96 F.3d 1352 (Fed. Cir. 1996) ........................................................... 8-9

### Statutes and Regulations

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................ 7

19 U.S.C. § 1677b(a) ................................................................................... 10

NONCONFIDENTIAL
VERSION

19 U.S.C. § 1677b(c)(1) ........................................................... 10, 11

19 U.S.C. § 1677b(c)(1)(B) .............................................................. 22

19 U.S.C. § 1677b(c)(3)(A)-(D) ...................................................... 11

19 U.S.C. § 1677f-1(f) .................................................................... 6

19 U.S.C. § 1677m(d) .................................................................... 32

19 C.F.R. § 351.408(a) .................................................................. 22

## Administrative Determinations

*Certain Aluminum Foil From the People's Republic of China:
Amended Final Results of Antidumping Duty
Administrative Review; 2017–2019*, 62 Fed. Reg. 17,358
(Dep't Commerce Apr. 2, 2021) ........................................................ 2

*Certain Aluminum Foil From the People's Republic of China:
Final Results of Antidumping Duty Administrative
Review; Final Determination of No Shipments; 2017-2019*,
86 Fed. Reg. 11,499 (Dep't Commerce Feb. 25, 2021)
("*Final Results*") ..................................................................... 2, 3, 33

*Issues and Decision Memorandum for the Final Results of
the Antidumping Duty Administrative Review of Certain
Aluminum Foil from the People's Republic of China; 2017-
2019* (Dep't Commerce Feb. 19, 2021) ("*I&D Memo*") ............... *passim*

*Issues and Decision Memorandum for the Final Affirmative
Determination in the Less-Than-Fair-Value Investigation
of Certain Quartz Surface Products from the People's
Republic of China* (Dep't Commerce May 19, 2019), *ref'd
in* 84 Fed. Reg. 23,767 (May 23, 2019)
(final determination) ..................................................................30-31

NONCONFIDENTIAL
VERSION

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Decision Memorandum for the Preliminary Affirmative Determination of Sales at Less Than Fair Value* (Dep't Commerce Oct. *2, 2019), ref'd in* 84 Fed. Reg. 54,106 (Oct. 9, 2019) ........................................26

## Miscellaneous

*Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process*, (2004) (available at: http: enforcement.trade.gov/policy/bull04-1.html) .....................................11

NONCONFIDENTIAL
VERSION

## **Glossary**

| Acronym\Abbreviation | Item |
|---|---|
| Def. | Defendant United States |
| Def.'s Resp. | Defendant's Response to Plaintiffs Motion for Judgment Upon the Agency Record, Dec. 17, 2021 (ECF No. 30) |
| Defendant-Intervenors | Aluminum Association Trade Enforcement Working Group and its individual members individual members: (1) JW Aluminum Company; (2) Novelis Corporation; and (3) Reynolds Consumer Products, LLC. |
| Dep't Commerce | Department of Commerce |
| *Final Results* | *Certain Aluminum Foil From the People's Republic of China: Final  Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; 2017-2019*, 86 Fed. Reg. 11,499 (Dep't Commerce Feb. 25, 2021) |
| HTS | Harmonized Tariff Schedule |
| Huafeng | Jiangsu Zhongji Lamination Materials Stock Co., Ltd., and Jiangsu Huafeng Aluminum Industry Co., Ltd. |

NONCONFIDENTIAL
VERSION

| Acronym\Abbreviation | Item |
|---|---|
| *I&D Memo* | *Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review of Certain Aluminum Foil from the People's Republic of China; 2017-2019* (Dep't Commerce Feb. 19, 2021) |
| Jiangsu Zhongji | Jiangsu Zhongji Lamination Materials Co., Ltd. |
| LME | London Metal Exchange |
| NME | Nonmarket economy |
| Plaintiffs | Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Jiangsu Zhongji Lamination Materials Co., Ltd. Jiangsu Zhongji Lamination Materials Stock Co., Ltd., and Jiangsu Huafeng Aluminum Industry Co., Ltd. |
| *Policy Bulletin 04.1* | *Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process* (2004) (available at: http: enforcement.trade.gov/policy/bull04-1.html) |
| Zhongji HK | Jiangsu Zhongji Lamination Materials Co., Ltd. |
| Zhongji's Br. | Plaintiffs' Motion for Judgment on the Agency Record, Sept. 9, 2021 (ECF No. 25) and accompanying Memorandum of Points and Authorities in support thereof (ECF No. 26) |

