United States Court of International Trade
Before the Honorable M. Miller Baker, Judge

|  |  |  |
|---|---|---|
| Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Jiangsu Zhongji Lamination Materials Stock Co., Ltd., Jiangsu Zhongji Lamination Materials Co., Ltd., Jiangsu Huafeng Aluminum Industry Co., Ltd., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| United States, | ) ) | Ct. No. 21-00138 Nonconfidential Version |
| Defendant, | ) ) ) | |
| Aluminum Association Trade Enforcement Working Group and its Individual Members, et al., | ) ) ) ) | |
| Defendant-Intervenors. | ) ) ) | |

Reply Brief in Support of Rule 56.2 Motion for Judgment Upon the Agency Record on Behalf of Plaintiffs Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Jiangsu Zhongji Lamination Materials Co., Ltd., Jiangsu Zhongji Lamination Materials Stock Co., Ltd. and Jiangsu Huafeng Aluminum Industry Co., Ltd.

Jeffrey S. Grimson
Sarah M. Wyss
Bryan P. Cenko
Wenhui "Flora" Ji
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC  20015
202.688.3610 (ph)
trade@mowrygrimson.com

February 22, 2022

TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................i

TABLE OF AUTHORITIES ...................................................................ii

GLOSSARY OF TERMS ........................................................................v

ARGUMENT .........................................................................................1

   I.   Commerce's Surrogate Value Determinations for Aluminum Ash, Rolling Oil Additive and International Freight Were Not Supported By Substantial Evidence Or In Accordance With Law..........................1

      A.   Commerce Must Provide a Discernable Explanation and Use the Best Available Information to Value FOPs Even When Employing Agency Discretion ...........................................................2

      B.   Commerce's Aluminum Ash SV Determination Was Not Supported by Substantial Evidence or in Accordance with Law........5

      C.   Commerce's SV Selections for Rolling Oil and Rolling Oil Additive Were Not Supported by Substantial Evidence or in Accordance with Law....................................................................13

      D.   Commerce's SV Selection for International Freight Was Not Supported by Substantial Evidence or in Accordance with Law......21

   II.   Commerce's Denial of Zhongji's Double Remedies Adjustment was Not Supported by Substantial Evidence and Otherwise Not in Accordance with Law..................................................................27

      A.   Zhongji has Established the Subsidies-to-cost Link.................30

      B.   Zhongji has Established the Cost-to-price Link .......................34

   III.   Commerce's Refusal to Modify its Liquidation Instructions Was Not Supported by Substantial Evidence and Otherwise Not in Accordance with Law..................................................................39

   CONCLUSION ...................................................................................42

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of Am. Sch. Paper Suppliers v. United States,*
 34 CIT 919, 716 F. Supp. 2d 1329 (2021) ................................. 15, 16, 24

*Burlington Truck Lines, Inc. v. United States,*
 371 U.S. 156 (1962) .................................................................. 12, 13, 35

*Canadian Solar Inc. v. United States,*
 _ CIT _, 537 F. Supp. 3d 1380 (2021) .................................................... 36

*GPX Int'l Tire Corp. v. United States,*
 33 CIT 1368, 645 F. Supp. 2d 1231 (2009), *aff'd*, 678 F.3d 1308 (Fed.
 Cir. 2012) ...................................................................................... 29

*Home Meridian Int'l. Inc. v. United States,*
 772 F.3d 1289 (Fed. Cir. 2014) ..................................................... 3, 4, 17

*Jiaxing Brother Fastener Co. v. United States,*
 822 F.3d 1289 (Fed Cir. 2016) ................................................................ 3

*Lifestyle Enter. v. United States,*
 35 CIT 158, 768 F. Supp. 2d 1286 (2011) ............................................. 26

*Longkou Haimeng Mach. Co. v. United States,*
 33 CIT 603, 617 F. Supp. 2d 1363 (2009) ......................................... 3, 8

*Nation Ford Chem. Co. v. United States,*
 166 F.3d 1373 (Fed. Cir. 1999) ............................................................... 4

*Nippon Steel Corp. v. United States,*
 458 F.3d 1345 (Fed. Cir. 2006) ....................................................... 4, 15

*NMB Singapore Ltd. v. United States,*
  557 F.3d 1316 (Fed. Cir. 2009) ........................................................ 3, 14

*NTN Bearing Corp. v. United States,*
  74 F.3d 1204 (Fed. Cir. 1995) .............................................................. 41

*Pfaff v. United States HUD,*
  88 F.3d 739 (9th Cir. 1996).................................................................. 33

*SolarWorld Ams., Inc. v. United States,*
  962 F.3d 1351 (Fed. Cir. 2020) .............................................................. 9

*Universal Camera Corp. v. NLRB,*
  340 U.S. 474 (1951)................................................................................ 4

*Weishan Hongda Aquatic Food Co. v. United States,*
  917 F.3d 1353 (Fed. Cir. 2019) ............................................................ 16

*Zhejiang DunAn Hetian Metal Co. v. United States,*
  652 F.3d 1333 (Fed. Circ. 2011) ............................................................ 4

**Statutes**

19 U.S.C. § 1677b ..................................................................................... 2

19 U.S.C. § 1677f-1.............................................................. 27, 35, 36, 39

19 U.S.C. § 1677m .................................................................................. 36

**Other Authorities**

123 CONG. REC. H1166, H1171-72 (Mar. 6, 2012) ................................ 29

*Certain Aluminum Foil from the People's Republic of China: Final
  Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 9,282
  (Dep't of Commerce Mar. 5, 2018)......................................................... 7

*Certain Aluminum Foil From the People's Republic of China: Final
    Results of Antidumping Duty Administrative Review; Final
    Determination of No Shipments; 2017-2019*, 86 Fed. Reg. 11,499 (Dep't
    of Commerce Feb. 25, 2021) ..................................................................6

*Certain Aluminum Foil From the People's Republic of China: Final
    Results of the Countervailing Duty Administrative Review; 2017–2018*,
    86 Fed. Reg. 12,171 (Dep't of Commerce Mar. 2, 2021)......................32

Certain Aluminum Foil From the People's Republic of China:
    Preliminary Results of Antidumping Duty Administrative Review,
    Preliminary Determination of No Shipments, and Partial Rescission;
    2017-2019, 85 Fed. Reg. 37,829 (Dep't of Commerce June 24, 2020)....7

*Certain Glass Containers from the People's Republic of China: Final
    Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141
    (Dep't Commerce May 22, 2020) ................................................24, 25

**Regulations**

19 C.F.R. § 351.102(b)(21)(iii) (2021) ......................................................25

## GLOSSARY OF TERMS

Aluminum Dross/Ash………………………………………Aluminum Ash

Aluminum Association Trade Enforcement Working Group and its individual members……………………………….Aluminum Association

Anhui Maximum Aluminum Industries Company……………...Maximum

Cost of Manufacturing …………………………………………….COM

Defendant Response Brief…………………………………….Def. Br.

