**Slip Op. 23-84**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

**Court No. 21-00138**

JIANGSU ZHONGJI LAMINATION
MATERIALS CO., (HK) LTD., *et al.*,

*Plaintiffs,*

v.

UNITED STATES,

*Defendant*,

and

ALUMINUM ASSOCIATION TRADE
ENFORCEMENT WORKING GROUP AND
ITS INDIVIDUAL MEMBERS, *et al.*,

*Defendant-Intervenors.*

Before: M. Miller Baker, Judge

## OPINION

[The court denies Plaintiffs' motion for judgment on the agency record, sustains the Department of Commerce's determination, and grants judgment on the agency record to Defendant and Defendant-Intervenors.]

Dated: June 7, 2023

**Ct. No. 21-00138**                                              **Page 2**

*Jeffrey S. Grimson*, *Sarah M. Wyss*, *Bryan P. Cenko*, and *Wenhui "Flora" Ji*, Mowry & Grimson, PLLC, of Washington, DC, on the papers for Plaintiffs.

*Brian M. Boynton*, Acting Assistant Attorney General; *Patricia M. McCarthy*, Director; *Reginald T. Blades, Jr.*, Assistant Director; and *Catharine M. Parnell*, Trial Attorney, Civil Division, U.S. Department of Justice of Washington, DC, on the papers for Defendant. Of counsel for Defendant was *JonZachary Forbes*, Staff Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

*John M. Herrmann*, *Paul C. Rosenthal*, *Joshua R. Morey*, and *Grace W. Kim*, Kelley Drye & Warren LLP of Washington, DC, on the papers for Defendant-Intervenors.

*Baker*, Judge: A Chinese aluminum foil producer challenges the Department of Commerce's imposition of antidumping duties in an administrative review based on the Department's calculation of surrogate values, denial of a double remedies adjustment, and liquidation instructions. Finding it supported by substantial evidence, the court sustains the determination.

## I

## A

An antidumping duty represents the amount by which the "normal value" of subject merchandise exceeds its "export price." 19 U.S.C. § 1673. If an investigation involves a non-market economy such as China, then Commerce determines normal value using surrogate values for "the factors of production utilized in producing the merchandise," along with "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id.* § 1677b(c)(1).

"In selecting surrogate values, Commerce 'attempts to construct a hypothetical market value of [the subject merchandise] in the [nonmarket economy].' " *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1330 (Fed. Cir. 2020) (first alteration in original) (quoting *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1375 (Fed. Cir. 2015)). The Department values factors of production, "to the extent possible," using data from surrogate countries that have market economies and that are (A) "at a level of economic development comparable to that of the nonmarket economy country," and (B) "significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4)(A)–(B).

By statute, the Department must value factors of production using the "best available information regarding the values of such factors in a market economy

country or countries considered" appropriate. *Id.* § 1677b(c)(1); *see also Seah Steel VINA Corp. v. United States*, 950 F.3d 833, 842 (Fed. Cir. 2020); *Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1268 (CIT 2006). Because the statute is silent about what constitutes the "best available information," Commerce has "broad discretion" in deciding what record evidence meets the criteria. *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011); *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999). "Commerce's analysis when selecting the 'best available information' on the record inherently involves a comparison of the competing data sources to identify what available information is 'best' to value factors of production . . . ." *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1367 (Fed. Cir. 2019) (citing 19 U.S.C. § 1677b(c)(1)); *see also Ass'n of Am. Sch. Paper Suppliers v. United States*, 716 F. Supp. 2d 1329, 1334 (CIT 2010).

In practice, the Department selects surrogate values that are product-specific, representative of a broad market average, publicly available, contemporaneous with the review period, and exclusive of tax and duty. *See* Import Administration Policy Bulletin 04.1, *Non-Market Surrogate Country Selection Process* at 4

(Mar. 1, 2004) (Policy Bulletin);[1] *Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1294 (Fed. Cir. 2016) (citing 19 C.F.R. § 351.408(c)(2)); *see also Changzhou Trina Solar*, 975 F.3d at 1331.

Commerce's data need not be perfect. *Jiaxing*, 822 F.3d at 1301. And the Department need not duplicate a manufacturer's precise experience. *See Nation Ford*, 166 F.3d at 1377. Instead, it seeks information that "most accurately represents the fair market value." *Id.* at 1377.

## B

The antidumping statute requires the Department to avoid imposing a double remedy when it simultaneously imposes countervailing duties and antidumping duties based on its non-market economy calculation methodology. *See* 19 U.S.C. § 1677f-1(f). This issue arises in non-market economy cases because the use of surrogate values—that is, values from countries other than the non-market economy country at issue—means that a countervailable subsidy "is not embedded in the price used as normal value. Consequently, the subsidy could potentially be remedied both by the [countervailing duty] and by the [antidumping duty]."

---

[1]   http://enforcement.trade.gov/policy/bull04-1.html.   The pincite above is to a .PDF printout of the Policy Bulletin webpage.

*Vicentin S.A.I.C. v. United States*, 404 F. Supp. 3d 1323, 1339 n.26 (CIT 2019).

In applying § 1677f-1(f), the Department examines (1) whether a countervailable subsidy has been provided; (2) whether that subsidy has been shown to have reduced the average price of imports during the relevant period; and (3) whether Commerce can reasonably estimate the extent to which that countervailable subsidy, in combination with the use of normal value determined under 19 U.S.C. § 1677b(c), has increased the weighted-average dumping margin for the class or kind of merchandise. Appx02468 (citing 19 U.S.C. § 1677f-1(f)(1)(A)–(C)). For a subsidy meeting these criteria, the statute requires the Department to reduce the antidumping rate by the estimated amount of the increase in the weighted-average dumping margin, subject to a specified cap. *Id.* (citing 19 U.S.C. § 1677f-1(f)(1)–(2)).

## II

### A

In 2019, Commerce opened the first administrative review of duties on aluminum foil from China covering November 2, 2017, through March 31, 2019. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 27,587, 27,589 (Dep't Commerce June 13, 2019), Appx25964, Appx25966. The Department selected two mandatory respondents: (1) Jiangsu Zhongji Lamination

Materials Co., (HK) LTD (Zhongji); and (2) Xiamen Xiashun Aluminum Foil Co. *See* Appx02464.