NONCONFIDENTIAL
VERSION

## DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGEMENT ON THE AGENCY RECORD

This response brief is filed on behalf of the Aluminum Association Trade Enforcement Working Group and its individual members,[1] Defendant-Intervenors in this action, in opposition to the Rule 56.2 Motion for Judgment on the Agency Record (ECF No. 25) and accompanying Memorandum of Points and Authorities in support thereof (ECF No. 26) (hereinafter, "Zhongji's Br.") filed on behalf of Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. ("Zhongji HK"), Jiangsu Zhongji Lamination Materials Co., Ltd. ("Jiangsu Zhongji"), Jiangsu Zhongji Lamination Materials Stock Co., Ltd., and Jiangsu Huafeng Aluminum Industry Co., Ltd. ("Huafeng") (collectively, "Plaintiffs"). Consistent with this Court' instructions, and to avoid repetition of arguments, Defendant-Intervenors incorporate certain sections of Defendant's response brief by reference and address additional facts and arguments in each section set forth below. *See* Letter to All Counsel, May 13, 2021 (ECF No. 22); Def.'s Resp. to Pls.'

---

[1] The individual members of the Aluminum Association Trade Enforcement Working Group are: (1) JW Aluminum Company; (2) Novelis Corporation; and (3) Reynolds Consumer Products, LLC.

NONCONFIDENTIAL
VERSION

Mot. for J. Upon the Agency R., Dec. 17, 2021 (ECF No. 30) (hereinafter "Def.'s Resp."). For the reasons set forth below, Plaintiffs' contentions are without merit, and this Court should sustain the underlying agency determination in its entirety.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

Plaintiffs challenge certain aspects of the U.S. Department of Commerce's (the "Department") final results of the first administrative review of antidumping duty order on Certain Aluminum Foil from the People's Republic of China that analyzes sales of subject merchandise in the United States during the period November 2, 2017 to March 31, 2019. *See Certain Aluminum Foil From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; 2017-2019*, 86 Fed. Reg. 11,499 (Dep't Commerce Feb. 25, 2021) (hereinafter, "*Final Results*") (Appx03639-03641)[2] and accompanying *Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review of*

---

[2] The *Final Results* were amended to correct a ministerial error in the agency's final margin calculations. *See Certain Aluminum Foil From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2017–2019*, 62 Fed. Reg. 17,358 (Dep't Commerce Apr. 2, 2021) (Appx04450-04452).

NONCONFIDENTIAL
VERSION

*Certain Aluminum Foil from the People's Republic of China; 2017-2019*

(Dep't Commerce Feb. 19, 2021) (hereinafter, "*I&D Memo*")

(Appx02480-02498).[3]

## ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT

Plaintiffs argue the *Final Results* are not supported by substantial

evidence and are otherwise not in accordance with law because the

Department:

1. Failed to select the "best available information" to
   value aluminum ash, rolling oil, rolling oil additive,
   and ocean freight;

2. Failed to adjust U.S. price for alleged "double
   remedies"; and

3. Failed to modify its liquidation instructions.

Plaintiffs' claims are wrong and should be rejected by this Court.

*First*, the Department's reliance on information concerning the

value of Bulgarian imports of merchandise classified under Harmonized

Tariff Schedule ("HTS") heading 2620, which provides for metallic ash

(including aluminum ash), as the best available information to value

Zhongji's aluminum ash by-product is reasonable. Zhongji proposes an

---

[3]   Additional citations will be directly to the confidential version of the
joint appendix and references to the administrative record document
titles and record numbers will be omitted.

NONCONFIDENTIAL
VERSION

alternative tariff classification (providing for aluminum scrap) that it claims is more specific to its by-product, but fails to cite any record evidence in support of its claim. Indeed, record evidence concerning the aluminum content of Zhongji's by-product demonstrates that information concerning the value of merchandise classified under HTS heading 2620 is the only appropriate information for valuing Zhongji's by-product. Zhongji's claim is a mere invitation for the Court to reweigh the evidence, which is inconsistent with the applicable standard of review.

*Second*, Zhongji claims that the Department's reliance on the value of merchandise classified under HTS subheadings 3404.99 and 3811.90 to value rolling oil and rolling oil additive is similarly flawed. As an initial matter, rolling oil and rolling oil additive are distinct raw materials, and Zhongji's treatment of them as single input in its brief is incorrect. Further, the record does not support Zhongji's claim that rolling oil and rolling oil additive are comparable to merchandise that is appropriately classified under the tariff classification Zhongji proposes (*i.e.*, HTS subheading 2710.12.21). The Department reasonably

NONCONFIDENTIAL
VERSION

concluded that merchandise classified under HTS subheading 2710.12.21 is not comparable to Zhongji's rolling oil because the record demonstrates Zhongji's rolling oil has been further processed beyond the merchandise that is classifiable under the tariff category proposed by Zhongji. Moreover, because HTS subheading 2710.12.21 does not provide for additives, that heading is not specific (or relevant) to Zhongji's rolling oil additive input. As a result, the Department reasonably determined to value Zhongji's rolling oil and rolling oil additive using information on the value of merchandise classified under HTS subheadings 3404.99 and 3811.90, consistent with the agency's surrogate value selections in the original investigation.