Defendant-Intervenor's Response Brief……………………….AA Br.

Factors of Production ………………………………………….FOP

Global Trade Atlas…………………………………………….GTA

Harmonized Tariff Schedule………………………………….HTS

Issues and Decision Memorandum……………………….…..IDM

Less Than Adequate Renumeration ……………………………..LTAR

Jiangsu Zhongji Lamination Materials Co., (HK) Ltd.,
Jiangsu Zhongji Lamination Materials Co., Ltd.,
Jiangsu Zhongji Lamination Materials Stock Co., Ltd.
and Jiangsu Huafeng Aluminum Industry Co., Ltd……………Zhongji

London Metal Exchange………………………………………..LME

Non-market economy……………………………………….NME

Preliminary………………………………………………….Prelim.

Questionnaire Response…………………………………………QR

Supplemental…………………………………………………………Supp.

Surrogate Value ………………………………………………………SV

World Trade Organization…..………………………………..……………WTO

Zhongji Rule 56.2 Brief……………………………………….…..Zhongji's Br.

Plaintiffs Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Jiangsu Zhongji Lamination Materials Co., Ltd., Jiangsu Zhongji Lamination Materials Stock Co., Ltd. and Jiangsu Huafeng Aluminum Industry Co., Ltd. (collectively, "Zhongji"), reply to the response briefs of Defendant United States and Defendant-Intervenor the Aluminum Association Trade Enforcement Working Group and its individual members ("Aluminum Association") (collectively, "defendants").  *See* Def.'s Resp. to Pls.' Mot. for J. Upon the Agency R. (Dec. 17, 2021), ECF No. 30 ("Def. Br."); Defendant-Intervenor's Resp. in Opp'n to Pls.' Mot. for J. Upon the Agency R. (Jan. 14, 2022), ECF No. 32 ("AA Br.").[1]

## ARGUMENT

I.   Commerce's Surrogate Value Determinations for Aluminum Ash, Rolling Oil Additive and International Freight Were Not Supported By Substantial Evidence Or In Accordance With Law

Commerce's surrogate value ("SV") selections for aluminum ash, rolling oil, rolling oil additive and international freight were not supported by substantial or otherwise in accordance law because the

---

[1] All references to parties' briefs are to the nonconfidential version unless otherwise noted.

SVs do not represent the best available information on the record to value these four factors of production ("FOPs") for Zhongji. *See* 19 U.S.C. § 1677b(c)(1); *see also* Mem. of P. & A. in Supp. of Rule 56.2 Mot. for J. Upon the Agency R. of Pls. Zhongji at 18–40 (Sept. 9, 2021) ("Zhongji Br."). Both defendants fail to sufficiently address Commerce's mandate to support its selection of its SVs with reasonably discernable explanations that consider the record as a whole. *See* Def. Br. at 10–29; AA Br. at 10–24. Nor could Commerce have supported its SV selections with substantial evidence because the Harmonized Tariff Schedule ("HTS") codes proposed by Zhongji represent the best available information on the record to value these FOPs. The only reasonable remedy is for this Court to remand and instruct Commerce to value these four FOPs using Zhongji's proposed HTS codes.

> A. Commerce Must Provide a Discernable Explanation and Use the Best Available Information to Value FOPs Even When Employing Agency Discretion

Commerce's obligation to use the best available information on the record to value Zhongji's FOPs is not diluted by agency discretion. The United States maintains that "Commerce has 'broad discretion' in deciding what record evidence" represents that best available

information on record and "{t}he data Commerce relies on need not be perfect." Def.'s Br. at 12–13 (internal citations omitted).  In making this assertion, the United States misapplies the rulings in *Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289 (Fed Cir. 2016), and *Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289 (Fed. Cir. 2014).  In both cases, the Federal Circuit held that, although data may be imperfect, Commerce's selection of SVs must be "reasonable and supported by substantial evidence." *Jiaxing Brother*, 822 F.3d at 1301; *see also Home Meridian*, 772 F.3d at 1295–96.  Further, when selecting between two data sources, "the path of Commerce's decision must be reasonably discernable." *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009); *see also Longkou Haimeng Mach. Co. v. United States,* 33 CIT 603, 609, 617 F. Supp. 2d 1363, 1369 (2009) ("For the Court to conclude that a reasonable mind would support Commerce's selection of surrogate data . . . Commerce must justify its selection with a reasoned explanation.") .  Further, to be supported by substantial evidence, Commerce must have considered the record as a whole including whatever in the record "fairly detracts from its weight." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir.

2006) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477–78 (1951)).  In sum, Commerce's discretion to select the best available information on the record does not obviate Commerce from supporting its determinations with substantial evidence to "establish{} the antidumping margins as accurately as possible."  *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Circ. 2011).  Here, Commerce failed to support its determinations with substantial evidence.

The United States also contends that "Commerce {is not} required to duplicate the non-market economy manufacturer's experience."  Def. Br. at 13 (relying on *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373 (Fed. Cir. 1999)).  The United States ignores the complete holding of *Nation Ford*—that deviating from the experience of the Chinese manufacturer is the exception to the general rule that an SV "must be as representative of the situation in the NME country as is feasible." *Nation Ford*, 166 F.3d at 1377.  Even when selecting between two allegedly imperfect sources, Commerce must select the SV that most closely reflects "{the respondents'} actual market cost experience." *Home Meridian*, 772 F.3d at 1296.  Commerce's selections of SVs for

4

Zhongji's aluminum ash, rolling oil, rolling oil additive were not supported by substantial evidence because the HTS codes proposed by Zhongji more accurately reflect its actual market cost experience.

### B. Commerce's Aluminum Ash SV Determination Was Not Supported by Substantial Evidence or in Accordance with Law

#### 1. Commerce Failed to Provide a Reasonably Discernable Explanation for Valuing Zhongji's Aluminum Ash Using HTS 2620

Commerce's aluminum ash SV selection was not supported by substantial evidence because Commerce failed to provide a reasonably discernable explanation for valuing Zhongji's *aluminum* ash using a HTS code that lacked any data specific to aluminum. Commerce's selection of data under HTS 2620 was flawed because these data contain no information for aluminum ash—the exact type of waste by-product in Zhongji's production of aluminum foil. *See* Zhongji Br. at 24. Both defendants contend that Commerce's determination was supported by substantial evidence because HTS 7602.00.19 is similarly flawed because it is not specific to the type of waste generated by Zhongji by not including information for ash and Commerce provided a reasonable explanation for its conclusion that "the amount of aluminum contained

5

in the ash did not outweigh the agency's consideration of the type of waste product Zhongji actually produced."  Def. Br. at 16; *see also* AA Br. at 13–16.  Although Zhongji rejects the conclusion that HTS 7602.00.19 is not specific to Zhongji's aluminum ash, even taking Commerce's factual findings as true, the arguments by both defendants fail because Commerce did not provide a reasonably discernable explanation to supports its conclusion that the type of waste (ash) outweighed the metallurgical content (aluminum) in selecting the best available information on the record.