Zhongji submitted surrogate value comments recommending that the aluminum dross/ash produced as a byproduct in its aluminum foil production process should be classified under Harmonized Tariff Schedule (HTS) heading 7602.00.19. Appx28870. It also recommended classifying rolling oil and rolling oil additive it uses in its production of aluminum foil under HTS 2710.12.21. Appx28868. Finally, the company suggested using information from Xeneta AS, a Norwegian shipping company, or the Descartes Group, a Canadian logistics company, to calculate international freight costs. Appx01026; Appx02483.

As to double remedies, Zhongji argued that its material inputs are subsidized according to a countervailing duty determination by the Department, and that those subsidies lower its costs. Appx02489–02490. In connection with the second part of the statutory double remedy test, the company explained that the price of all its aluminum materials—inputs bought and foil sold—is directly related to the London Metal Exchange ingot price, which the company contends further showed that its aluminum prices declined during the review period. *See* Appx02490.

Zhongji then asked Commerce to modify its liquidation instructions. *See generally* Appx02488–02489. The company explained that some of its customers re-invoiced sales prior to import and thus the importer of

record could differ from the final customer. *Id.* Consequently, it worried that U.S. Customs and Border Protection might liquidate its imports at the China-wide rate. *Id.* To avoid this, Zhongji requested that the Department insert the words "resold or imported" into the instructions. Appx02488.

B

Commerce published the preliminary results in June 2020 and calculated a dumping margin of zero percent for Zhongji. *See* Appx02465.

In the final determination, however, that rate changed to 23.62 percent. See *Certain Aluminum Foil from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments; 2017–2019*, 86 Fed. Reg. 11,499, 11,500 (Dep't Commerce Feb. 25, 2021), Appx3640. The final determination measured Zhongji's aluminum ash byproduct using the four-digit HTS code 2620. See Appx02485–02486. Commerce rejected the company's proposed HTS code 7602.00.19, concluding that at the four digit-level HTS 7602 correctly covers scrap, cuttings, and other byproducts, but not ash, and emphasized that because Zhongji reported its byproduct as "dross/ash," HTS 7602 was not the most specific category available. Appx02486.

The Department used HTS 3403.99 and HTS 3811.90 to value Zhongji's rolling oil and rolling oil additive, finding that the company's "description of these

inputs available on the record is not sufficiently detailed to support selection of the eight-digit HTS categories" Zhongji recommended using instead. Appx02487; *see also* Appx01241, Appx01039. Commerce used Maersk data for international freight rather than data from Xeneta[2] or Descartes. Appx02487.

The Department also found that evidence submitted by Zhongji in its double remedies response was insufficient to establish a subsidy-to-cost link or a cost-to-price link. Appx02490. Commerce therefore did not make a double remedies adjustment to the company's purchases of primary aluminum, aluminum plate, and electricity. Appx02490–02492. Finally, the Department rejected Zhongji's request to modify its liquidation instructions, finding it unnecessary. Appx02489.

The company then commenced this litigation seeking relief under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and 1516a(a)(2)(B)(iii). ECF 8, ¶ 2 (complaint).[3] The Aluminum Association Trade Enforcement Working Group intervened to support the government. ECF 20. Zhongji then moved for judgment on the agency record. *See* USCIT R. 56.2; *see also* ECF 25 (motion), ECF 47

---

[2] Commerce rejected the Xeneta data mainly because it determined that the source is not publicly available. *See* Appx02487.

[3] Three days later, Commerce published an amended final determination to correct "ministerial errors" relating to other companies. Zhongji's margin remained the same. *See* Appx04450–04452.

(public brief), ECF 49 (confidential brief). The government (ECF 30) and the Association (ECF 31, confidential; ECF 32, public) opposed and the company replied (ECF 48, public; ECF 50, confidential). Zhongji later requested, with the consent of the other parties, that the court decide the case without oral argument, and the court obliges that request. ECF 51.

## III

The court has subject-matter jurisdiction under 28 U.S.C. § 1581(c).

In 19 U.S.C. § 1516a(a)(2) actions such as this, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). That is, the question is not whether the court would have reached the same decision on the same record—rather, it is whether the administrative record, taken as a whole, permits the Department's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up).

Specifically for surrogate value calculations, the "court's duty is 'not to evaluate whether the information Commerce used was [actually] the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'" *Zhejiang*, 652 F.3d at 1341 (quoting *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1327 (CIT 2006)). Affirming the Department's determination "requires a reasoned explanation from Commerce that is supported by the administrative record." *Dorbest*, 462 F. Supp. 2d at 1269–70; *see also Longkou Haimeng Mach. Co. v. United States*, 617 F. Supp. 2d 1363, 1369 (CIT 2009).

In addition, Commerce's exercise of discretion in § 1516a(a)(2) cases is subject to the default standard of the Administrative Procedure Act, which authorizes a reviewing court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Solar World Americas, Inc. v. United States*, 962 F.3d 1351, 1359 n.2 (Fed. Cir. 2020) (explaining that in § 1516a cases, i.e., cases brought under section 516A of the Tariff Act of 1930, APA "section 706 review applies since no law provides otherwise") (citing 28 U.S.C. § 2640(b)). "[I]t is well-established that an agency action is arbitrary when the agency offers insufficient reasons for

treating similar situations differently." *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (cleaned up).

## IV

Zhongji's challenges to the final determination fall into three broad categories: (a) challenges to the calculation of surrogate values, (b) a challenge to the denial of a double remedies adjustment, and (c) a challenge to the liquidation instructions. The court considers these in turn.

## A

Zhongji argues that Commerce's selection of surrogate values for its aluminum ash, rolling oil and rolling oil additive, and international freight is unsupported by substantial evidence because the selections did not reflect the best available information on the record. ECF 47, at 2.

Specifically, the company argues that the Department selected an overly broad HTS code that was not specific to the aluminum ash it used; that Commerce failed to provide a reasoned explanation for selecting data to value Zhongji's rolling oil and rolling oil additive that differed from evidence the company submitted; and that the Department failed to provide a reasoned explanation for valuing the company's international freight using Maersk data rather than the Descartes or Xeneta datasets. *Id.* at 2–3.