*Third*, the Department's reliance on data published by Maersk as the "best available information" for valuing ocean freight is supported by substantial evidence. The record does not demonstrate that the two alternative sources of information proposed by Zhongji – Descartes and Xeneta – are reflective of market economy prices for ocean freight. As a result, neither source is appropriate for surrogate valuation purposes. Descartes data also do not satisfy the Department's surrogate valuation

criteria, as they are not contemporaneous with the period of review at issue in the Department's proceeding and are not specific to the Zhongji's ocean freight charges for shipments of aluminum foil. Accordingly, the Department's selection of Maersk data to value ocean freight is reasonable and should be affirmed by this Court.

*Fourth*, the Department correctly rejected Zhongji's request for a double remedies adjustment. Zhongji failed to satisfy the applicable statutory provision (*i.e.*, 19 U.S.C. § 1677f-1(f)) and the Department's test for establishing eligibility for a double remedies adjustment. In particular, the record makes clear that no cost-to-price link existed, given that the actual cost of Zhongji's inputs does not impact price, which is based on a published price index.

*Fifth*, Zhongji failed to demonstrate why its specific circumstances differed from the many others confronted by the Department and U.S. Customs and Border Protection – namely where a respondent's U.S. customer is not identified as the U.S. importer of record on entry documents. As a result, the Department reasonably

concluded there was no basis for revising its liquidation instructions
with respect to Zhongji's sales.

## STANDARD OF REVIEW

The standard of review applicable in this action requires that:

> {t}he court shall hold unlawful any
> determination, finding, or conclusion found . . . to
> be unsupported by substantial evidence on the
> record, or otherwise not in accordance with law . .
> . .

19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "'more than a
mere scintilla'" and "'such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion.'" *Suramerica de
Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir.
1994) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229
(1938)). "'{T}he substantiality of evidence must take into account
whatever in the record fairly detracts from its weight.'" *Id.* (quoting
*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). Such
detracting evidence includes "'contradictory evidence or evidence from
which conflicting inferences could be drawn.'" *Id.* (quoting *Universal
Camera Corp.*, 340 U.S. at 487). Thus, the Court must decide whether
"the administrative record contain{s} substantial evidence to support"

NONCONFIDENTIAL
VERSION

the Department's decision and whether that decision was "rational."
*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.
Cir. 1984).

A plaintiff, however, must do more than simply point to
contradictory evidence in the record to overturn the agency's decision.
"{T}he possibility of drawing two inconsistent conclusions from the
evidence does not prevent an administrative agency's finding from being
supported by substantial evidence." *Id.* (citations omitted). To the
extent, therefore, that a plaintiff claims the evidence before the
Department "could be open to multiple interpretations, its argument
does not require, or even allow, reversal." *Mitsubishi Heavy Indus., Ltd.
v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001) (citing
*Matsushita*, 750 F.2d at 933).

In addition, a plaintiff may not ask the Court to re-weigh the
evidence and decide the case for the Department. *See Matsushita,* 750
F.2d at 933. The role of the Court is not to question the agency's
decisions about the weight or quality of the evidence. *See United States
Steel Group v. United States*, 96 F.3d 1352, 1356-57 (Fed. Cir. 1996) (it

NONCONFIDENTIAL
VERSION

is the agency's task to evaluate and assign weight to the evidence); *see also Matsushita*, 750 F.2d at 933 (it is not the weight of the evidence, but whether the evidence reasonably supports a rational decision, that is evaluated by a reviewing court).

The standard also requires the Department to "articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). While the Department must explain the basis for its decision, the Court "will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

## STATEMENT OF FACTS

Consistent with this Court's instructions, and to avoid repetition of the facts, Defendant-Intervenors incorporate Defendant's statement of facts by reference, and address any additional facts necessary to the argument in each section below. *See* Letter to All Counsel, May 13, 2021 (ECF No. 22); Def.'s Resp. at 3-6.

NONCONFIDENTIAL
VERSION

## I.   The Department Relied on the Best Available Information to Value Zhongji's Factors of Production

### A.   Best Available Information Standard

If subject merchandise is exported from a non-market economy country such as China, and the Department determines that available information does not permit the agency to calculate normal value of the subject merchandise under 19 U.S.C. § 1677b(a), the Department

> shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses.

19 U.S.C. § 1677b(c)(1). Further, except in limited circumstance not applicable here,

> the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

*Id.*

The factors of production consumed in producing subject merchandise include, but are not limited to: "hours of labor required," "quantities of raw materials employed," "amounts of energy and other

NONCONFIDENTIAL
VERSION

utilities consumed," and "representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3)(A)-(D).