While Commerce acknowledged that HTS 2620 lacked data for aluminum, it nonetheless concluded that "metallurgic content is not the sole factor in determining the most appropriate surrogate value of a by-product." *Certain Aluminum Foil From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; 2017-2019*, 86 Fed. Reg. 11,499 (Dep't of Commerce Feb. 25, 2021) ("Final Results"), and accompanying Issues and Dec. Mem. at 7 ("Final IDM"), Appx02486.  Commerce, however, provided no clarification in the Final Results or the Preliminary Results as to why metallurgical content is not the sole factor in determining the

value of Zhongji's aluminum ash.  *See Certain Aluminum Foil From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Partial Rescission; 2017-2019,* 85 Fed. Reg. 37,829 (Dep't of Commerce June 24, 2020) ("Prelim. Results"), Appx02464–02466, and accompanying Issues and Dec. Mem. at 1-28 ("Prelim. IDM") (providing no details on Commerce's aluminum ash SV selection), *Appx01000– 01027*; *see also* Prelim. Results, and accompanying SV Mem. at 44 (simply noting that HTS 2620 "best matched the respondents' description of the input"), Appx01241.  Commerce cites to its Final Determination in the original investigation, but that determination is not analogous because it involved aluminum scrap not aluminum ash, and also provided no explanation of why metallurgical content is not the sole factor in determining the SV.  *See* Final IDM at 7 n.47 (citing *Certain Aluminum Foil from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 9,282 (Dep't of Commerce Mar. 5, 2018), and accompanying Issues and Dec. Mem. at Cmt. 11 ("Inv. Final IDM")), Appx02486.  Commerce failed to provide any, let alone a reasonably discernable, explanation for why it

7

weighed the type of waste over metallurgical content.

The arguments by both defendants that "reasonable minds might differ on which one of these two categories is superior for valuing Zhongji's aluminum ash by-product" do not pass muster.  AA Br. at 12–17; *see also* Def. Br. at 14–19.  This is not a scenario where Commerce did not explain its decision to select one of two reasonable options but is instead an outright failure by Commerce to provide any reasonably discernable explanation for selecting HTS 2620 over HTS 7602.00.19.  Commerce's determination was not supported by substantial because no "reasonable mind {can} support Commerce's selection of surrogate data" to value Zhongji's aluminum ash when it did not "justify its selection." *Longkou Haimeng,* 33 CIT at 609, 617 F. Supp. 2d at 1369.

> ### 2.  HTS 7602.00.19 Represents the Best Available Information to Value Zhongji's Aluminum Ash

No amount of further analysis by Commerce could render its determination to value Zhongji's aluminum ash using HTS 2620 supported by substantial or in accordance with law because the best available information on the record to value Zhongji's aluminum ash is under HTS 7602.00.19.

Because HTS 7602.00.19 is specific to the aluminum waste produced by Zhongji, data under this code are the only information on the record that are "specific to the material." *SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351, 1360 (Fed. Cir. 2020). As an eight-digit code, HTS 7602.00.19 excludes other types of aluminum waste such as "shavings, chips, milling, sawdust and filings" that were not representative of Zhongji's input. *See* Zhongji Br. at 26. Both defendants assert that HTS 7602.00.19 is not specific to Zhongji's aluminum ash because it does not include data for the type of waste product– ash. *See* Def. Br. at 15–16; AA Br. at 16–17. This assertion conflicts with Zhongji's description of its input as "aluminum ash consist{ing} of *slags* from the melting furnace." Letter on Behalf of Zhongji to Commerce re: Section C&D Supplemental Questionnaire Response at SD-8 (Jan. 21, 2020) (Public Version) ("Zhongji Supp. Sec. D QR"), Appx13575 (emphasis added). "Slag" is defined as "{s}tony *waste* matter separated from metals during the smelting or refining of ore." Slag, LEXICO, https://www.lexico.com/en/definition/slag (last visited Feb. 21, 2022) (emphasis added). HTS 7602.00.19, covering "Aluminum *waste* and scrap: Other (including factory rejects)," is the

9

most appropriate tariff classification for Zhongji's aluminum ash

because it covers the type of *waste* by-product made during the

production of aluminum foil.  Letter on Behalf of Zhongji to Commerce

re: SV Cmts. at Ex. SV3 (Nov. 1, 2019) (Public Document), Appx29118.

The Aluminum Association even recognized that a significant portion of

Zhongji's aluminum ash consists of "slag and impurities."  AA Br. at 16.

Zhongji does not seek to value its aluminum ash as aluminum scrap,

contrary to the Aluminum Association's assertion, s*ee id,* but instead as

aluminum waste.  Commerce's failure to recognize this rendered its

determination unsupported by substantial evidence.

Further, Commerce's selection of HTS 2620 to value Zhongji's

aluminum ash was fundamentally flawed because these data are not

specific to Zhongji's aluminum ash.  First, the data under HTS 2620 are

overly broad by containing metals other than aluminum.  *See* Zhongji

Br. at 23.   Moreover, as acknowledged by both defendants, these data

do not accurately reflect Zhongji's "aluminum ash the exact material

Zhongji reported as a by-product and that {Commerce} was tasked with

valuing" because they contain no import data specific to aluminum ash.

AA Br. at 13; *see also* Def. Br. at 16.  The record demonstrates that

Zhongji's aluminum ash is just that- a byproduct consisting of aluminum, which is produced during the melting/casting and rolling phases when "*aluminum* ingot, aluminum scrap, *aluminum*-silicon alloy, *aluminum*-titanium alloy, *aluminum*-titanium born filaments" and other inputs are "melted{ed} into aluminum strip." Zhongji Supp. Sec. D QR at SD-5 (Public Version), Appx13572 (emphasis added). It is only logical that a by-product would similarly consist of aluminum.

In contrast to HTS 2620, HTS 7602.00.19 includes data for ash specific to aluminum. *See* Zhongji Br. at 25. By containing data for aluminum, a reasonable mind can only conclude that HTS 7602.00.19 represents the best available information on the record to value Zhongji's *aluminum* ash because it most closely reflects the by-product Commerce was tasked with valuing. *See SolarWorld*, 962 F.3d at 1360–61 (holding that Commerce properly rejected a HTS classification that "{was} not specific to the material" and instead selected the "more specific HTS categories").