In all three surrogate value calculations Zhongji challenges, imperfect data forced the Department to make compromises. For aluminum ash, it reasonably selected a second-best category that emphasized ash rather than aluminum. As to rolling oil, it reasonably chose a broader code rather than a narrower code because the company's data did not compel a narrower choice. Finally, the Department reasonably selected the Maersk database for shipping cost comparisons, because on at least some of the criteria outlined in Commerce's Policy Bulletin the Maersk dataset was superior. All these decisions met the substantial evidence standard for the reasons stated below. Therefore, this court sustains the agency's surrogate value calculations for rolling oil, rolling oil additive, and commercial shipping.

In its final determination, Commerce relied on Bulgarian data from the Global Trade Atlas for HTS 2620 to value Zhongji's aluminum ash byproduct. *See* Appx02505; *see also* Appx01248. The company argues that data it submitted show that the Department should instead have used the more specific HTS code 7602.00.19. *See* Appx28870, Appx28983.

The tariff schedule applicable to Bulgaria includes an HTS code (subheading 2620.40) that provides for aluminum ash—the exact material Zhongji reported as a byproduct. *See* Appx28287, Appx28290, Appx28327–28332; Appx28992–28994. During the applicable period of review, however, there were no

Bulgarian imports classified under HTS subheading 2620.40. *See* Appx28330.

So the Department was faced with a choice between two imperfect options: (1) Bulgarian import statistics for merchandise classified under HTS 2620, which provides for "ash and residues (other than from the manufacture of iron or steel), containing metals, arsenic or their compounds," including aluminum ash, but also ash comprised of other metals; or (2) Bulgarian import statistics for merchandise classified under HTS subheading 7602.00.19, which provides for aluminum waste and scrap other than "turnings, shavings, chips, milling waste, sawdust and filings; waste of coloured, coated or bonded sheets and foil, of a thickness (excluding any backing) not exceeding 0.2 mm," but does not provide for aluminum ash (or any ash for that matter). *See* ECF 47, at 21; Appx28290, Appx28327–28332; Appx28992–28994, Appx29116–29121.

Zhongji argues that HTS code 2620 was unrepresentative of its aluminum ash because it is not specific to aluminum and instead includes slag, ash, and other residues. ECF 47, at 13. In contrast, it argues that HTS 7602.00.19 matched its product very well. *Id.* at 25–26. The Global Trade Atlas data covering HTS 7602.00.19 are, according to the company, specific to its aluminum waste. *Id.* (citing Appx28867–28875, Appx28983, Appx29116–29118).

In response, the government argues that Commerce reasonably determined that the tariff heading

associated with ash, although not specific to aluminum, was more appropriate than the tariff subheading associated with other non-ash aluminum waste products. ECF 30, at 6. The Department objected to HTS code 7602.00.19 because "the broader HTS category 7602 under which it falls describes scrap, cuttings, and other such by-products, not ash," Appx02486,[4] and explained that "metallurgic content is not the sole factor in determining the value of a by-product," *id*. The government also contends that "[a] tariff subcategory that includes merchandise such as scrap coils of flat-rolled aluminum products is inconsistent with the physical characteristics of ash, which . . . should be mostly comprised of the chemical residues from fluxing agents that remove impurities from the melt." ECF 30, at 16–17.

Commerce regularly rejects overly broad datasets. *See Polyethylene Retail Carrier Bag Comm. v. United States*, 29 CIT 1418, 1444 (2005). For instance, in *Jiangsu Jiasheng Photovoltaic Technology Co. v. United States*, 28 F. Supp. 3d 1317 (CIT 2014), the

---

[4] Zhongji argues that this is a "misstatement of the HTS schedule as 7602.00.90 includes scrap," ECF 47, at 25, and asserts that "7602.00.11 includes other types of aluminum waste such as 'shavings, chips, milling, sawdust and filings,' " *id*. at 26 (citing Appx29116–29118). "By selecting [a] more detailed eight-digit HTS code—here, 7602.00.19"—the company sought "to exclude the type of materials that Commerce determined were not representative of its input." *Id*.

court upheld the Department's decision to value Trina Solar's aluminum frames in its antidumping duty investigation using an eleven-digit HTS code instead of a six-digit HTS code, HTS 7616.99, in part because "7616.99 is a catch-all category that covers many diverse aluminum products . . . whose value is not reasonably comparable to that of respondent's aluminum solar panel frames." *Id.* at 1338.[5]

However, if reasonable minds could differ, that suffices to sustain Commerce's conclusion. *See Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230, 1233 (CIT 2011) ("[I]f a reasonable mind could accept the connection presented between the facts found and the conclusion reached, an alternative judgment may not be substituted for that of the agency.") (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009)).

## B

Zhongji concedes that the HTS code the Department used describes ash. ECF 47, at 22–23. The company argues, however, that its recommended code is also specific to ash, *see id.* at 25, and is therefore strictly better, since the government concedes that

---

[5] Zhongji argues that here, unlike in *Jiangsu Jiasheng*, Commerce selected a broad four-digit HTS code that was not specific to the aluminum ash and therefore cannot represent the best available information. ECF 47, at 23.

Zhongji's code is specific to aluminum, *see* ECF 30, at 15–16.

But a review of the codes and the record undermines that argument. The plain language of the HTS states that subheading 2620.40 provides for aluminum ash, and that subheading 7602.00.19 does not. *See* Appx28992–28994, Appx29116–29121. Thus, ultimately, this dispute boils down to a technical judgment by Commerce over whether to prioritize "aluminum" or "ash" in selecting between two imperfect categories.

This sort of decision is a technical judgment for the Department to make. Even if reasonable minds might differ, the substantial evidence standard is met. *See Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1352 (CIT 2018) ("The court may not 'reweigh the evidence or . . . reconsider questions of fact anew.' ") (ellipsis in original) (quoting *Downhole Pipe*, 776 F.3d at 1377).

The court therefore concludes that the Department's choice was reasonable and thus supported by substantial evidence.

### 1

In its final determination, Commerce valued Zhongji's rolling oil using Bulgarian Global Trade Atlas data under HTS 3403.99 and rolling oil additive under 3811.90. *See* Appx02505; Appx02487; *see also*

Appx01248.[6] The company instead urged the Department to use code 2710.12.21 to value its rolling oil and rolling oil additive.[7] *See* Appx28868, Appx28882–28884. Zhongji argues that Commerce's determinations to value its rolling oil under HTS 3403.99 and its rolling oil additive under HTS 3811.90 were unsupported by substantial evidence and otherwise not in accordance with law. ECF 47, at 13, 27.

a

Zhongji argues that HTS 2710.12.21 is more specific to the rolling oil and rolling oil additive it used because its oil is made from petroleum and has a flash point that meets the specification in the EU tariff

———————————

[6] Chapter 34 covers "Soap, organic surface-active agents, washing preparations . . ." and Chapter 38 covers "miscellaneous chemical products." *See* Appx29053–29064; Appx12791–12794.