The statute directs the Department to value a respondent's factors of production based on the "best available information." 19 U.S.C. § 1677b(c)(1). As that statutory term is not defined, the Department has "broad discretion to determine what constitutes the best available information." *Qingdao Sea-line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014). In determining what information constitutes the "best available," the Department typically evaluates the degree to which data are publicly available, contemporaneous with the period of review, tax and duty exclusive, representative of a broad market average, and product-specific. *See Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process*, at 4 (2004) (available at: http: enforcement.trade.gov/policy/bull04-1.html) (hereinafter, "*Policy Bulletin 04.1*"); *Carbon Activated Tianjin Co. v. United States*, Ct. No. 20-00007, Slip Op. 21-149 at 5, 2021 Ct. Intl. Trade LEXIS 151, *5 (Oct. 22, 2021).

NONCONFIDENTIAL
VERSION

In reviewing the Department's selection of what constitutes the best available information, the Court "may not 'reweigh the evidence or . . . reconsider questions of fact anew.'" *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1352 (Ct. Int'l Trade 2018) (quoting *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015)). The Court's role "is 'not to evaluate whether the information {the Department} used was the best available, but' to determine 'whether a reasonable mind could conclude that {the Department} chose the best available information.'" *Id.*, 313 F. Supp. 3d at 1352 n.13 (quoting *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011)).

### B. <u>The Department Reasonably Relied on Information for Merchandise Classifiable Under a Tariff Classification That Provides for Aluminum Ash to Value Zhongji's Aluminum Ash By-Product</u>

Zhongji argues that the Department's selection of information concerning the value of Bulgarian imports of merchandise classified under HTS heading 2620, a heading that provides for aluminum ash, as the best available information to value its aluminum ash by-product is not supported by substantial evidence. Zhongji argues that a different

NONCONFIDENTIAL
VERSION

HTS provision (*i.e.*, HTS sub-heading 7602.00.19) that does not provide for aluminum ash "is more specific" to Zhongji's aluminum ash by-product. *See* Zhongji's Br. at 21-26. This claim is wrong, and it should be rejected by this Court as a mere invitation to re-weigh the evidence.

The Bulgarian (*i.e.*, European Union) tariff schedule includes a tariff code (*i.e.*, subheading 2620.40) that provides for aluminum ash – the exact material Zhongji reported as a by-product and that the Department was tasked with valuing. *See* Appx28287, Appx28290, Appx28327-28332; Appx28992-28994.  During the applicable period of review, however, there were no Bulgarian imports of merchandise classified under HTS subheading 2620.40. *See* Appx28330.  As a result, the Department was faced with a choice between two imperfect options for information to value aluminum ash: (1) Bulgarian import statistics for merchandise classified under HTS heading 2620, which provides for "ash and residues (except from iron or steel manufacture) containing arsenic, metals or their compounds," including aluminum ash, but also ash comprised of certain other metals; and (2) Bulgarian import statistics for merchandise classified under HTS sub-heading 7602.00.19,

NONCONFIDENTIAL
VERSION

which provides for aluminum waste and scrap other than "turnings

shavings, chips, milling waste, sawdust and filings, waste of coloured,

coated or bonded sheets and foil, of a thickness (excluding any backing)

not exceeding 0.2 mm," but does not provide for aluminum ash (or any

metallic ash for that matter). *See* Zhongji's Br. at 21; Appx28290,

Appx28327-28332; Appx28992-28994, Appx29116-29121.

Faced with these two options, the Department reasonably

determined to rely on information on Bulgarian imports of metallic ash

(*i.e.*, a by-product of the same form and relative open market value as

Zhongji's aluminum ash by-product) as the best available information

with which to value Zhongji's aluminum ash by-product. Relatedly, the

Department determined not to rely on information concerning the value

of Bulgarian imports involving aluminum in a different form – *i.e.*,

aluminum scrap. Even if reasonable minds might differ on which one of

these two categories is superior for valuing Zhongji's aluminum ash by-

product, the standard of review demands more before this Court may

remand the agency's determination for reconsideration. *See Jacobi*

*Carbons AB*, 313 F. Supp. 3d at 1352 ("the Court may not 'reweigh the

NONCONFIDENTIAL
VERSION

evidence or . . . reconsider questions of fact anew'") (quoting *Downhole Pipe & Equip., L.P.*, 776 F.3d at 1377).  Zhongji's claims to the contrary are wrong.