Despite recognizing that HTS 2620 does not contain data for aluminum, both defendants maintain that Commerce correctly found that metallurgical content was not the sole factor in valuing Zhongji's

11

aluminum ash. *See* Def. Br. at 17; AA Br. at 14–15 (both citing Final IDM at 7, Appx02486). This line of reasoning ignores the fact that metallurgical content is the most important factor in valuing Zhongji's aluminum ash. In essence, Commerce elevated form over substance, which is entirely unreasonable when dealing with valuable metal inputs. By analogy, if a respondent's FOP was "gold shavings" would a closer surrogate value be "graphite shavings" or "gold dust?" It could only be the later as the substance imparts the value to the FOP.

Finally, the United States attempts to bolster Commerce's determination with a post-hoc rationalization that must be disregarded by this Court. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action."). The United States maintains that metallurgical content is not the sole factor in determining the value of a by-product is based in part "because ash contains chemical residue that has low metallurgical value." Def. Br. at 16. The United States does not reference any analysis from Commerce for this argument nor could it as Commerce does not make this argument. *See id.* (citing only to the Aluminum Association's rebuttal

case brief at Commerce); Final IDM at 7, Appx02486. Consequently,

this Court must disregard the United States' argument as an unlawful

post-hoc rationalization because it was not relied upon by Commerce in

its underlying determination. *See Burlington Truck*, 371 U.S. at 168.

For these reasons, this Court must remand this issue to

Commerce with instructions to use HTS 7602.00.19 to value Zhongji's

aluminum ash because this classification is more specific to Zhongji's

actual cost experience by including data for aluminum.

### C. Commerce's SV Selections for Rolling Oil and Rolling Oil Additive Were Not Supported by Substantial Evidence or in Accordance with Law

Commerce's determinations to value Zhongji's rolling oil and

rolling oil additive under HTS 3404.99 and HTS 3811.90 respectively

were not supported by substantial evidence or in accordance with law

because: 1) Commerce did not provide a reasonable explanation in

support of its conclusion; and 2) the only reasonable reading of the

record, based on the specification sheet submitted by Zhongji, was that

the best available information to value Zhongji's rolling oil and rolling

oil additive was under HTS 2710.12.21.

First, Commerce's determinations to value Zhongji's rolling oil and rolling oil additive under HTS 3404.99 and HTS 3811.90 were not supported by substantial evidence because Commerce failed to provide a reasonably discernable explanation by not considering the record as whole in making its determination. *See NMB Singapore,* 557 F.3d at 1319. Zhongji submitted a specification sheet setting forth the characteristics of its rolling oil and rolling oil additive that Commerce dismissed with little to no explanation. *See* Zhongji Br. at 29–30. The United States maintains that Commerce properly determined that Zhongji's specification sheet did not demonstrate why HTS 2710.12.21 represents the best available information on the record to value Zhongji's rolling oil and rolling oil additive. *See* Def. Br. at 22. As the United States recognizes, however, Commerce provided a mere sentence explanation in support of its determination: "Zhongji's description of its addictives available on the record is not sufficiently detailed to support selection of the eight-digit HTS categories for these inputs in this case." *Id.* (citing Final IDM at 8, Appx02487). Commerce failed to discuss or reference Zhongji's specification sheet. *See* Final IDM at 7-8, Appx02486–02487. By not including any discussion of Zhongji's

specification sheet, Commerce neglected its obligation to consider the record as a whole including whatever "fairly detracts" from its determination. *Nippon Steel*, 458 F.3d at 1351.

Even if Commerce did consider Zhongji's specification sheet, as implied by the United States, a mere sentence consideration of this evidence cannot constitute a reasonably discernable explanation. The facts here are analogous to *Paper Suppliers* where the Court held that Commerce's selection of a financial statement was not supported by substantial evidence because Commerce "failed to articulate a rational connection between the evidence on the record and its selection of the . . . financial {statement}" when it did not "substantively address {respondent}'s arguments that the information was incomplete and incorrect." *Ass'n of Am. Sch. Paper Suppliers v. United States*, 34 CIT 919, 924–25, 716 F. Supp. 2d 1329, 2335 (2021). The Court should find the holding in *paper Suppliers* to be persuasive given the factual similarities to this case. Here, Zhongji detailed how its specification sheet illustrated that HTS 2710.12.21 represented the best available information on the record to value Zhongji's rolling oil and rolling oil additive. *See* Letter on Behalf of Zhongji to Commerce re: Case Brief at

11-12 (Aug. 3, 2020) (Public Version) ("Zhongji Case Br."), Appx25789–25790.  Much like in *Paper Suppliers*, Commerce failed to "articulate a rational connection between the evidence on the record" and its determination by providing a conclusory sentence and no supporting analysis in the Final Results concerning Zhongji's arguments that its specification sheet establishes that HTS 2710.12.21 represents the best available information on the record to value its rolling oil and rolling oil additive.

Both defendants' arguments that Commerce supported its determination by citing to the Aluminum Association's rebuttal brief at Commerce and Commerce's past determination in the investigation are equally unavailing.  *See* Def. Br. at 20–22; Aluminum Association Br. at 19-20.  The best available information standard "inherently involves a comparison of the competing data sources to identify what available information is 'best' to value factors of production."  *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1367 (Fed. Cir. 2019).  Commerce provided no analysis for rejecting Zhongji's specification sheet in favor of the Petitioners' arguments or Commerce's past determination in the initial investigation.  A mere citation to two

16

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

documents without further explanation cannot meet the reasonably discernable threshold because Commerce did not connect the dots between these documents and its underlying conclusion that Zhongji's description of its rolling oil and rolling oil additive in its specification sheet was not "sufficiently detailed to support selection of the eight-digit HTS categories for these inputs in this case." Final IDM at 8, Appx02487. Commerce's selections of its SVs for rolling oil and rolling additive, therefore, were not supported by substantial or in accordance with law because Commerce failed to provide why the information contained in these documents provided more compelling evidence than Zhongji's own specification sheet.

Second, although Commerce failed to provide a reasonably discernable explanation for its determination, no further analysis by Commerce could support valuing Zhongji's rolling oil and rolling oil additive under HTS 3404.99 and HTS 3811.90, respectively, because the data under HTS 2710.12.21 most closely reflect Zhongji's "actual market cost experience." *Home Meridian*, 772 F.3d at 1296. Zhongji defined its rolling oil and rolling oil additive as a [ ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████ ] which aligns with HTS 2710.12.21.  Letter on Behalf of

Zhongji to Commerce re: Surrogate Value Rebuttal Comments at Ex.

SVR-2 (Nov. 12, 2019) (Business Proprietary Document) ("Zhongji

Rebuttal SV Cmts."), Appx12804–12814.  Both defendants maintain

that the Zhongji failed to provide an explanation for why its rolling oil

and rolling additive should both be classified under the same HTS code.