[7] Chapter 27 covers "mineral fuels, mineral oils and products of their distillation . . . ." Appx28995–29004. The specific HTS code Zhongji submitted, HTS 2710.12.21, covers:

> Petroleum oils and oils obtained from bituminous minerals (other than crude) and preparations not elsewhere specified or included, containing by weight 70% or more of petroleum oils or of oils obtained from bituminous minerals, these oils being the basic constituents of the preparations, other than those containing biodiesel and other than waste oils: Light oils and preparations: For other purposes: Special spirits: White spirit.

Appx28999.

schedule notes covering white spirits. ECF 47, at 29. The company acknowledges that "the law does not require Commerce to build the record on the plaintiffs' behalf," *id.* (quoting *Linyi City Kangfa Foodstuff Drinkable Co. v. United States*, Ct. No. 15-00184, Slip Op. 16-89, at 8–9, 2016 WL 5122648, at *3 (CIT Sept. 21, 2016)), but argues that a specification sheet for its rolling oil and rolling oil additive was enough to compel the use of Chapter 27, *id.* (citing Appx12804–12814).[8]

Zhongji therefore argues that Commerce failed to provide a "reasoned explanation" for rejecting its

---

[8] The company argues that the Department failed to address this record evidence and "merely found 'unpersuasive Zhongji's argument that the eight-digit HTS classifications that it has offered to value refining oils and additives . . . are more specific to Zhongji's inputs used in its production process than the four- or six-digit HTS classifications that Commerce selected . . . .' " *Id.* at 30 (quoting Appx02487 and citing Appx01241). Thus, according to the company, the Department failed to consider information that "fairly detracts from [the] weight" of its conclusion. *Id.* at 30–31 (brackets in original) (quoting *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006)). But Commerce did consider this evidence—it found that the evidence in the specification sheet did not sufficiently show why HTS 2710.12.21 would be the most appropriate subheading to value these products. Appx02487. Specifically, it determined that Zhongji's "description of [its additives] available on the record is not sufficiently detailed to support selection of the eight-digit HTS categories for these inputs in this case." *Id.*

proposal. ECF 47, at 31 (citing *Dorbest*, 462 F. Supp. 2d at 1269). The company seeks either a reversal of that decision or a remand for the Department to examine the specification sheet Zhongji submitted and provide a reasoned explanation for why it does not establish that the inputs fall under HTS 2710.12.21. *Id.*

b

As noted, *see above* note 8, Commerce found that the company did not sufficiently describe the relevant inputs on the record to support selection of the eight-digit HTS categories rather than the six-digit categories that the Department selected. Appx02487. In choosing the six-digit category, Commerce cited the Association's rebuttal brief and the Department's original determination as supporting its conclusion. *Id.* & nn.50, 52.

The Association asserted that Zhongji's information confirms that the rolling oil consumed in its operations is not a raw oil (i.e., a product typically classified under Chapter 27 of the tariff schedule). *See* Appx25849.[9] Thus, the Association contends, although the rolling oil Zhongji used is made of white spirit, it has undergone sufficient refining to become a purified oil. *Id.* Commerce used the value under HTS 3403.99

---

[9] The Association also argued that Zhongji submitted information confirming that the rolling oil used in its operations must meet FDA, Kosher, and Halal requirements followed by the mill, and is thus purified, not raw. *Id.*

covering "lubricating preparations not containing pe-
troleum oils or oils obtained from bituminous miner-
als," finding that it "best matched [the company's] de-
scription of the input." Appx01241 (title case re-
moved). The government argues that "HTS 3811.90
specifically references additives" like Zhongji's rolling
oil additive but the HTS code the company used,
2710.12.21, "does not reference additives." ECF 30,
at 21–22. The government also notes that, "in the orig-
inal investigation, the mandatory respondent identi-
fied HTS subheading 3811.90 as the proper provision
for rolling oil additive." *Id.* at 22 (citing Appx31361).
Because of these characteristics, and because other
mandatory respondents identified Commerce's sub-
heading as proper, the government argues that the De-
partment's selection of HTS 3811.90 was based on the
best information available and therefore meets the
substantial evidence burden. *Id.* at 22–23.

The government has the better of this argument.
Zhongji raises legitimate points about why its HTS
code was superior. But a reasonable mind could easily
conclude that the agency was right about the technical
details and right to privilege the original HTS code.
Despite the company's objections, the record shows
that Commerce did consider its evidence—the Depart-
ment just rejected it. The court therefore finds that
Commerce's classification of the company's rolling oil
and rolling oil additive products was based on substan-
tial evidence.

2

Zhongji also argues that the Department failed to provide a reasonable explanation for rejecting the Descartes shipping data the company submitted. ECF 47, at 13–14. It argues that Commerce's decision to instead use Maersk data was unsupported by substantial evidence. *Id.* at 14, 32.

In response, the government argues that the Department selected the Maersk data because they are publicly available and do not incorporate non-market economy state-owned shipping data, as distinguished from Xeneta and Descartes. ECF 30, at 6–7. The government argues that this decision was reasonable and supported by substantial evidence. *Id.*

As a matter of policy, Commerce tries to select surrogate values that are product-specific, representative of a broad market average, publicly available, contemporaneous with the review period, and tax/duty exclusive. *See* Policy Bulletin at 4. Its practice is to use publicly available data. *Id.*

In this case, there were three datasets available on the record for the Department to consider. The first was Descartes, which had the advantage of being based on real rates and being publicly available—but had the disadvantage of including impermissible data

from Chinese shipping[10] and had other technical dis-
advantages. The second option was Xeneta. That da-
taset shared with Descartes the advantage of drawing
from real rates and other technical advantages. But
Commerce reasonably concluded that the Xeneta set
was proprietary—a critical disadvantage based on De-
partment policy. The Xeneta set, like Descartes, also
included shipping data from China. The third option
was Maersk. Maersk had two major advantages: it was
publicly available, and it excluded rates from China.
But it also had one key disadvantage: The Maersk data
are based on freight *quotes*, not freight *prices paid*.