Zhongji cites to *Jiangsu Jiasheng*[4] in support of its claim that the Department prefers to rely on information for merchandise classified under HTS codes that are narrower for surrogate valuation purposes. *See* Zhongji's Br. at 22. In that case, however, the Court sustained the Department's reliance information concerning merchandise classified under a four-digit category (HTS heading 7604), instead of a six-digit category (HTS subheading 7616.99), because the Department reasonably concluded the four-digit category was more representative of the value of respondent's aluminum frames. *See Jiangsu Jiasheng*, 28 F. Supp. at 1338.

The same circumstance is present here, as the Department reasonably explained:

> {A}lthough HTS category 7602.00.19 covers
> aluminum waste, the broader HTS category 7602
> under which it falls describes scrap, cuttings, and

---

[4]    *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014).

> other such byproducts, not ash. Because Zhongji
> reported this by-product as dross/ash, we find
> that the HTS 7602 categories that cover scrap,
> cuttings, and other by-products are not as specific
> to Zhongji's the dross/ash by-product as compared
> to other information on the record for this review.

Appx02486. Thus, the fact that one particular HTS classification covers

a narrower set of products is of no moment if that narrower set of

products is not specific to the by-product at issue.

Zhongji's description of its aluminum ash by-product confirms that

valuing the product as metallic ash – rather than aluminum scrap – is

the only appropriate selection. Zhongji explained that its aluminum ash

by-product contains only [     ] to [     ] percent aluminum content, with

the remaining content consisting of "slag and impurities." Appx16159.

As a result, if the Department had valued Zhongji's aluminum ash by-

product as aluminum scrap, which has a much greater aluminum

content, the Department's surrogate valuation would have been

unreasonable.

Zhongji also claims that HTS subheading 7602.00.19 "is narrowly

defined to include the type of aluminum ash generated by Zhongji."

Zhongji's Br. at 26. This claim is both contrary to the record and the

NONCONFIDENTIAL
VERSION

plain language of the relevant Bulgarian HTS, which clearly

demonstrates that HTS subheading 2620.40 provides for aluminum ash,

and that HTS subheading 7602.00.19 does not. *See* Appx28992-28994,

Appx29116-29121.

Zhongji has provided no basis for this Court to disturb the

Department's reasonable conclusion that information concerning the

value of Bulgarian imports classified under HTS heading 2620 is the

best available information to value Zhongji's aluminum ash by-product.

The Court may not reweigh the evidence, which is what Zhongji is

inviting the Court to do here.

### C. The Department's Selections of Surrogate Information to Value Zhongji's Rolling Oil and Rolling Oil Additive Inputs Are Reasonable

Zhongji argues that the Department's selections of information

relating to Bulgarian imports of merchandise classified under HTS

subheading 3404.99 and HTS subheading 3811.90 to value rolling oil

and rolling oil additive, respectively, are not supported by substantial

evidence. Specifically, Zhongji argues that information on the value of

Bulgarian imports of merchandise classified under HTS subheading

**NONCONFIDENTIAL**
**VERSION**

2710.12.21 is purportedly more specific to these input materials. *See* Zhongji's Br. at 27-31.

As an initial matter, rolling oil and rolling oil additive are separate input materials with different physical characteristics and values. As such, Zhongji's arguments urging the use of information for merchandise classifiable under a single tariff classification to value both inputs is inappropriate and incorrect. Consistent with this Court's instructions, and to avoid repetition, Defendant-Intervenors incorporate Defendant's response brief by reference with respect to rolling oil and rolling oil additive. *See* Letter to All Counsel, May 13, 2021 (ECF No. 22); Def.'s Resp. at 19-23. Defendant-Intervenors, however, identify below additional citations to the record and raise additional arguments not set forth in Defendant's response brief.

1.     **Rolling Oil**

Zhongji argues that its submission of "material data sheets" demonstrates that its rolling oil is properly classified under HTS subheading 2710.12.21, because the sheet: (1) identifies **[**

**]** Based on these

-18-

physical characteristics, Zhongji argues that the appropriate information to value rolling oil is information on merchandise classifiable under HTS subheading 2710.12.21, which provides for:

> Petroleum oils and oils obtained from bituminous minerals (other than crude) and preparations not elsewhere specified or included, containing by weight 70% or more of petroleum oils or of oils obtained from bituminous minerals, these oils being the basic constituents of the preparations, other than those containing biodiesel and other than waste oils: Light oils and preparations: For other purposes: White spirit.

Zhongji's Br. at 30 (citing Appx12804-12814).

During the underlying administrative proceedings, however, Zhongji submitted information to the Commerce Department confirming that the rolling oil it consumes must meet U.S. Food and Drug Administration, Kosher, and Hallal requirements followed by the mill due to the products' ultimate use in food applications. *See* Appx16156, Appx16173-16178. Based on this information, and as discussed in Defendant's response brief, the Department reasonably concluded that the rolling oil consumed by Zhongji has undergone sufficient refining and testing to become a purified oil preparation that is appropriately classified under HTS subheading 3403.99, and does not

-19-

involve a raw petroleum oil that would be appropriately classified under HTS subheading 2710.12.21. *See* Appx02487 (citing Appx25847-25850); *see also* Def.'s Resp. at 21.