*See* Def. Br. at 21–23; AA Br. at 18–20.  This assertion is not supported

by the record as Zhongji set forth that it provided a "specification sheet

for its rolling oil *and* rolling oil additive."  *See* Zhongji Rebuttal Cmts. at

SVR-7, Ex. SVR-2 (Business Proprietary Document) (emphasis added),

Appx12772, Appx12804–12814.  Zhongji's claim that its specification

sheet applies to both its rolling oil and rolling oil additive matches its

description of its production process where "rolling oil and rolling oil

additive are added to aid the rolling process."  Letter on Behalf of

Zhongji to Commerce re:  Section D Questionnaire Response at D-11

(Oct. 4, 2019) (Public Version), Appx10083; *see also id.* at Ex. D-3

(Business Proprietary Document) ("Zhongji Section D. Resp.") (listing

[ ███████████████████████████████████████████

████████████████████████ ]), Appx10115.  Given that both inputs are added

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

during the same production step, it is reasonable to presume that these

inputs would have similar properties and fall under the same HTS

classification. The best available information to value Zhongji's rolling

oil and rolling oil additive, based on its own production documentation,

therefore, is HTS 2710.12.21 because it covers [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ ] like Zhongji's inputs.

No reasonable mind can conclude that the arguments by both

defendants can outweigh Zhongji's own production documentation on

the record.  Concerning Zhongji's rolling oil, both defendants maintain

that HTS 3404.99 is more specific to Zhongji's rolling oil because

inspection reports on the record demonstrate that Zhongji's white spirit

has gone through further processing to meet FDA, Kosher and Halal

requirements.  *See* Def. Br. at 21; AA Br. at 19–20.  Importantly, while

both defendants claim that these reports demonstrate that Zhongji's

rolling oil has undergone further processing, neither party cites to any

specific language in these documents to support their claims.  *See* Def.

Br. at 20-21; AA Br. at 19-20 (citing Letter on Behalf of American

Association to Commerce re: Petitioners' Rebuttal Br. at 16-19 (Aug. 18,

2020) (Public Version) ("Pet'rs Rebuttal Br."), Appx25847-25850 (not

citing any specific language from these documents)).  Nor could either party reference any particular language in these documents, as these reports are merely for product inspections and not "for the requirement of customers."  Letter on Behalf of Zhongji to Commerce re: Second Section D Supplemental Questionnaire Response at SD2-2 (Mar. 13, 2020) (Public Version), Appx16156.  Given that these reports are mere inspection documents that do not establish any additional processing, they cannot outweigh Zhongji's own specification sheet on the record.

Similarly, concerning Zhongji's rolling oil, both defendants maintain that Commerce's selection of HTS 3811.90 was supported by substantial evidence because a mandatory respondent classified its rolling oil under the same code in the initial investigation.  *See* Def. Br. at 22; AA Br. at 20.  Both defendants, however, leave out a key fact— that it was a different respondent, and not Zhongji, who classified their rolling oil under HTS 3811.90.  *See* Letter on Behalf of Aluminum Association to Dep't of Commerce re: Petitioners' Final Surrogate Value Comments at Ex. SV2-4A (Mar. 30, 2020) (Public Document), Appx31355-31361.  No reasonable mind could conclude that a *separate* respondent's classification of an input, from an *entirely different*

*segment*, outweighs an actual production document submitted by the *relevant party* in the current *segment*. *See Zhejiang Dunan*, 652 F.3d at 1344. The arguments by both defendants cannot outweigh the specification sheet submitted by Zhongji which demonstrates that its rolling and rolling oil additive is most accurately classified under HTS 2710.12.21.

For these reasons, this Court must remand this issue to Commerce with instructions to use HTS 2710.12.21 to value Zhongji's rolling oil and rolling additive because Zhongji's own specification sheet on the record demonstrates this classification most closely aligns with its FOPs.

> D. Commerce's SV Selection for International Freight Was Not Supported by Substantial Evidence or in Accordance with Law

Commerce's determination to value international freight using Maersk data, as opposed to the either the Descartes or Xeneta data as proposed by Zhongji, was not supported by substantial evidence or in accordance with law because: 1) Commerce did not provide a reasonably discernable explanation in support of its conclusion and failed to consider all arguments against selecting the Maersk data; and 2) the

best available information on the record to value Zhongji's international freight was either the Descartes, or, in the alternative, the Xeneta data.

First, Commerce's international freight SV determination was not supported by substantial evidence because Commerce did not provide a reasonably discernable explanation to support its rejection of the Descartes data and did not weigh the record as a whole in rejecting the Xeneta data. Concerning the Descartes data, the only reference by Commerce to this data source is, what appears to be, a mistaken statement in the Preliminary Results that Commerce "valued international freight using price rates from Descartes.com." Prelim. IDM at 27, Appx01026. Zhongji's calculations made clear that Commerce relied on the Maersk data in its Preliminary Results and continued to do so in the Final Results. *See* Zhongji Br. at 32–34. Nowhere in its analysis in the Final Results did Commerce discuss why it selected the Maersk data over the Descartes data. *See* Final IDM at 8, Appx02487 (discussing the Maersk only as compared to the Xeneta data). The Aluminum Association acknowledges this flaw in Commerce's analysis but nonetheless claims that Commerce's reasons for rejecting the Xeneta data are also applicable to the Descartes data.

22

*See* AA Br. at 22.   The Aluminum Association asks this Court to do exactly what the reasonably discernable standard is designed to avoid – placing itself in the shoes of Commerce to make a factual determination.   The Court must decline to do so because Commerce's complete failure to even mention a potential data source on the record to value Zhongji's international freight renders it determination not supported by substantial evidence.[2]

Regarding the Xeneta data, although Commerce set forth its reasoning for rejecting the Xeneta data, it did not compare the alleged flaws it identified in the Xeneta data to the flows in the Maersk data that Zhongji set forth in its case brief at Commerce.   *See* Zhongji Case Br. at 18–19 (Public Version), Appx25797–25798 (setting forth that the Maersk data is "irredeemably flawed" because its rates "were only estimates").   By not addressing Zhongji's arguments, Commerce has failed to articulate a "rational connection between the facts found and

---

[2] As Commerce failed to even mention the Descartes data in the Final Results, the reasons supplied by both defendants to support their arguments that Commerce properly found the Descartes data to be flawed, *see* Def's Br. at 26–29, AA Br. at 22–24, must be rejected by this Court as unlawful post-hoc rationalizations.  *See Burlington Truck*, 371 U.S. at 168.

the choices made." *Paper Suppliers*, 34 CIT at 924, 716 F. Supp. 2d at 1335.