In its final determination, Commerce valued
Zhongji's international freight using Maersk data. *See*
Appx02487, Appx02506. The Department considered
the Xeneta data as a potential source to value the com-
pany's international freight, Appx02487, but found
"Maersk to be a superior [surrogate value] source as
compared to Xeneta" because of its "public availabil-
ity" and because "the Xeneta data can reflect shipping
data from China which is an impermissible source for
[surrogate valuation]." *Id*. (citing Appx25863–25868).

---

[10] The problem with using Chinese data is that Zhongji's
goods were themselves shipped from China, meaning a da-
taset containing Chinese data could contain the very sub-
sidy that Commerce is trying to identify through this entire
investigation.

a

Zhongji argues that Commerce's selection of the Maersk data was unsupported by substantial evidence because it failed to "compar[e] . . . the competing data sources to identify what available information is 'best' to value factors of production." ECF 47, at 33 (alterations in original) (quoting *Weishan*, 917 F.3d at 1367). The company argues that the Maersk data "are fundamentally flawed" because they are based on "mere quotes that have not been finalized." *See id.* at 38 (citing Appx28387, Appx28415–28738). These "estimates do not necessarily identify, or include[,] all relevant charges, and do not reflect consummated transactions." *Id.* at 39. "By comparison, the Xeneta data consist of 'several hundred thousand rates per month.' " *Id.* (quoting Appx12828). Zhongji argues that these shortcomings it contends mar the Maersk data are "even more egregious considering that the Court upheld Commerce's selection of Descartes data to value [the company's] international freight in the underlying investigation."[11] ECF 47, at 34–35 (citing *Jiangsu Zhongji Lamination Materials Co. v. United States*, [3]96 F. Supp. 3d 1[3]34, 1353 (CIT 2019)).

The company argues in the alternative that Commerce's selection of the Maersk data to value its

---

[11] The government points out that, in the underlying investigation, "the only available surrogate values on the record were from Xeneta and Descartes, not Maersk." ECF 30, at 27.

international freight was unsupported by substantial evidence and otherwise not in accordance with law because the Xeneta data are clearly the best available information on the record. *Id.* at 35–36 (citing Appx12827–12846).[12]

In response, the government argues that the Department reasonably determined that the Maersk data were the best available for two reasons. ECF 30, at 23. First, Commerce determined that the Xeneta data are proprietary, but the Maersk data are publicly available. *Id.* at 24 (citing Appx02487). Second, as discussed above, the Department noted that the Xeneta data "can reflect shipping data from China, which is an impermissible source." *Id.* at 26 (citing Appx02487).[13]

---

[12] Relatedly, and in reply to the final determination, Zhongji argues that the Department provided no support for its assertion that the Xeneta data reflect shipping data from China and instead merely referred to the Association's rebuttal brief. ECF 47, at 38 (citing Appx02487). The company argues that in so doing Commerce failed to provide a reasoned explanation for its finding. *Id.* (citing *Dorbest*, 462 F. Supp. 2d at 1269–70).

[13] The Association argued that Xeneta's and Descartes's sampling of freight rates involving the movement of merchandise from China to the United States captures Chinese non-market economy ocean carriers, including state-owned entities. Appx25865. The Association also identified specific evidence showing that certain rate sheets showed use of a state-owned shipping line, COSCO. Appx25866.

Zhongji disputes that the Xeneta data are not publicly available. It acknowledges that this court previously held otherwise, ECF 47, at 36 (citing *Jiangsu Zhongji*, 396 F. Supp. 3d at 135[4]),[14] but argues that, in a separate recent countervailing duty investigation, Commerce found that data obtained from a pay-for-subscription service were public in nature because "any party [could] access the information if they pay for the service." ECF 47, at 36–37 (alteration in original) (citing *Certain Glass Containers from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 31,141 (Dep't Commerce May 22, 2020) and accompanying I&D Memo at Cmt. 9, p. 44).[15] Zhongji further notes that while *Glass Containers* involved countervailing, rather than antidumping, duties, "Commerce interpreted the definition of 'publicly available' under 19 CFR

---

[14] "Commerce's determination that the Xeneta data were not publicly available was . . . within its discretion and consistent with its past practice." 396 F. Supp. 3d at 1353.

[15] Zhongji quotes Commerce as having said: "With regard to whether Xeneta data is proprietary, we disagree. Xeneta data is a pay for service subscription service, meaning any party can access the information if they pay for the service. In this respect Xeneta is not proprietary but public in nature." *Id.* (quoting the *Glass Containers* I&D Memo at 44, which in turn cited 19 C.F.R. § 351.102(b)(21)(iii) for the definition of "publicly available").

§ 351.102(b)(21)(iii), which is applicable to the dumping context." *Id.*[16]

The company also rightly notes that the alternative Descartes database has been used before. But the government argues that this has generally occurred when Descartes was the only information available and contends that where the Department "has relied on the Descartes data, Commerce recognized the inclusion of rates from non-market economy carriers and explained: '[f]or any rate that the Department determined was from a non-market economy carrier, the Department has not included that rate in the period-average international freight calculation.' " ECF 30, at 27–28 (brackets in original) (quoting *Certain Steel Wheels from the People's Republic of China: Notice of Preliminary Determination of Sales at Less Than Fair Value, Partial Affirmative Preliminary Determination of Critical Circumstances, and Postponement of Final Determination*, 76 Fed. Reg. 67,703, 67,713 (Dep't Commerce Nov. 2, 2011)).[17]

---

[16] In response, the government points out that Maersk information was not on the record in that case for comparison with Xeneta and Descartes data. ECF 30, at 25. "Further, other factual concerns presented in this review with respect to the Xeneta and Descartes data . . . were not raised in *Certain Glass Containers*." *Id.* (citing *Certain Glass Containers* I&D Memo at 44–46).