### 2.   Rolling Oil Additive

As discussed above, Zhongji identified "rolling oil" and "rolling oil additive" as two distinct direct materials in reporting its factors of production to the Department, yet it claims those inputs should be valued using information on merchandise classifiable under a single tariff classification – *i.e.*, HTS subheading 2710.12.21.  As Defendant correctly explains in its response brief, the mandatory respondent in the original investigation "identified HTS subheading 3811.90 as the proper provision for valuing rolling oil additive."  Def.'s Resp. at 22 (citing Appx31354-31361).  Thus, based on Zhongji's failure to identify a distinct tariff classification for valuing rolling oil additive (as distinct from rolling oil), the Department reasonably concluded this input should be valued consistently with the surrogate value selections relied on by the agency in the original investigation.

NONCONFIDENTIAL
VERSION

**D.   The Department's Selection of Maersk Data As the Best Available Information to Value Ocean Freight Is Reasonable**

Zhongji argues the Department's selection of Maersk data to value ocean freight is unsupported by substantial evidence and otherwise not in accordance with law because: (1) Descartes data are the "best available information" to value international freight, and the Department failed to compare these two data sources adequately; and, alternatively (2) Xeneta data are also superior to Maersk data.  *See* Zhongji's Br. at 32-340.  Zhongji's claims are wrong.

Three sources of ocean freight data were presented to the Department during the underlying proceedings – Maersk, Descartes, and Xeneta. The Department selected the Maersk data to value ocean freight because they satisfy all of the Department's surrogate value criteria – specifically, the Maersk data are publicly available, contemporaneous with the period of review, specific to the routes used by Zhongji, representative of a broad market average (as the quotes include rates for each month of the period using different shipping routes), and tax and duty exclusive. *See* Appx28415-28738; Appx02487

NONCONFIDENTIAL
VERSION

(stating that "Maersk data better meet the factors Commerce considers in selecting {surrogate values}, including public availability").

In addition, of the three different sources, only the Maersk data are confirmed to represent rates from market economy carriers. Thus, neither the Descartes data, nor the Xeneta data, are appropriate surrogate values under the statute or the Department's regulations. *See* 19 U.S.C. § 1677b(c)(1)(B); 19 C.F.R. § 351.408(a). While the Department explicitly stated that "the Xeneta data can reflect shipping data from China which is an impermissible source for valuing {inputs}," the same is true with respect to the Descartes data. *See, e.g.*, Appx25865-25868. Thus, while the Department did not explicitly state that it was rejecting the Descartes data on this basis, the path of the agency's decisional path can be reasonably discerned. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (the Court "will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned'") (quoting *Bowman Transp. Inc.*, 419 U.S. at 286).

Moreover, the Descartes data suffer from a number of other significant flaws, which clearly demonstrate the information is not the

"best available," as claimed by Zhongji. For example, Zhongji submitted only six quotes, reflecting the limited breadth of the data (*i.e.*, not representative of a broad market average). *See* Appx29356-29364. In contrast, 85 Maersk quotes are included in the administrative record, one quote for each month of the period of review (Nov. 2017 – Mar. 2019) for each of five shipping routes: (1) Shanghai to Los Angeles, CA; (2) Shanghai to Seattle, WA; (3) Shanghai to Savannah, GA; (4) Shanghai to Norfolk, VA; and (5) Shanghai to New Orleans, LA. *See* Appx28415-28738.

Additionally, of the six quotes submitted by Zhongji, only one is contemporaneous with the period of review (dated in January 2018). *See* Appx29356-29364. Four of the remaining five quotes are dated March 31, 1995, and the fifth quote is dated March 15, 2010, meaning that the vast majority of the quotes pre-date the period of review by at least seven years. *Id*. In contrast, as discussed above, *each* of the 85 Maersk quotes on the record is contemporaneous with the period of review, with one quote for each month of the period of review, for each of five routes

NONCONFIDENTIAL
VERSION

used by Zhongji (as corroborated by public ship manifest data). *See*
Appx28415-28738.

Thus, in addition to being NME rates (or at a minimum
unconfirmed sources that may be NME rates), none of the Descartes
quotes satisfies the Department' surrogate value criteria, and a
reasonable mind *could not* conclude that the ocean freight rates from
Descartes are superior to the Maersk data. Thus, the Department's
selection of Maersk data as the best available to value ocean freight is
supported by substantial evidence and is otherwise in accordance with
law.