Second, although Commerce failed to support its determination to value Zhongji's international freight using Xeneta data, any further explanation by Commerce would still not be supported by substantial evidence or otherwise not in accordance with law because the Xeneta data represent the best available information the record to value Zhongji's international freight.  Commerce identified two reasons for selecting the Maersk data over the Xeneta data: 1) the Xeneta data were not publicly available, and 2) the Xeneta data reflected shipping data from China.  *See* Final IDM at 8, Appx02487.  These rationales must be rejected because they conflict with Commerce's past determinations and the record itself.  Commerce's finding that the Xeneta data is not publicly available conflicts with its determination in the Glass Containers case where it found that the Xeneta data was "not proprietary but public in nature" because it was a "pay for subscription service." *Certain Glass Containers from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141 (Dep't Commerce May 22, 2020) and accompanying Issues and

Dec. Mem. at 44 ("Glass Containers IDM").  The United States maintains that Zhongji's reliance on Commerce's determination in the Glass Containers case was inapposite from this action because Maersk data was not on the record in that case.  *See* Def. Br. at 25.  In making its conclusion regarding the Xeneta data in the Glass Containers case, however, Commerce interpreted the definition of "publicly available" under its own regulations.  *See* Glass Containers IDM at 44 (citing the requirement that information be publicly available under 19 C.F.R. § 351.102(b)(21)(iii) (2021).  The facts of each matter are irrelevant to agency's interpretation of its own regulations and, therefore, the regulatory interpretation in the Glass Containers case represents highly persuasive authority in this action.

Moreover, Commerce does not discuss in detail how the Xeneta data can reflect shipping data from China and instead merely refers to the Petitioners' rebuttal brief at Commerce.  *See* Final IDM at 8, Appx02487.  In its rebuttal brief, the Aluminum Association includes no record citations to the Xeneta data and instead simply infers that the "'broad . . . sampling of freight rates across all active contracts involving the movement of merchandise from China to the United States captures

Chinese NME ocean carriers." Pet'rs Rebuttal Br. at 34, Appx25865.

Nor do either defendant provide a reference to the actual Xeneta data in

their response briefs to support this conclusion. *See* Def. Br. at 27

(citing just to the Aluminum Association's rebuttal brief at Commerce);

AA Br. at 22. As no party can point to any record evidence that the

Xeneta data captures Chinese shipping data, Commerce relied on mere

speculation instead of record evidence to support its conclusion to reject

the Xeneta data as the best available information on the record. *See*

*Lifestyle Enter. v. United States*, 35 CIT 158, 179, 768 F. Supp. 2d 1286,

1309 (2011) ("Commerce cannot base its analysis on mere speculation.").

In sum, neither of the flaws identified by Commerce in the Xeneta data

represented substantial evidence to reject the source.

For these reasons, this Court must remand this issue to

Commerce with instructions to use the Descartes data, or, in the

alternative, the Xeneta data to value Zhongji's international freight

because these data reflect the best available information on the record

by including actual costs and not mere price data.

II.    Commerce's Denial of Zhongji's Double Remedies
       Adjustment was Not Supported by Substantial Evidence and
       Otherwise Not in Accordance with Law

Commerce's determination to deny Zhongji a double remedies

adjustment was not supported by substantial evidence and not in

accordance with law because Zhongji established that its receipt of

subsidies on primary aluminum, aluminum plate and electricity led to a

decrease in its cost of manufacturing ("COM") (a "subsidies-to-cost

link") and that its COM directly affected its sales prices (a "cost-to-price

link"). *See* Zhongji Br. at 40–63. These two factors - subsidies-to-cost

link and cost-to-price link – are the points of contention between the

parties.

The consistent thread weaving through Commerce's underlying

determination and defendants' response briefs on this issue is that they

all narrowly focus on Commerce's stated technical requirements—a

subsidies-to-cost link and a cost-to-price link—but totally ignore the

purpose of the double remedies adjustment, which is to counteract

overlapping AD and CVD remedies that can result from Commerce's

application of NME law. Congress codified Section 777A of the Tariff

Act of 1930 (19 U.S.C. § 1677f-1(f)(1)) in direct response to the World

Trade Organization's ("WTO") finding that double remedies are prohibited by the WTO Agreement on Subsidies and Countervailing Measures.  *See* Appellate Body Report, United States – Definitive Anti-Dumping and Countervailing Duties on Certain Products from China, WT/DS379/AB/R ¶ 599 (adopted Mar. 25, 2011) ("WTO AB Report"). The WTO explained that, in an NME proceeding, when Commerce uses unsubsidized surrogate costs to construct a normal value and compares that to a respondent's actual export price that has been lowered by subsidies, "{t}he resulting dumping margin is thus generally considered to be based on an asymmetric comparison and is generally higher than would otherwise be the case."  WTO AB Report at ¶ 542.  As explained in Zhongji's opening brief and detailed below, no party contests that Commerce uses *unsubsidized* surrogate values for primary aluminum, aluminum plate and electricity to construct Zhongji's normal value or that these same exact inputs were *subsidized*, as Commerce itself determined in the companion CVD case.  This case shows a textbook asymmetric comparison between normal value and export price as anticipated by the WTO.

The double remedies adjustment was also created to specifically address the concerns of *GPX Int'l Tire Corp. v. United States*, 33 CIT 1368, 1377, 645 F. Supp. 2d 1231, 1242–43 (2009), *aff'd*, 678 F.3d 1308 (Fed. Cir. 2012), in which "the CIT ruled that the prospect of a double remedy is likely when CVD duties are imposed at the same time as the NME AD duties." 123 CONG. REC. H1166, H1171-72 (Mar. 6, 2012) (statement of Rep. Jackson Lee) (citing *GPX Int'l* and stating that "{t}he problems raised by this decision has been addressed by this legislation."). Here, Commerce acts contrary to law when it construes its own stated requirements for Zhongji to receive a double remedy adjustment so stringently and unreasonably that the adjustment no longer functions to solve the problem Congress sought to address.

As explained in Zhongji's opening brief and below, there is no doubt that Zhongji established with record evidence both the subsidies-to-cost link and cost-to-price link as Commerce required, but the Court must also consider Commerce's determination here in light of the intended purpose of Section 1677f-1(f)(1) to counteract the recognized double remedy inherent in Commerce's concurrent application of CVD law and AD NME law.

A.      Zhongji has Established the Subsidies-to-cost Link

The facts are clear that Zhongji purchased primary aluminum,
aluminum plate and electricity, that these inputs made up part of
Zhongji's COM and that these same inputs were subsidized, as
determined by Commerce itself.  *See* Zhongji Br. at 45–46.  The United
States claimed generally that Zhongji did not provide ample
documentation to support the subsidies-to-cost link.  *See* Def. Br. at 34.
The Aluminum Association, notably, makes no arguments.  *See* AA Br.
at 25.  Contrary to the United States' assertion, Zhongji established the
subsidies-to-cost link with record evidence and Commerce's finding to
the contrary was not supported by substantial evidence and not in
accordance with law.