[17] The government also explains that no such adjustment was possible here, because the information Zhongji submitted did not permit the identification of non-market

b

This court recently addressed the issue here at some length. In two cases, we remanded Commerce's reliance on Maersk data where the Department failed to explain why it found it reasonable "to choose price quotes over broad data sets." *Changzhou Trina Solar Energy Co. v. United States*, 492 F. Supp. 3d 1322, 1330 (CIT 2021) (*Trina I*); *see also Changzhou Trina Solar Energy Co. v. United States*, 532 F. Supp. 3d 1333, 1336–37 (CIT 2021) (*Trina II*). Zhongji argues that the reasoning in *Trina I* and *Trina II* is persuasive because the facts are analogous.[18] ECF 47, at 39. But we also stated that "it is reasonable for Commerce

_____

economy carrier rates included in the Descartes data. *Id.* at 28 (citing Appx25867).

[18] In response, the government seeks to distinguish this case by arguing that the facts presented in *Trina II* differ in meaningful ways. ECF 30, at 26. The government notes that the parties to the administrative review in *Trina II* never raised the question of whether the freight data Commerce used were publicly available. *Id.* (citing *Solar Cells from China* I&D Memo at 27–32). The government also notes that in *Trina I*, the parties never raised whether the freight data included Chinese non-market carrier information—the case was about specificity. *Id.* (citing *Trina I*, 492 F. Supp. 3d at 1327–32). The government argues that the court should not rely on *Trina I* here because the facts underlying that matter "differ substantially from those present in this case." *Id.*

to choose price quotes over broad data sets in some circumstances." *Trina I*, 492 F. Supp. 3d at 1330.

Similarly, in *Trina II* we upheld Commerce's determination upon remand to rely on Xeneta data, instead of Maersk data, to calculate its surrogate value for international freight. 532 F. Supp. 3d at 1337. But we did so under the substantial evidence standard. Under that forgiving standard, it seems possible that *either* deciding the Xeneta evidence was admissible *or* deciding it was not would *both* be supported by substantial evidence.[19]

The Maersk data were not dominated by either the Xeneta or the Descartes. On the criteria identified by the Policy Bulletin (completeness, quality of data, public availability, and permissibility of data sources) the Maersk database beat both the Xeneta source (on public availability and permissibility) and the Descartes source (on permissibility). Because weighting each aspect of the Policy Bulletin is within Commerce's discretion, the Department met the burden required by the substantial evidence standard.

B

Zhongji argues that Commerce's determination not to grant it a double remedies adjustment was unsupported by substantial evidence because it established

---

[19] Zhongji does not appear to have considered this possibility.

that (1) there is a link between the countervailable subsidies it received and its cost of manufacturing and (2) there is a link between its cost of manufacturing and its selling price of aluminum foil. ECF 47, at 3, 41–43. The company also argues that Commerce could reasonably estimate the extent to which the assigned dumping margin increased as the result of subsidies. *Id.* at 15.

In response, the government argues that the Department's denial was based on substantial evidence because Zhongji failed to demonstrate (1) a "subsidy-to-cost link" and (2) a "cost-to-price link" as required by Commerce's interpretation of 19 U.S.C. § 1677f-1(f)(1)(B). ECF 30, at 7.

1

The first statutory requirement is whether "a countervailable subsidy (other than an export subsidy . . .) has been provided with respect to the class or kind of merchandise." 19 U.S.C. § 1677f-1(f)(1)(A). Zhongji reported that certain inputs were simultaneously subject to countervailable subsidies in the form of primary aluminum, aluminum plate, and strip/electricity provided for less than adequate remuneration. *See* Appx16029; *see also* ECF 47, at 46 (arguing that the company satisfied the first statutory element). The government does not dispute that the company established this point. *See* ECF 30, at 30–36 (addressing other statutory elements but not the first one).

The second consideration is whether the subsidies identified have "been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period." 19 U.S.C. § 1677f-1(f)(1)(B). Commerce looks for a subsidies-to-cost link and a cost-to-price link. *See* Appx02490–02492. Failure to show either of these elements allows the Department to deny the double-remedy adjustment. *See Vicentin S.A.I.C. v. United States*, 503 F. Supp. 3d 1255, 1263 (CIT 2021) (discussing Commerce's interpretation that § 1677f-1(f)(1) requires the producer/exporter to show both a "subsidies-to-cost link" and a "cost-to-price link").

In its final determination, Commerce found that Zhongji "failed to establish either a 'subsidy-to-cost link' or a 'cost-to-price link.' " Appx02490. The company disputes that finding and argues that it demonstrated how the pricing of each direct input was incorporated directly into its cost-of-manufacturing ledgers, and further showed that its input prices and its cost of manufacturing both trended down during the period of review. *See* ECF 47, at 47–48 (citing Appx16025, Appx16049–16050).

As for subsidy-to-cost, in this case, the majority of the cost of manufacturing comes from foil stock. *See* Appx16025. Zhongji told the Department that the price of foil stock is lowered by subsidies on other

aluminum materials. *See* Appx16029.[20] Since aluminum ingot, strip, and stock constitute much of the cost of manufacturing the subject merchandise here, the company argues that any decrease in the cost of inputs necessarily decreased the cost of manufacturing. ECF 47, at 50. Zhongji asserts that it submitted subledgers showing how its electricity expense ties back to its overall cost of manufacturing. *Id.* (citing Appx16063–16066). The company says it provided expense records rather than an accounting of subsidies because the aluminum and electricity subsidies are not recognized as subsidies in China and are therefore not reflected in the company's financial statements.[21] *Id.* at 51.

---

[20] Two of the company's foil stock suppliers, Jiangsu Huafeng Aluminum Industry and Anhui Maximum Aluminum Industries, both produce foil stock, subject to the subsidy on primary aluminum and aluminum strip. Both Huafeng's and Maximum's aluminum inputs account for most of their production costs. *Id.*

[21] Zhongji argues that, in other recent and similar cases, the Department has not required a line-item accounting. For instance, in a recent investigation of quartz surface products from China, Commerce found basic expense information sufficient. *Id.* at 52–53 (citing *Certain Quartz* I&D Memo at 12 and *Certain Corrosion Inhibitors from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 7,532 (Dep't Commerce Jan. 29, 2021) and accompanying Mem. on Final Double Remedy Calc. at 2).

Zhongji argues that the facts related to subsidy-to-cost are substantively identical to other recent cases in which Commerce has ruled that a respondent met the requirements of 19 U.S.C. § 1677f-1(f)(1)(B). *Id.* at 52–54.[22] The company argues that, because the Department provided no reasoning permitting parties to discern why it treated this case differently from a case like *Certain Quartz*, its decision was not based on substantial evidence.[23] ECF 47, at 52–55.