## II.   The Department Reasonably Rejected Zhongji's Request for a Double Remedies Adjustment

Zhongji claims the Department's decision not to grant it a double
remedies adjustment is unlawful. *See* Zhongji's Br. at 40-66. Zhongji's
claim is wrong.

As an initial matter, the Department denied Zhongji's request for
a double remedies adjustment because "Zhongji failed to establish
either a 'subsidy-to-cost link' or a 'cost-to-price link'" (Appx02490) – two
necessary elements of the Department's test for establishing eligibility

for such an adjustment. *See* Def.'s Resp. at 30-31 (addressing the legal background and standard for a double remedies adjustment). While Zhongji provides a lengthy analysis of other necessary elements (*see* Zhongji's Br. at 44-46, 63-66), Defendant-Intervenors will focus their response on Zhongji's arguments concerning these links, as that was basis of the Department's rejection of Zhongji's request. *See* Zhongji's Br. at 47-62. Moreover, *both* a subsidy-to-cost and a cost-to-price link are necessary elements to establish eligibility for a double remedies adjustment. *See* Def.'s Resp. at 31. While one would normally analyze these links in sequential order (first subsidy-to-cost, then cost-to-price), because the record makes clear that Zhongji failed to establish a cost-to-price link, Defendant-Intervenors address this element and incorporate Defendant's response brief with respect to the subsidy-to-cost link by reference. *See* Def.'s Resp. at 32-34.

A. **The Department Correctly Determined There Is No Cost-To-Price Link**

A cost-to-price link occurs where a change in the cost of manufacture results in a change to the prices charged to the customer. *See, e.g., Wooden Cabinets and Vanities and Components Thereof from*

NONCONFIDENTIAL
VERSION

*the People's Republic of China: Decision Memorandum for the
Preliminary Affirmative Determination of Sales at Less Than Fair
Value*, at 48 (Dep't Commerce Oct. 2, 2019), *ref'd in* 84 Fed. Reg. 54,106
(Oct. 9, 2019) (preliminary determination); *see also* Appx02491. In the
underlying proceedings, the Department determined that Zhongji failed
to establish this link because its "demonstration of its system for
tracking primary aluminum, aluminum plate, and electricity in its
accounting records merely establishes how Zhongji tracks its usage of
these three consumption inputs." Appx02491-02492.  The Department
concluded that the accounting information submitted by Zhongji
"fail{ed} to establish a link between the subsidies received by Zhongji,
the {cost of manufacture} of the subject merchandise, and the price of
the merchandise." Appx02492. The Department's determination was
both reasonable and the only conclusion that could be reached based on
Zhongji's pricing structure and plain admissions that changes in costs
do not impact the prices at which Zhongji sells its products to
customers.

NONCONFIDENTIAL
VERSION

Zhongji's prices for aluminum foil contain two components.  The first is a "conversion premium," which is "negotiated by the parties" and "is designed to reflect the costs incurred to process the materials into the finished goods." Appx16024-16025. The second is a "metal component," which "is determined by reference to the {London Metal Exchange ("LME")} index." Appx16025. Zhongji uses the "LME ingot value in the LME monthly cash average of the month prior to the mill shipment" to represent the metal component of its prices. Appx09077.

Zhongji acknowledged during the underlying proceedings that the first of these two components "normally would not change after" Zhongji receives a purchase order from its customer, "unless there were substantial changes to the cost components underlying that figure." Appx16025. As a result, changes to Zhongji's export prices "are largely driven by fluctuations in the LME ingot price in the relevant time period." *Id.* Further, "{b}ecause the LME ingot price is a knowable figure established by a third-party, Zhongji HK generally does not have to renegotiate that pricing element to account for changes in the metal component of its manufacturing cost." Appx16026.  In other words,

changes to Zhongji's U.S. prices for aluminum foil are based on changes in the LME price index, a price index that does not reflect subsidies from the Chinese government and is used in nearly all contracts, by all aluminum foil producers (U.S. and foreign) to establish prices for aluminum foil.

Indeed, the Department's double remedies questionnaire explicitly instructed Zhongji to describe its "policy or practice with regard to price reductions," and to "provide the most recent example during the relevant period when" Zhongji "lowered the price of subject merchandise in response to a decrease in an input cost or the cost of manufacturing." Appx16033.  In response, Zhongji confirmed that changes in its cost *do not* result in changes in its price. Instead, "the export prices to the United States hinges on the LME ingot price," and Zhongji *did not* lower its price in response to a decrease in an input cost or in its cost of manufacture. Appx16033.  Thus, Zhongji's questionnaire response made clear there is no cost-to-price link. As such, the Department's denial of Zhongji's request for a double remedies adjustment is supported by substantial evidence and otherwise in accordance with law.