Regarding COM, Zhongji precisely demonstrated to Commerce
that its primary aluminum and aluminum plate purchases are recorded
as raw material costs in its COM ledger and that its electricity
purchases are recorded as energy costs in its COM ledger.  *See* Letter on
Behalf of Zhongji to Commerce re: Double Remedies Questionnaire
Resp. at DR-6 (Public Version) ("Double Remedies QR"), Appx16029.
There can be no dispute that raw materials are part of COM and, in

fact, this is baked into Commerce's own dumping margin calculation program where it establishes that [ ██████████████████ ██████████████ ] *See* Final Results, and accompanying Calculation Mem. at Attach. I (Business Proprietary Document), Appx01338.  Consistent with Commerce's established COM construction, Zhongji reconciled its reported material input and energy costs with its accounting legers as required.  *See* Zhongji Section D Resp. at Ex. D-10 (Business Proprietary Document), Appx 10170– 10175.  Neither defendant presents any rebuttal to this basic construct of direct materials and energy as components of COM.  This simple understanding of COM is all that is needed to establish that a decrease in the price of Zhongji's raw materials, whether by subsidies or any other variable, leads to a decrease in COM.

Zhongji similarly established with record evidence and legal precedent that its purchase prices of primary aluminum, aluminum plate and electricity were subsidized.  *See* Zhongji Br. at 45-46.  Most notably, Zhongji submitted its CVD questionnaire response showing purchases under all three programs considered by Commerce for the double remedies adjustment: Provision of Primary Aluminum for Less

Than Adequate Renumeration ("LTAR"), Provision of Electricity for LTAR and Provision of Aluminum Plate and/or Sheet and Strip for LTAR. *See* Double Remedies QR at Ex. DR-3 (Business Proprietary Document), Appx16039-16048. There is also no doubt that Commerce countervailed each of those programs and determined that Zhongji received a measurable benefit to the effect of a 4.26% CVD rate for primary aluminum, 33.36% for aluminum plate and 1.46% for electricity. *See Certain Aluminum Foil From the People's Republic of China: Final Results of the Countervailing Duty Administrative Review; 2017–2018*, 86 Fed. Reg. 12,171 (Dep't of Commerce Mar. 2, 2021), and accompanying Issues and Dec. Mem. at 9. Importantly, Commerce's CVD determination covered the same exact aluminum foil that is covered by this AD case and was concurrent with the POR. By virtue of the overlapping PORs, the exact raw material and electricity subsidies countervailed by Commerce must have flowed directly into Zhongji's reported COM in this case. Neither Commerce nor defendants posit a theory on where those subsidies would be recognized if not in COM.

The United States claims that because Zhongji's metal purchase prices incorporate the London Metal Exchange ("LME") index, Zhongji

has not established that subsidies exist on its aluminum inputs.  *See*
Def. Br. at 33.  The United States correctly explains that the LME "is a
published price index that nearly all aluminum contracts throughout
the world incorporate in pricing," but then inexplicably states that
Zhongji "did not sufficiently show how incorporating this global index
element into Zhongji's purchases of metal and pricing was reflective of
specific subsidies from the Chinese government."  *Id.* at 33–34.  Zhongji
agrees that the use of a published price index such as the LME shows
that a price is set according to market principles and is not subsidized,
but that line of reasoning is best presented to Commerce in the CVD
investigation to argue *against* a CVD on aluminum inputs.  It has no
relevance here where Commerce has already determined that there is a
subsidy on primary aluminum and aluminum plate.  The Court should
reject the United States' new convenient position that there are no
subsidies on Chinese aluminum inputs where LME is part of the price
because Commerce has already taken the opposite view in issuing its
CVD determination in this case.  *See Pfaff v. United States HUD*, 88
F.3d 739, 748 (9th Cir. 1996) ("Radically inconsistent interpretations of
a statute by an agency, relied upon in good faith by the public, do not

command the usual measure of deference to agency action").

> B.      Zhongji has Established the Cost-to-price Link

Zhongji demonstrated the requisite cost-to-price link with evidence showing that: (1) prices of subject merchandise declined during the POR and (2) Zhongji's COM is incorporated directly into subject merchandise pricing.  *See* Double Remedies QR at DR-1–DR-4 (Business Proprietary Document), Appx16024–16027.  Commerce's determination to the contrary remains not supported by substantial evidence despite arguments made by defendants in their response briefs.

Aluminum foil as a product presents a relatively rare situation where the cost and price of the merchandise is directly tied to the rise and fall of international price indices of a raw material representing an overwhelming proportion of the cost.   To claim, as Commerce does, that there is <u>no</u> cost-to-price link is a highly disingenuous proposition and one that is contradicted by the record.  Indeed, Commerce offered no real analysis on the 'cost-to-price link aside from a conclusory statement that "Zhongji failed to establish a 'cost-to-price link,' as set forth in section 777A(f) of the Act."  Final IDM at 12, Appx02491.  Thus, as a

threshold matter, the Court should reject all argument relating to this issue from both defendants as post-hoc rationalization. *See Burlington Truck*, 371 U.S. at 168. Even if defendants' responsive arguments are properly before the Court, they fail on the merits.

First, on evidence of price decline, the United States claimed that the record does not support Zhongji's double remedies adjustment because "Commerce typically looks to average unit value data rather than to specific proprietary price data such as Zhongji provided" to determine price decline of subject merchandise. Def. Br. at 32. This is simply not established on the record, in practice or by statute. Commerce gave no instructions in its Double Remedies Questionnaire related to pricing data format to establish cost-to-price link. The United States cited to no past determinations where Commerce rejected proprietary price data as evidence of declining average import prices under Section 1677f-1(f)(1)(B). *See id.* at 32. The United States merely cites to 19 U.S.C. § 1677f-1(f)(1)(B), but the plain language of the statute only states that data should demonstrate reduced "average price of imports of the class or kind of merchandise during the relevant period," but says nothing about type of data. Contrary to the United

States' claims, Zhongji provided the exact information required under

19 U.S.C. § 1677f-1(f)(1)(B) in the form of [ ███████████████

████████████████████████████████████████

████████████████████████████ ].  *See* Double

Remedies QR at Ex. DR-1 (Business Proprietary Document),

Appx16035 –16036.

Even if Commerce has some discretion to establish data

preferences related to Section 1677f-1(f)(1)(B), Commerce is not

permitted to invent a new requirement without giving parties sufficient

notice.  *See Canadian Solar Inc. v. United States*, _ CIT _, _, 537 F.

Supp. 3d 1380, 1398 (2021) (remanding Commerce's denial of

respondent Entered Value Adjustment because Commerce failed to

provide party timely notice of additional inquiry of information or

deficiency of response).  Commerce also had a statutory obligation to

inform Zhongji if its Double Remedies questionnaire response was

deficient and to provide Zhongji with an opportunity to remedy that

deficiency, but Commerce failed to do so.  *See* 19 U.S.C. § 1677m(d).