In response, the government argues that "Zhongji did not offer a sufficient explanation of how quoted London Metal Exchange prices for primary aluminum ingot establish a monthly decline in the prices of aluminum jumbo rolls, a distinct product and not of the same class or kind of merchandise as called for under

---

[22] As in *Certain Quartz*, Zhongji asserts that it reported here that it consumes countervailed inputs that flow into its cost of manufacturing, *see id.* at 53 (citing Appx16029), and that the subsidy programs affected its cost of manufacturing, *see id.* (citing Appx16025). Indeed, it claims to have further reinforced the subsidies-to-cost link by showing that its aluminum inputs constitute a significant portion of the merchandise cost of manufacturing. *See id.* (citing Appx16049–16050).

[23] Zhongji adds that Commerce's decision is arbitrary because it treated a similar situation differently "without adequate explanation and factual support on the record." ECF 47, at 55 (quoting *Thai Plastic Bags Indus. Co. v. United States*, 949 F. Supp. 2d 1298, 1302 (CIT 2013), and citing *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)).

19 U.S.C. § 1677f-1(f)(1)(B)." ECF 30, at 32 (citing Appx02491). Commerce's final determination gave that same explanation.[24] Appx02491.

The Department found unpersuasive Zhongji's claim that London Metal Exchange prices establish the existence of a "subsidy-to-cost link" for its aluminum inputs. *Id.*[25] The government states that the London Market Exchange is "a published price index that nearly all aluminum contracts throughout the world incorporate in pricing." ECF 30, at 33. Commerce determined that the company failed to sufficiently show how incorporating this global index element into its purchases established a "subsidy-to-cost link" for its aluminum inputs. Appx02491.

The government argues that the Department reasonably determined that Zhongji failed to establish a subsidy-to-cost link because it "did not provide additional documents to demonstrate a connection between subsidies received and cost of manufacture

---

[24] The government also notes that, when determining whether there has been a monthly decline in prices, "Commerce typically looks to average unit value data rather than to specific proprietary price data" as provided by a respondent. ECF 30, at 32.

[25] Commerce based its analysis on the information that Zhongji provided; there is no dispute here of material fact. Appx02491.

beyond showing how the cost of materials and electricity are accounted for in its records." ECF 30, at 34.

2

Commerce's second requirement as it interprets 19 U.S.C. § 1677f-1(f)(1)(B) is cost-to-price. According to Zhongji, "[a]luminum pricing generally consists of two components: (1) a conversion premium, negotiated and agreed by the parties and (2) the price of the metal component that is based on the [London Metal Exchange] ingot price." ECF 47, at 59 (citing Appx16024–16025). The company asserts that under this pricing structure, price fluctuation "is automatically translated to aluminum strip, foil stock, and foil," such that all changes in the export prices of subject merchandise "are largely driven by fluctuations of the aluminum input cost."[26] *Id.* (citing Appx16025–16026).

To show that those statements are accurate here, Zhongji reported that the head of the sales department "monitors the [London Metal Exchange] ingot price and checks with the purchase manager and financial manager regarding the cost of the domestic purchase prices of foil stock, aluminum strip, aluminum ingot,

---

[26] Zhongji's submission to Commerce stated that "[w]hen setting and changing the prices of exports to the United States, the primary factor . . . is the overall cost of manufacturing, including the costs of the main inputs such as foil stock, aluminum strip, aluminum ingot, and the cost of electricity, labor, overheads etc." Appx16025.

electricity and other elements of the cost of manufacturing periodically to consider the prices quoted to the customers." Appx16026. The company argues that this evidence directly responds to Commerce's requests for information about internal processes, showing how price changes are realized and how cost of manufacturing is incorporated directly into pricing.[27] ECF 47, at 58 (citing Appx16024–16027).

In reply, the government notes that, for the "cost-to-price link," "a company must demonstrate a connection between subsidies received and cost of manufacture, and how a change in the cost of manufacture is transferred to the price of the subject merchandise." ECF 30, at 35 (citing Appx02491–02492). According to the government, Zhongji's accounting records established only how it tracks its usage of these three inputs. *Id.* (citing Appx02492). As a result, the government argues, this information failed to establish a link between the cost of manufacture and the price of the merchandise. *Id.*

The company also spends some time trying to show that (f)(1)(C) is met. ECF 47, at 63–66. The third element of the double remedies test is whether the

---

[27] Zhongji analyzes two cases at length to support the claim that in prior cases the record would suffice to establish a cost-to-price link and argues that Commerce varied from a recent case with similar facts when it should not have (*Certain Quartz*) and instead analogized this case to another investigation with dissimilar facts. ECF 47, at 61–62.

Department "can reasonably estimate the extent to which the countervailable subsidy . . . , in combination with the use of [normal value] determined pursuant to [19 U.S.C. § 1677b(c)], has increased the weighted average dumping margin for the class or kind of merchandise." 19 U.S.C. § 1677f-1(f)(1)(C). By again applying and analyzing *Certain Quartz*, Zhongji argues that Commerce could have used similar methodology to properly estimate the appropriate reduction here. ECF 47, at 65–66.

Finally, the company argues that if the Department found its information deficient, then the agency should have given it a chance to remedy any deficiency, but did not. ECF 47, at 57 (citing 19 U.S.C. § 1677m(d)). But "[t]he interested party that is in possession of the relevant information has the burden of establishing . . . the amount and nature of a particular adjustment." 19 C.F.R. § 351.401(b)(1); *see also NTN Corp. v. United States*, 306 F. Supp. 2d 1319, 1328 (CIT 2004) (same).

3

The question is whether Zhongji "demonstrated" to the Department that the Chinese countervailable subsidy "reduced the average price of imports of the class or kind of merchandise during the relevant period." 19 U.S.C. § 1677f-1(f)(1)(B). The company argues that it did; the government argues it did not.