NONCONFIDENTIAL
VERSION

In its opening brief before this Court, Zhongji seeks to self-servingly revise its questionnaire response submitted during the underlying administrative proceedings, asserting that "changes in the export prices of subject merchandise are, therefore, largely driven by *fluctuations of the aluminum input cost* during the relevant time period." Zhongji's Br. at 59 (citing Appx16025) (emphasis added). As discussed above, however, that is not what Zhongji reported to the Department during the agency proceedings, and not how Zhongji's pricing functions. As Zhongji stated explicitly during the administrative proceedings, its export prices to the United States "hinge{} on the LME ingot price," *i.e.*, "a knowable figure established by a third-party," and, as a result, Zhongji "generally does not have to renegotiate that pricing element to account for changes in the metal component of its manufacturing cost." Appx16026, Appx16033.  Zhongji could not, and did not, point to one instance where it reduced prices due to any changes to its input costs, despite the Department's explicit request for such information. *See* Appx16033.

NONCONFIDENTIAL
VERSION

Zhongji also cites the Department's analysis in *Quartz Surface Products*, claiming the facts it provided are "identical." Zhongji's Br. at 61-62 (quoting *Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Quartz Surface Products from the People's Republic of China*, at 12 (Dep't Commerce May 19, 2019), *ref'd in* 84 Fed. Reg. 23,767 (May 23, 2019) (final determination) (hereinafter, "*Quartz Surface Products I&D Memo*"). Zhongji's claim, however, is wrong. The Department stated in *Quartz Surface Products* that the respondent's "accounting department reports significant cost changes to management," "management . . . considers the price changes," and management "instructs the sales department to conduct market research *and price negotiations with the U.S. customers.*" *Quartz Surface Products I&D Memo* at 12 (emphasis added).

Unlike the respondent in the *Quartz Surface Products* case, Zhongji does not renegotiate prices with its customers when there are changes to its costs. *See* Appx16026 (statement by Zhongji that "{b}ecause the LME ingot price is a knowable figure established by a

-30-

third-party, Zhongji HK generally does not have to renegotiate that pricing element to account for changes in the metal component of its manufacturing cost"). Instead, Zhongji's prices "are largely driven by fluctuations in the LME ingot price," not its costs. Appx16025.

Zhongji also argues the Department should have notified it of a deficiency pursuant to 19 U.S.C. § 1677m(d) if the agency "questioned Zhongji's response or found information that it submitted deficient." Zhongji's Br. at 62. As discussed above, however, Zhongji's response was not deficient. Rather, it confirmed there is no cost-to-price link. As a result, there was no "deficiency" for the Department to "promptly inform" Zhongji about, nor any need for the agency to provide Zhongji with an "opportunity to remedy or explain" its very clear response. 19 U.S.C. § 1677m(d).

## B. The Department Correctly Determined There Was No Subsidy-to-Cost Link

Defendant-Intervenors incorporate by reference the discussion in Defendant's response brief on Zhongji's failure to establish the existence of a subsidy-to-cost link. *See* Def.'s Resp. at 32-34.

NONCONFIDENTIAL
VERSION

## III.   **The Department Reasonably Declined to Modify Its Standard Liquidation Instructions**

Consistent with this Court's instructions, and to avoid repetition of arguments, Defendant-Intervenors incorporate by reference Defendant's response brief with respect to Zhongji's claims concerning the Department's liquidation instructions. *See* Letter to All Counsel, May 13, 2021 (ECF No. 22); Def.'s Resp. at 36-38. As Defendant explained, Zhongji failed to demonstrate why its specific circumstances differed from the many others confronted by the Department and U.S. Customs and Border Protection – namely where a respondent's U.S. customer is not identified as the U.S. importer of record on entry documents. Thus, the Department reasonably concluded there was no basis for revising its liquidation instructions, as requested by Zhongji.

## IV.   **Conclusion**

For the reasons set forth above, and those identified in Defendant's response brief incorporated herein by reference, Defendant-Intervenors respectfully urge this Court to reject Plaintiffs' arguments and to affirm the Department's *Final Results* in their entirety.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
GRACE W. KIM
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Defendant-Intervenors

Dated:  January 14, 2022

**CERTIFICATE OF COMPLIANCE
WITH COURT OF INTERNATIONAL TRADE
STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's June 14, 2021 Order (ECF No. 24) setting the word limitation to Defendant-Intervenors' Response Brief to 7,000 words, counsel to the Aluminum Association Trade Enforcement Working Group and its individual members ((1) JW Aluminum Company; (2) Novelis Corporation; and (3) Reynolds Consumer Products, LLC) certifies that this Response Brief contains 5,677 words, including footnotes. The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Defendant-Intervenors

Dated:  January 14, 2022