Second, on the relationship between Zhongji's COM to its prices,

the Aluminum Association argues that there is no cost-to-price link

because "Zhongji does not renegotiate prices with its customers when there are changes to its costs." AA Br. at 31. To the contrary, Zhongji "monitors . . . and checks with the purchase manager and financial manager regarding the cost of the domestic purchase prices of foil stock, aluminum strip, aluminum ingot, electricity and other elements of the cost of manufacturing periodically to consider the prices quoted to the customers." Double Remedies QR at DR-3 (Public Version), Appx16026. It also notes that "pricing revisions are required," and that U.S. customers are "informed accordingly." *Id.* at DR-4.

The Aluminum Association also misconstrues the role of the LME in Zhongji's pricing decisions, asserting that "Zhongji's export prices 'are largely driven by fluctuations in the LME ingot price,' not its costs." AA Br. at 31. This line of reasoning is a distraction. Zhongji has reiterated many times that its prices consists of two components: (1) a conversion premium, negotiated and agreed by the parties and (2) the price of the metal component that is based on the LME ingot price. *See Double Remedies QR at DR-1–DR-2, Appx16024–16025*. As the LME component is a published, market index, neither Zhongji nor its customers or suppliers have any control over it. Any fluctuations that

Zhongji has control over, resulting from subsidies or other cost reductions for example, and all negotiations between Zhongji, its suppliers and its customers happen within the conversion premium component of the price.  For example, when Zhongji can lower its foil prices because of lower costs, it does by renegotiating the conversion premium agreed to by its customers. *See id.* at DR-3–DR-4, Appx16026 –16027.

Finally, both defendants fail to rebut Zhongji's assertion that "{w}hen setting and changing the prices of exports to the United States, the primary factor that Zhongji HK considers is the overall cost of manufacturing, including the costs of the main inputs such as foil stock, aluminum strip, aluminum ingot, and the cost of electricity, labor, overheads etc." Double Remedies QR at DR-2 (Public Version), Appx16025, and Zhongji's records showing that its COM flows directly into its pricing for subject merchandise based on fluctuations in the cost of aluminum inputs and electricity.  *See id.* at Ex. DR-1 (Business Proprietary Document), Appx16035–16036 (showing that exports of subject merchandise [ ███████████████████████████████

████████ ] during the period of review in tandem with [ ████████ ] in

38

input purchases).  Commerce likewise ignored this evidence when summarily rejecting the cost-to-price link without proper consideration.

Based on the above and the arguments presented in Zhongji's opening brief, the Court should find that Commerce's denial of Zhongji's double remedies adjustment was not supported by substantial evidence and not in accordance with law because Zhongji demonstrated a subsidy-to-cost link and a cost-to-price link and has otherwise met all statutory elements under 19 U.S.C. § 1677f-1(f)(1)(B) to receive such adjustment.

III.    Commerce's Refusal to Modify its Liquidation Instructions Was Not Supported by Substantial Evidence and Otherwise Not in Accordance with Law

Zhongji requested that Commerce modify its default language in Zhongji's liquidation instructions to capture certain re-invoiced sales to avoid erroneous liquidation of Zhongji shipments at the China-wide rate.  Both defendants asserted that the circumstances here did not differ from other import transactions in which the U.S. importer of record is often not the ultimate customer, to warrant a modification of the standard instruction.  *See* Def. Br. at 37; AA Br. at 32.  To the contrary, Zhongji has provided ample information establishing why the

standard customs instruction is insufficient to address its sales arrangement. *See* Zhongji Br. at 66–67.  Critically, Zhongji's resale can take place prior to importation. *See* Letter on Behalf of Zhongji to Commerce re: Pre-Preliminary Results Comments on Liquidation Instructions Reseller Issue (Apr. 2, 2020) (Public Version), Appx 24809–24816.  As a result, in certain instances, a different importer of record would appear on the entry documents than Zhongji's initial customer. Because Commerce's standard language only covers entries that are "imported by or sold to" firms, as indicated on the commercial invoice or CBP documentation, Zhongji's entries that are re-sold prior to importation are subject to the China-wide rate of 105 percent, instead of Zhongji's rate of 23.62 percent.

Further, the United States claims that Commerce's practice is to "issue liquidation instructions based on entered value rather than by U.S. customer, and in this case the importer of record was unknown to Zhongji." Def. Br. at 37.  The United States misunderstands the facts. As Zhongji has reiterated many times during the course of this review, where Zhongji made a U.S. sale to a customer with knowledge that the goods are destined for the United States, but Zhongji's direct customer

40

then reinvoiced the product prior to importation, the importer of record would be different from Zhongji's initial customer as identified in its sales database. *See* Letter on Behalf of Zhongji to Commerce re: Section C Questionnaire Response at Ex. C-1 (Sept. 30, 2019) (Business Proprietary Document), Appx09862–09870 (showing that Zhongji reported its customers in the fields CUSCODU and CUSNAMU where Zhongji made sales with knowledge that the goods were destined for the United States). For sales made where the re-seller importer does not appear in Zhongji's customer database, Commerce's default instruction language would cause these sales, which were analyzed for purposes of importer-specific assessment rates, to effectively drop out of the administrative review and liquidate at the China-Wide rate when they were rightfully eligible for Zhongji's calculated rate. Commerce's default liquidation language, thus, will result in an inaccurate, punitive assessment of duties and frustrate the purpose of the review. *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (emphasizing that antidumping laws are "remedial not punitive").

In sum, this Court must remand this issue back to Commerce with instructions to modify its liquidation instructions once they are issued,

to include the phrase "*resold or* imported" in paragraph 1 before the list of importers, to capture Zhongji's sales where its merchandise was subsequently re-invoiced prior to being sold into the United States.

CONCLUSION

For the foregoing reasons, the Court should grant Zhongji's motion for judgment on the agency record and remand the Final Results for redetermination consistent with the points of law and record evidence discussed in Zhongji's initial brief and this reply brief.

Respectfully submitted,

Dated: February 22, 2022

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Sarah M. Wyss
Bryan P. Cenko
Wenhui "Flora" Ji
*Counsel to Zhongji*

42

CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures as modified by as modified by the order granting Plaintiffs' Consent Motion for Extension of Time and Motion for Enlargement of Word Count Limit in the Court's Standard Chambers Procedures. ECF No. 34. Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 7,995 words.

Dated: <u>February 22, 2022</u>          /s/ Jeffrey S. Grimson
                                        Jeffrey S. Grimson
                                        Mowry & Grimson, PLLC
                                        5335 Wisconsin Avenue, NW,
                                        Suite 810
                                        Washington, D.C. 20015
                                        202-688-3610
                                        trade@mowrygrimson.com
                                        *Counsel to Zhongji*