In its preliminary determination, Commerce explained that (1) a "subsidy to cost link" exists where

there is a "subsidy effect" to the merchandise's cost of manufacture and (2) a "cost to price link" exists where a change in the cost of manufacture results in a change to the price charged to customers. Appx02468 (citing *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 Fed. Reg. 54,106 (Dep't Commerce Oct. 9, 2019), and accompanying preliminary memorandum at 48). The Department explained that Zhongji had "failed to demonstrate that the programs discussed in [its] double remedies questionnaire[ ] have led to a decrease to either input costs or" cost of manufacturing. Appx02469. Commerce also stated that the company had failed to provide sufficient responses to the questions about "cost and price changes during the relevant period." *Id.* In the final determination, the Department reiterated its preliminary findings and concluded that Zhongji had provided "no convincing explanation" and "failed to establish" the results it urged the Department to reach. Appx02491.

The company cites its questionnaire responses and argues that they show that Commerce's decision was incorrect. *See* ECF 47, at 43–44 (citing Appx16029–16030 and stating that they establish a link between input prices, cost of manufacture, and sales prices). The cited pages, however, state that (1) Zhongji "does not have a formal threshold for changes in the cost

item that would lead to adjustment of prices" because any price adjustments result from management discussions and (2) "[t]he price charged to the customer changes based on an agreed reference to the LME ingot price, usually monthly." Appx16030.

The two admissions cited above are enough to support the Department's conclusion. First, the company admits that it does not necessarily adjust prices when the inputs' costs change. Second, the company admits that its pricing changes based on the London Market Exchange ingot price, which presumably has nothing to do with any countervailable subsidies provided by the Chinese government. In other words, whether "the average price of imports" to the United States was reduced is apparently a matter of whether Zhongji's management decides to adjust prices. The Department's conclusion that the company failed to demonstrate eligibility for a double remedies adjustment is therefore supported by substantial evidence.

## C

Finally, Zhongji argues that Commerce's decision not to modify its liquidation instructions to include the phrase "resold or imported" where the company's merchandise was re-invoiced before importation was unsupported by substantial evidence because these instructions will lead to inaccurate and overly punitive liquidation. ECF 47, at 3–4. Zhongji also argues that the Department ignored its concerns about the inappropriate application of the China-wide rate. *Id.* at 15.

The company argues that Commerce erred by not modifying its liquidation instructions because some U.S. customers re-invoiced the company's sales to third parties before importation. *Id.* at 67 (citing Appx24809–24816). As a result of this sales arrangement sometimes a different importer of record appears on the entry documents than the initial customer. *Id.*

Zhongji thus argues that when the Department issued liquidation instructions, the sales subject to the re-sale arrangement would not be assessed duties commensurate with the company's review-specific rate because the importer of record would differ from the initial customer as identified in the sales database. *Id.* at 69 (citing Appx09862–09870). According to the company, this means that, when the re-seller does not appear in the customer database, Commerce's default language would cause these sales to liquidate at the China-wide rate instead of the company's rate. *Id.* at 70. Zhongji therefore argues that the default liquidation language will result in an inaccurate, punitive assessment of duties. *Id.*

In response, the government argues that the Department did not modify its standard liquidation instructions to Customs because Zhongji did not demonstrate how re-invoicing merchandise was unique and warranted a specific deviation in Commerce's standard practice. ECF 30, at 7.

Antidumping laws are "remedial[,] not punitive." *NTN Bearing Corp. v. United States*, 74 F.3d 1204,

1208 (Fed. Cir. 1995) (citing *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103–04 (Fed. Cir. 1990)). The function of antidumping law is to "reduc[e] or eliminat[e] discrepancies in pricing . . . ." *U.S. Steel Grp. v. United States*, 177 F. Supp. 2d 1325, 1330 (CIT 2001); *see also C.J. Tower & Sons v. United States*, 71 F.2d 438, 445 (CCPA 1934) (noting Congress's expressed purpose in the Anti-Dumping Act of 1921 was to impose "an amount of duty sufficient to equalize competitive conditions"). Also, "[t]he purpose of the antidumping law, as its name implies, is to discourage the practice of selling in the United States at [less than fair value] by the imposition of appropriately increased duties." *Melamine Chems., Inc. v. United States*, 732 F.2d 924, 933 (Fed. Cir. 1984). Zhongji cites these cases to argue that Commerce was obliged to tailor its liquidation instructions to ensure that the duties imposed are "appropriately increased" solely to equalize market conditions. ECF 47, at 70–71. While the company tries to explain why that follows on the facts here, *id.* at 72–73, the Department said, "Because the importer of record is information that is available to [Customs], our practice is to issue liquidation instructions on the basis of entered value rather than by U.S. customer." Appx02489. Commerce said it could find no reason to depart from that practice here because the importer of record was unknown to Zhongji. *Id.*

In this case, the Department made its calculation using the reported sales from Zhongji to its listed U.S.

customers. Neither Commerce nor the company knows the specifics of the sales information between those U.S. customers and third-party companies, and the Department's margin calculations did not reflect such information. *See* 19 U.S.C. § 1677a(a) (" '[E]xport price' means the price at which the subject merchandise is first sold . . . before the date of importation by the producer or exporter . . . to an unaffiliated purchaser in the United States . . . .") Because this is general policy and because Zhongji failed—in the agency's eyes—to show why that general policy should not apply here, Commerce adhered to its standard instructions, a decision the government argues is supported by substantial evidence.

After reviewing the record, this court sustains the Department. It is not entirely clear what argument Zhongji is trying to make on this record. The company makes some very general points about the purpose of antidumping law that are correct. But it seems to vacillate between arguing either (i) that some specific aspect of its business makes Commerce's standard liquidation instructions problematic here, or (ii) that, based on the general points the company raised, those liquidation instructions are unlawful as a general matter.

If Zhongji is trying to argue for (ii)—that, in general, the liquidation instructions are unlawfully punitive—it needs to produce far more evidence than a few pages of case analysis. If it is trying to argue instead for (i)—that special circumstances justify an

exception—then it needs to explain more thoroughly what those circumstances are and how they differ from other cases. By not clearly taking either path, the company fails to provide a clear reason why the Department's instructions ought to vary. The court therefore concludes that Commerce's decision was based on substantial evidence.

*   *   *

For the reasons provided above, the court denies Zhongji's motion for judgment on the agency record, grants judgment on the agency record to the government and the Association, *see* USCIT R. 56.2(b), and sustains the Department of Commerce's final determination. A separate judgment will enter. *See* USCIT R. 58(a).

Dated:  June 7, 2023          */s/ M. Miller Baker*
            New York, NY         M. Miller Baker, Judge